# Exhibit 1

```
                                                    Page 1

 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION
 3                      CASE NO.: 6:23-cv-01869-RBD-DCI
 4   ISLAM "SAL" SHIMY,
 5        Plaintiff,
 6   vs.
 7   EASTERN FLORIDA STATE COLLEGE, BOARD OF TRUSTEES,
 8        Defendant.
 9
     _____/
10

     DEPOSITION OF:      ISLAM "SAL" SHIMY
11

     DATE:               THURSDAY, JANUARY 30, 2025
12

     TIME:               11:31 A.M. - 4:56 P.M.
13

     PLACE:              EASTERN FLORIDA STATE COLLEGE
14                       COCOA CAMPUS
                         BUILDING 2, ROOM 113
15                       1519 CLEARLAKE ROAD
                         COCOA, FLORIDA 32922
16

     STENOGRAPHICALLY
17   REPORTED BY:        ANNE MARIE HAMILL
18
19
20
21
22
23
24
25
```

# Exhibit 1

|  | Page 2 |
|---|---|
| 1 | A P P E A R A N C E S: |
| 2 | MELISSA CHRISTINE MIHOK, ESQUIRE |
|  | OF: Mihok Law PA |
| 3 | 409 Durham Shore Court |
|  | Apollo Beach, FL 33572 |
| 4 | 813-549-4550 |
|  | Mmihoklaw@gmail.com |
| 5 | APPEARING ON BEHALF OF THE PLAINTIFF |
| 6 | MARK E. LEVITT, ESQUIRE |
|  | OF: Ford Harrison |
| 7 | 300 S Orange Avenue |
|  | Suite 1300 |
| 8 | Orlando, FL 32801 |
|  | 407-418-2306 |
| 9 | Mlevitt@fordharrison.com |
|  | APPEARING ON BEHALF OF THE DEFENDANT |

1  APPEARANCES:
2  MELISSA CHRISTINE MIHOK, ESQUIRE
     OF: Mihok Law PA
3  409 Durham Shore Court
     Apollo Beach, FL 33572
4  813-549-4550
     Mmihoklaw@gmail.com
5  APPEARING ON BEHALF OF THE PLAINTIFF
6  MARK E. LEVITT, ESQUIRE
     OF: Ford Harrison
7  300 S Orange Avenue
     Suite 1300
8  Orlando, FL 32801
     407-418-2306
9  Mlevitt@fordharrison.com
    APPEARING ON BEHALF OF THE DEFENDANT
10
11
    ALSO PRESENT:  MICHAEL A. RICHEY, J.D.
12          DARLA FERGUSON
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

```
1              I N D E X
2  TESTIMONY OF ISLAM "SAL" SHIMY
3  DIRECT EXAMINATION BY MR. LEVITT          7
4  CROSS-EXAMINATION BY MS. MIHOK          201
5  REDIRECT EXAMINATION BY MR. LEVITT      202
6  CERTIFICATE OF OATH                      203
7  CERTIFICATE OF DEPOSITION TRANSCRIPT     204
8  NOTIFICATION LETTER                      205
9  ERRATA SHEET                             206
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1              INDEX OF EXHIBITS
2  DEFENDANT'S EXHIBITS
3  EXHIBIT NO. 1   CONTRACT OF EMPLOYMENT FOR
                   INSTRUCTIONAL PERSONNEL OF EASTERN
4                  FLORIDA STATE COLLEGE           57
5  EXHIBIT NO. 2   CONTRACT OF EMPLOYMENT FOR
                   INSTRUCTIONAL PERSONNEL OF EASTERN
6                  FLORIDA STATE COLLEGE           63
7  EXHIBIT NO. 3   LETTER DATED APRIL 27, 2022 TO ISLAM
                   W. SHIMY FROM RANDALL P. FLETCHER,
8                  ED.D.                           79
9  EXHIBIT NO. 4   APPENDIX C:  UNITED FACULTY OF
                   FLORIDA/EASTERN FLORIDA STATE COLLEGE
10                 GRIEVANCE FORM                  85
11 EXHIBIT NO. 5   EASTERN FLORIDA STATE COLLEGE
                   MEMORANDUM TO DR. LAURA EARLE, UFF
12                 PRESIDENT; ROBIN BOGGS, UFF GRIEVANCE
                   REPRESENTATIVE FROM DR. DEDRA SIBLEY,
13                 DEAN, STEM & BUSINESS PROGRAMS, COCOA
                   & PALM BAY CAMPUS ADMINISTRATOR
14                 DATED MAY 25, 2022              91
15 EXHIBIT NO. 6   EASTERN FLORIDA STATE COLLEGE
                   MEMORANDUM TO DR. LARA EARLE, UFF
16                 PRESIDENT; ROBIN BOGGS, UFF GRIEVANCE
                   REPRESENTATIVE FROM DR. SANDY
17                 HANDFIELD, AVP ACADEMIC AFFAIRS
                   DATED JULY 18, 2022            93
18
     EXHIBIT NO. 7   EASTERN FLORIDA STATE COLLEGE
19                 MEMORANDUM TO DR. LARA EARLE, UFF
                   PRESIDENT; ROBIN BOGGS, UFF GRIEVANCE
20                 REPRESENTATIVE FROM JACK PARKER, VICE
                   PRESIDENT, EXTERNAL AFFAIRS
21                 DATED AUGUST 24, 2022         104
22 EXHIBIT NO. 8   CHARGE OF DISCRIMINATION FLORIDA
                   COMMISSION ON HUMAN RELATIONS      110
23
24
25
```

**Page 5**

```
1              I N D E X, CONTINUED
2  EXHIBIT NO. 9   LETTER TO MR. ISLAM SHIMY FROM U.S.
                   DEPARTMENT OF JUSTICE CIVIL RIGHTS
3                  DIVISION, KRISTEN CLARKE, ASSISTANT
                   ATTORNEY GENERAL CIVIL RIGHTS
4                  DIVISION DATED JUNE 29, 2023   115
5  EXHIBIT NO. 10  COMPLAINT AND DEMAND FOR JURY TRIAL   119
6  EXHIBIT NO. 11  EASTERN FLORIDA STATE COLLEGE
                   EMERGENCY CONTACT              120
7
     EXHIBIT NO. 12  ISLAM "SAL" SHIMY, MBA
8                  CURRICULUM VITAE               120
9  EXHIBIT NO. 13  EASTERN FLORIDA STATE COLLEGE STATEMENT
                   OF OUTSIDE EMPLOYMENT          122
10
     EXHIBIT NO. 14  PLAINTIFF'S ANSWERS TO DEFENDANT'S
11                 FIRST SET OF INTERROGATORIES   129
12 EXHIBIT NO. 15  PLAINTIFF'S SUPPLEMENTAL ANSWERS TO
                   DEFENDANT'S FIRST SET OF
13                 INTERROGATORIES               130
14 EXHIBIT NO. 16  PLAINTIFF'S SECOND SUPPLEMENTAL
                   INITIAL DISCLOSURES           140
15
     EXHIBIT NO. 17  BREVARD PUBLIC SCHOOLS COORDINATING
16                 TEACHER - SCHOOL ACADEMIES    148
17 EXHIBIT NO. 18  COUNTY SCHOOL BOARD FORM          148
18 EXHIBIT NO. 19  SCHOOL BOARD OF BREVARD COUNTY
                   LETTER TO ISLAM SHIMY FROM KARYLE
19                 GREEN, ED.D., DIRECTOR PROFESSIONAL
                   STANDARDS & LABOR RELATIONS
20                 DATED FEBRUARY 13, 2023       150
21 EXHIBIT NO. 20  SCHOOL BOARD OF BREVARD COUNTY LETTER
                   TO ISLAM SHIMY FROM KARYLE GREEN,
22                 ED.D. INTERIM CHIEF HUMAN RESOURCES
                   OFFICER DIRECTOR PROFESSIONAL
23                 STANDARDS & LABOR RELATIONS
                   DATED FEBRUARY 15, 2023       150
24
25
```

2 (Pages 2 - 5)

# Exhibit 1

Page 6

1   I N D E X, CONTINUED
2  EXHIBIT NO. 21  NORTH MYRTLE BEACH POLICE CASE
            REPORT          155
3
   EXHIBIT NO. 22  BREVARD COUNTY SHERIFF'S OFFICE
4            CASE REPORT        157
5  EXHIBIT NO. 23  EASTERN FLORIDA STATE COLLEGE
            INCIDENT REPORT      161
6
   EXHIBIT NO. 24  TEMPORARY INJUNCTION FOR PROTECTION
7            AGAINST DOMESTIC VIOLENCE WITH MINOR
            CHILD(REN)        165
8
   EXHIBIT NO. 25  EASTERN FLORIDA STATE COLLEGE
9            FOLLOW-UP REPORT    167
10 EXHIBIT NO. 26  OFFENSE-INCIDENT REPORT COCOA BEACH
            POLICE DEPARTMENT    168
11
   EXHIBIT NO. 26A CAPIAS        168
12
   EXHIBIT NO. 27  INFORMATION      168
13
   EXHIBIT NO. 28  FLORIDA DEPARTMENT OF CHILDREN AND
14            FAMILIES REPORTING CONCERNS FOR
            CHILD VICTIMS      171
15
16
17
18
19
20
21
22
23
24
25

Page 7

1           P R O C E E D I N G S
2                *********
3       THE REPORTER:  Would you raise your right hand,
4   please.
5       Do you solemnly swear or affirm that the
6   testimony you're about to give in this cause is the
7   truth, the whole truth and nothing but the truth.
8       THE DEPONENT:  I do.
9       THE REPORTER:  Thank you, sir.
10          DIRECT EXAMINATION
11  BY MR. LEVITT:
12      Q.  Would you please state your name, for the
13  record.
14      A.  It's Islam Shimy.  And I go by Sal Shimy.
15      Q.  And you say it's Shimy, right?
16      A.  Shimy.
17      Q.  Have you ever had your deposition taken
18  before?
19      A.  A deposition?
20      Q.  Yes, like this.
21      A.  There was a possibility on one, but it
22  didn't happen in my family case.
23      Q.  Okay.  So it never happened, so you haven't
24  been deposed?
25      A.  It did, but in the middle --

Page 8

1       THE REPORTER:  Let him finish the whole question
2   before you start to answer.
3       THE DEPONENT:  Yes, ma'am.
4       THE REPORTER:  You cut him off a little bit.
5       Q.  (BY MR. LEVITT)  Okay.  So the question is,
6   were you in a deposition or not?  I'm not clear.
7       A.  Yes, I was in my family case.
8       Q.  Okay.  So I'm going to cover some ground
9   rules.  The first of which is what we just talked about
10  and that is, let's try not to talk over each other
11  because she's got to take everything down.  So, please,
12  let me finish my question and I will do my best to let
13  you finish your answer.  It sounds easier than it might
14  be because in normal conversation we tend to talk over
15  each other and you don't even know it.  So, sort of,
16  take a breath in between, and sometimes I pause and keep
17  going.  So if we have to remind you as we go, it's
18  nothing that you're doing wrong.  It's so we have a good
19  record, okay?
20      A.  Sure.  And when I do I have the right to
21  refer back to my attorney before I answer a question?
22      Q.  You really don't.  At this point, you're
23  under oath to answer questions truthfully unless your
24  lawyer has some type of objection, which she may from
25  time to time.  But even with an objection, you still

Page 9

1   answer the question.  So at this point, you're here to
2   do that.  You can't consult her how to answer, what to
3   do, anything like that, okay?
4       A.  Sure.
5       Q.  It's also important that you answer verbally
6   rather than shakes of the head or nods because if it's a
7   yes or no, if you shake your head, while we all see it,
8   she can't get that down.  So please try to respond
9   verbally as best you can.  And, again, if you slip up
10  there, we might just gently remind you, you know, to
11  answer yes or no, okay?
12      A.  Yes, sir.
13      Q.  Very good.  So far, so good.  You're doing
14  good.  Is there any reason that you cannot give this
15  deposition today?
16      A.  No.  I made all the arrangements that I can.
17      Q.  And you're feeling okay?  You're not sick or
18  anything like that today?
19      A.  Little nervous especially with having
20  Ms. Ferguson and Mr. Richey here.
21      Q.  That's to be expected.  So you've given us
22  your name.  Have you ever been known by any other name?
23      A.  I go by Sal.
24      Q.  Is there any other name other than Islam Sal
25  Shimy?  Any other names you've used?

3 (Pages 6 - 9)

# Exhibit 1

| | Page 10 |
|---|---|
| 1 | A. No. |
| 2 | Q. Any other nicknames you've had over the |
| 3 | years? |
| 4 | A. No. |
| 5 | Q. What's your date of birth? |
| 6 | A. July 3rd, '75. |
| 7 | Q. So this July you will be -- |
| 8 | A. A lot, fifty. |
| 9 | Q. Fifty, all right. |
| 10 | MS. MIHOK: Hey now. |
| 11 | THE DEPONENT: Golden years. |
| 12 | Q. (BY MR. LEVITT) Where were you born? |
| 13 | A. I was born in Cairo, Egypt. |
| 14 | Q. When did you come to the United States? |
| 15 | A. Sometime in 1997 permanently. Before then |
| 16 | during my childhood, I used to come back and forth with |
| 17 | my parents. My dad had a business here. |
| 18 | Q. Okay. You said your father had a business |
| 19 | here? |
| 20 | A. Right. |
| 21 | Q. Did he live in Egypt or here? |
| 22 | A. No. It was mainly in Egypt, but he was in |
| 23 | computer software industry and he used to come to |
| 24 | California a lot. |
| 25 | Q. And so when you traveled here before moving |

| | Page 11 |
|---|---|
| 1 | here, is that just, like, as a visitor? |
| 2 | A. Mainly, yeah. My school and everything was |
| 3 | in Egypt. |
| 4 | Q. What caused you to move here in 1997? |
| 5 | A. Not a specific reason. |
| 6 | Q. So you would have been what, about 22 years |
| 7 | old then? |
| 8 | A. My early 20s, yes. Just graduated my |
| 9 | bachelor's before I moved here. Yeah. |
| 10 | Q. When you moved here, what did you have to do |
| 11 | to be able to move to the United States back then? |
| 12 | A. In terms of financially or... |
| 13 | Q. No. Visa or can you just come? Did you |
| 14 | come on some type of visa? How were you able to move to |
| 15 | the United States in 1997? |
| 16 | A. I was here to finalize my CPA examination. |
| 17 | And I ended up getting married and that's how I got my |
| 18 | permanent residency and my citizenship. |
| 19 | Q. Okay. Are you a U.S. Citizen now? |
| 20 | A. Yes, sir. |
| 21 | Q. When did you get your actual citizenship? |
| 22 | A. I can't recall the exact date. But it would |
| 23 | be a very good estimate if I say 2004 or '05. |
| 24 | Q. You say you got married. When did you get |
| 25 | married? |

| | Page 12 |
|---|---|
| 1 | A. I got married -- |
| 2 | Q. Approximately? We're not going to tell |
| 3 | you -- |
| 4 | A. Yeah, I'll get in trouble. 1998, I think. |
| 5 | Yeah. |
| 6 | Q. Within a year or so after you moved here? |
| 7 | A. Yes, sir. |
| 8 | Q. Is it somebody that you knew before or you |
| 9 | met her when you came over here? |
| 10 | A. No. We actually met in California. |
| 11 | Q. When you came to the United States, where |
| 12 | did you go? |
| 13 | A. I was in Delaware and northern New York in |
| 14 | the beginning when I first came in. And then after |
| 15 | that, I was in Silicon Valley in California. |
| 16 | Q. We're going to cover some of your employment |
| 17 | and education in a moment. What's the name of your wife |
| 18 | that you married in '98? |
| 19 | A. Shelly Shimy. |
| 20 | Q. Shelly -- |
| 21 | A. Um-hmm. |
| 22 | Q. -- Shimy. |
| 23 | A. (Witness nods.) |
| 24 | Q. Do you recall her maiden name? |
| 25 | A. Maria. |

| | Page 13 |
|---|---|
| 1 | Q. I'm sorry. |
| 2 | A. Maria. |
| 3 | Q. Maria. Is that her last name? What was |
| 4 | her -- |
| 5 | A. Her middle. Oh, her last name Serpa. |
| 6 | Serpa. It's from Portuguese. Portuguese. |
| 7 | Q. Can you spell that? |
| 8 | A. S-e-r-p-a. |
| 9 | Q. How long were you married to Shelly? |
| 10 | A. Little under 20 years. |
| 11 | Q. When did you -- I assume you got divorced. |
| 12 | A. I believe the divorce was 2017, '18. |
| 13 | Somewhere around that range. |
| 14 | Q. Where did you get married? |
| 15 | A. We got married in Rhode Island. |
| 16 | Q. Have you been married any other time? |
| 17 | A. Recently in 2000 -- is it '19 or '20 when I |
| 18 | married ███████████. |
| 19 | Q. Can you spell that for the court reporter? |
| 20 | A. Sure. It's ███████ Last name |
| 21 | ███████. |
| 22 | Q. And was Shelly -- going back to Shelly for a |
| 23 | moment, was she a U.S. Citizen? |
| 24 | A. Yes, she was. |
| 25 | Q. And so when you married her, that's when you |

# Exhibit 1



Page 14

1  said you got, sort of, your permanent residence?
2       A.  She's the one that finalized the immigration
3  process.  Yes.
4       Q.  And you --
5       A.  Because at the time -- can I?
6       Q.  Yeah.
7       A.  At the time, I was finishing my CPA for a
8  while and then I was going back.  But when we met, I
9  decided to stay.  Then she came back with me to Egypt
10 for a while.  Then we got married and I stayed here.
11      Q.  You married ▮▮▮ is that how she says her
12 name?
13      A.  She goes by ▮▮▮
14      Q.  ▮▮▮?
15      A.  She goes by ▮▮▮, I believe.  I'm pretty
16 confident that she goes by that.  Her name is ▮▮▮.
17 It's very hard to pronounce, but ▮▮▮
18      Q.  ▮▮▮.  We'll call her ▮▮▮ how about
19 that?
20      A.  Sure.
21      Q.  I'll remember that.  That's my mother's
22 name, ▮▮▮.  So I'll remember that.  Are you married
23 currently?
24      A.  No.
25      Q.  When did you get divorced from ▮▮▮?

Page 15

1       A.  May 20th, '24.
2       Q.  Do you have any children?
3       A.  I do have three children.  I had two
4  children with Shelly.  The older one is Aly, A-l-y.
5  He's currently 23.  He's a UCF IT student.  And Kareem,
6  K-a-r-e-e-m, Shimy.  And he's 19, just graduated high
7  school.
8       Q.  Where does he live now?
9       A.  Both kids are mainly with their mother.
10 Kareem used to live with me until a few months ago, but
11 they come back and forth.
12      Q.  The mother being Shelly, correct?
13      A.  Correct.  She lives in Orlando.
14      Q.  Where does Shelly live now?
15      A.  Orlando.
16      Q.  Do you still talk to Shelly at all or in
17 touch with her?
18      A.  A hundred percent on a regular basis.
19      Q.  Does she work or have a job of any kind; do
20 you know?
21      A.  She used to be housewife majority of the
22 marriage.  And after we got divorced, she has a job with
23 Molly Maid.
24      Q.  And you said you have three children.  Is
25 there another child?

Page 16

1       A.  ▮▮▮.  She is now three years old.
2  And that is from ▮▮▮.
3       Q.  Where does she live?
4       A.  Very complicated, long story.  But right now
5  she's with me full-time temporary.  We're still in court
6  proceedings.
7       Q.  Okay.  So does she still -- do you have
8  temporary custody of her?
9       A.  Our divorce agreement is a 50/50
10 timesharing.  However, the mother has been traveling a
11 lot.  And last I heard, she joined the military.  So she
12 is not available for correspondence, according to her
13 attorney, until about May.  So until May, she cannot
14 resume timesharing.  And once she's done in May, we're
15 going to revisit because based on her military active
16 duty, she might be relocating.  So that may be adjusted
17 so I do have ▮▮▮ full time since a little after
18 Thanksgiving.
19      Q.  Okay.
20      A.  However, since we got divorced in May, that
21 is when we started our agreement of the timesharing of
22 50/50 because prior to that, she kept ▮▮▮ away from me
23 for a very long period of time.  And I would say since
24 May last year until now, I had ▮▮▮ 85 to 90 percent of
25 the time.

Page 17

1       Q.  And what's your current address?
2       A.  3718 W, that stands for west, Malory,
3  M-a-l-o-r-y, Court, Cocoa, Florida, 32926.  It is my
4  parents' house.  And they bought it here to help me out
5  with my situation when we had to leave my house, which
6  my -- where I used to live with my kids, Aly and Kareem,
7  was in Port St. John.  I had a condo there.  But because
8  of the divorce proceedings, ▮▮▮ has control of
9  occupying the unit.  So my parents bought this house to
10 be closer and in the meantime at the time I was still
11 employed by the college so I can be close to the campus
12 because it's about five minutes from here.
13      Q.  Who lives at the house?
14      A.  It is my parents, however, they are in Egypt
15 for a few months now.  Eventually, they will be coming
16 back.  And my fiance or girlfriend or paramour and
17 ▮▮▮.
18      Q.  So when your parents are here, they live at
19 that house?
20      A.  Yes, sir.
21      Q.  You're saying they're currently visiting
22 Egypt for an extended period of time, a few months?
23      A.  That's correct.
24      Q.  What's your father's name?
25      A.  Mohammed.  Mohammed.  Do you want me to

5 (Pages 14 - 17)

# Exhibit 1

---

Page 18

1 spell it?
2     Q. No.
3     A. Mohammed Ali, A-l-i.
4     Q. Does he still have a business here?
5     A. No. He's long-time retired.
6     Q. Retired?
7     A. Yeah.
8     Q. And is he still married to your mother?
9     A. Yes.
10     Q. What's your mother's name?
11     A. Nadia.
12     Q. Nadia?
13     A. (Witness nods.)
14     Q. When did you move into the Malory Court
15 address, the house owned by your parents? When is the
16 first time you, sort of, moved in there on a permanent
17 basis?
18     A. When we bought it. And that was January --
19 what year is this, '25? I would say '23.
20     Q. Were you still employed by the college?
21     A. Yes.
22     Q. We'll get into this in much greater detail.
23 But do you recall when your contract was not renewed
24 here at the college? What timeframe was that?
25     A. I remember that the notice was for April

---

Page 19

1 19th. The meeting with Dr. Flectcher and Dr. Handfield
2 was a few weeks before that. I don't recall exactly
3 when the meeting was.
4     Q. Do you recall the year?
5     A. Oh, '22. So we'll go back to when I moved
6 to Malory, that's '22, not '23.
7     Q. Okay.
8     A. I'm horrible with details. I apologize.
9     Q. That's all right.
10     A. I know it was definitely January.
11     Q. And you were still employed here?
12     A. No, I am not.
13     Q. No. You were at the time you moved --
14     A. Yes.
15     Q. -- you were still employed here?
16     A. That's correct.
17     Q. That's how we know the year?
18     A. Yes. The reason -- the reason why we bought
19 in that particular location is to be close to campus.
20     Q. And before that, you said you had a condo up
21 at Saint John?
22     A. In Port St. John, yes. It's -- do you need
23 an address for that?
24     Q. How long did you --
25     A. Own it?

---

Page 20

1     Q. First, how long did you live there before --
2     A. I -- I bought it. I lived there since I
3 bought it, I believe, 2013 or '14.
4     Q. What happened to that property?
5     A. It's still there.
6     Q. Do you still own it?
7     A. Coowner.
8     Q. So that's the one you said that ███ --
9     A. Right. Right now, it's under marital asset
10 dispute.
11     THE REPORTER: I'm sorry. It's under what?
12     THE DEPONENT: Marital asset dispute.
13     Q. (BY MR. LEVITT) But she has --
14     A. Possession.
15     Q. Possession. I was going to say custody of
16 the house.
17     A. Close enough.
18     THE REPORTER: If we could have questions and
19 answers. You're both, kind of, having a conversation
20 and it's hard to --
21     THE DEPONENT: I'll be quiet. I will speak when
22 I'm asked to.
23     THE REPORTER: Thank you.
24     Q. (BY MR. LEVITT) Now, your divorce from
25 ███, do you recall when that was first filed?

---

Page 21

1     A. Yes.
2     Q. When?
3     A. It was -- I moved to Malory I told you in
4 January '22. So that would be February of that year I
5 filed for the initial case. Because there's two divorce
6 cases. One I filed first, that got negotiated to be
7 dismissed for immigration purposes. Part of what her
8 attorney negotiated with my former attorney at the time.
9 Then after that, there's another case that was filed in
10 '22, in August '22.
11     Q. So you filed first and --
12     A. ███ filed second.
13     Q. Why did that get dropped, you said, for
14 immigration purposes? Can you explain that?
15     A. Sure. When I was working here, I have not
16 lived with ███ for a long period time. It's been on
17 and off. So under the same roof, I wouldn't be able to
18 say we ever did 30 consecutive days. It's been always a
19 conflicted relationship.
20     So when I filed for divorce, I had ███ with
21 me. ███ was at the time -- she was born in
22 September '21. So she was -- she was about four or five
23 months old, give or take. When I filed, she came up
24 with allegations and she filed for an injunction that
25 she was awarded by the Court based on the allegations in

---

# Exhibit 1

Page 22

1 the injunction, temporary injunction, to be issued. At
2 the time ▇▇▇ was working part time here at the
3 college. Without going into details, I'm sure you have
4 that. So with the injunction she specified Eastern
5 Florida State College as a whole as a place of
6 employment that would restrict me from coming to work.
7 That was the whole purpose. So what I did was I filed
8 for -- before -- before any of that happened, once I got
9 issued with the notice, I report at the time to Dr.
10 Daniels, Michael Daniels. So I reported to Michael
11 Daniels what's going on. He already had a very big
12 idea, background of what's been going on for many, many
13 weeks prior to that in terms of escalations and things.
14 Nothing was affecting campus or the safety of my
15 students, so it never reached beyond Michael. So when I
16 got served, the first thing I did, I reached out to
17 Mike. I told him that this is what's happening and I
18 have classes, and I don't know what to do. Am I able to
19 come to campus? How does that work? He's like, no,
20 Sal, if you come to campus, you have the possibility
21 that you would be arrested or you would be in violation.
22     Q. Please keep your voice up --
23     A. Sure.
24     Q. -- so the court reporter --
25     A. Sure.

Page 23

1     Q. -- can get it and --
2     A. Sure.
3     Q. -- speak slowly --
4     A. I'm sorry. But this whole thing is
5 emotional a little bit.
6     Q. Sure.
7     A. I apologize if my voice gets a little bit
8 (unintelligible.)
9     Q. Not a problem.
10     A. But what I did is, he was able to help me
11 find coverage until I filed for a modification, or I
12 don't remember the name of the exact document, but
13 something that would help me to come particularly to my
14 office. I was in building five over here next door to
15 my office and my class, and she was working in building
16 three. I would not go to building three at the time, on
17 a temporary basis, until that case gets resolved one way
18 or the other.
19     And I went there and I stood in front of the
20 Judge. And the Judge continued the hearing for the
21 injunction itself, as my attorney was not available at
22 the time. And they awarded that I can come to work. So
23 my class got covered for a couple of days, then I was
24 able to resume my work. This injunction, temporary
25 injunction, which if you get issued an injunction, as

Page 24

1 far as I know, it's about a year period. It stayed
2 almost seven months. Delaying, delaying back and forth,
3 asking for this, asking for that. It never got heard
4 especially because the allegations itself. You have
5 access to all the documents I'm pretty sure. But I'm
6 not very happy because I would rather have it in the
7 hearing and getting dropped versus those negotiations.
8 But they used the injunction mainly for the family case
9 to negotiate that because my concern was at the time, as
10 long as I was employed by the college, and
11 unfortunately, ▇▇▇ knew that. It was everything to
12 me. My career and my college is what I'm trying to
13 protect from anything that would affect my employment,
14 or my reputation, or my ethical or professional image
15 especially in front of my students and administration,
16 of course.
17     Q. Let me interrupt you here.
18     A. Sure.
19     Q. I want to keep us focused and moving
20 forward. So I think we were talking about you filed for
21 divorce and you mentioned there were some immigration
22 issues that caused that to be dropped. Is that what you
23 told us?
24     A. They used the injunction as a reason to --
25 for me to negotiate that. I dropped and dismissed the

Page 25

1 case, signed a postnuptial agreement until she finalize
2 her immigration process. Because the divorce would
3 cause difficulties and delays for her because she was
4 working here under a work authorization, not under a
5 green card. And that has, you know, a limited period of
6 activeness. It expired one way or another. So they
7 negotiated that I'll do a postnuptial agreement, we'll
8 have shared custody of ▇▇▇ We don't -- we're not
9 going to have -- my main focus was not to have
10 one-on-one interaction with the mother. So we made an
11 agreement 50/50 custody, drop off and pick up only
12 through the daycare. So we don't have to interact, as
13 limited as possible.
14     Q. All right. So the immigration issue, which
15 is what I was trying to understand is -- was ▇▇▇
16 immigration. She was not a U.S. Citizen --
17     A. That's correct. That's correct. She was
18 here on a student visa at the time.
19     Q. And somehow dropping the divorce proceeding
20 would help her status?
21     A. Well -- well -- well, pretty much. You'll
22 have a green card application pending. If you get
23 divorced or legally divorced while this application is
24 still pending and you're not physically issued the green
25 card, that might cancel the green card. So they told me

7 (Pages 22 - 25)

# Exhibit 1

Page 26

1 to dismiss it until she gets a green card.
2      Q. Did she file for divorce at some later time?
3      A. It was not even three months later.
4      Q. Did the green card immigration status get
5 cleared up before she filed?
6      A. What happened was my daughter was attending
7 a daycare in Titusville called KinderCare. And that's
8 where we used to exchange the child. Through our
9 history until today, by the way, this is not done, ███
10 is very notorious with allegations. So the daycare
11 started to have issues because she has been pushing the
12 staff to allegate (sic) through DCF that ███ is not
13 well, or have abuse, some sort of abuse or misconduct
14 with her. Of course, the staff doesn't see anything and
15 when they didn't cooperate, things started to escalate
16 that she's not happy with them or with the situation.
17 So the green card was issued August -- sometime in the
18 first week of August '22 and she received it sometime
19 around the middle of the month. The minute she got her
20 green card, I went to pick up my daughter from the
21 daycare, they informed me that the mother withdraw ███
22 and ███ would not be returning to the daycare, and the
23 mother is seeking sole custody. That's when I tried to
24 contact Legal Aid to see what's going on there.
25      First of all, when I did not find ███ at the

Page 27

1 daycare, I called a standby officer from the sheriff's
2 office to try to pick up ███ from my condo where they
3 live in Port St. John and she refused.
4      Q. Let me stop you a second.
5      A. Sure.
6      Q. Again, I want to keep us focused from early
7 in your employment. Obviously, your relationship with
8 your child and your wife at the time is going to play
9 into this to some extent, but I don't want to get too
10 bogged down and --
11      A. There's so many details.
12      Q. -- that they can't --
13      A. Sure. Sure.
14      THE REPORTER: I'm sorry. That they can't?
15      MR. LEVITT: I don't want to get bogged down.
16      THE REPORTER: Okay.
17      Q. (BY MR. LEVITT) So --
18      A. Let me just finish what I'm saying. I'm not
19 going to go through the story. What I'm saying is, once
20 she accomplished what she wanted to get from me
21 dismissing my case, she withdraw ███ from the daycare,
22 and she literally -- I didn't see ███ for almost two
23 years.
24      Q. And that's when she filed for divorce?
25      A. She filed for divorce and disappeared,

Page 28

1 pretty much.
2      Q. Okay. You say disappeared. Was she not
3 living in the Port St. John property?
4      A. Yes, she was. But in terms of ███, I
5 didn't know the whereabouts of ███ or if they were
6 still physically there or not. But she has
7 possession -- she had possession of the condo based on
8 the dismissal and the postnuptial agreement that we had
9 when I dismissed my case so my daughter would have a
10 place to live.
11      Q. All right. Do you maintain any type of
12 social media? In other words, are you on Facebook or
13 any of those social media platforms where you post
14 things?
15      A. I do. I am. I don't post, but I am. I
16 look at Facebook, yes.
17      Q. Have you ever posted -- going back to this
18 timeframe of 2022, have you ever posted anything
19 relating to the college on your Facebook or other social
20 media?
21      A. The only time I ever posted anything related
22 to the college was when I was employed. After my
23 termination, I never posted anything. When I was
24 employed, there was an event I'm trying to post for. I
25 do have a lot of colleagues on my page. If there's an

Page 29

1 accomplishment for someone, I would like to share, or if
2 I have a guest speaker in my class, which I used to do
3 that a lot and I would like to say this is the guest
4 speaker, this is the point to post. And that was very
5 limited, not much. I'm not making posting anything.
6 After my employment, I never posted anything related to
7 the college.
8      Q. Did you -- just to clarify, did you ever
9 post anything on social media about not being renewed by
10 the college?
11      A. Absolutely not. A lot of my -- I would call
12 them my -- somebody you work with, but you're not
13 friends, what do you call that?
14      Q. Colleague.
15      A. Colleagues. A lot of my colleagues didn't
16 even know about the termination until they heard it from
17 someone else to the point where I was still being
18 asked -- I'm always helping out in different departments
19 especially with the college. I haven't been just on the
20 teaching side, I also been on the staff side as an
21 advisor. And I was involved in many different campuses.
22 I have been visiting all the way from Palm Bay to
23 Titusville, so I do have colleagues all around campuses
24 and whenever they reached out for help with something
25 like a syllabus or a syllabi, or an event they're trying

8 (Pages 26 - 29)

# Exhibit 1

Page 30

1 to do for student recruitments or things like that, I
2 used to talk to them. Never mentioned if I was
3 terminated or not.
4    Q. Now, in preparation for today, did you
5 review any documents?
6    A. I came here to answer questions. I don't
7 even know what documents I should review.
8    Q. And other than speaking with your attorney,
9 which I don't want to hear about that, have you spoken
10 to anyone else about your lawsuit or this deposition?
11    A. Anthony El-Khouri. And it's mainly because
12 he's been reaching out asking questions about it, but I
13 don't give him any details. But he's aware of it.
14    Q. Did you know Mr. El-Khouri before --
15    A. No.
16    Q. -- before the college did not renew you?
17 Did you know him then?
18    A. No.
19    Q. Your paths had not crossed professionally at
20 the college?
21    A. Never.
22    Q. And who reached out to who first?
23    A. Anthony.
24    Q. And do you recall when he first reached out
25 to you?

Page 31

1    A. No. But it was -- it was during the
2 contract termination time.
3    Q. Okay. Are you still in touch with him or
4 he's still in touch with you?
5    A. Every now and then.
6    Q. When he first reached out to you, what do
7 you recall him talking to you about?
8    A. First, he informed me who he is. And he
9 told me, you're not the only one that this happened to
10 you. And he was not happy about his contract being
11 terminated as well. And he was going -- he was -- he
12 was taking it very -- I don't know Anthony on a personal
13 level, but for someone you speak with, especially with
14 my experience with adult students, that he was
15 emotionally and psychologically not feeling well. So I
16 took it more like he's trying to vent.
17    Q. How often would you say you and he spoke --
18    A. Oh.
19    Q. -- from the first time?
20    A. Not often.
21    Q. Every month, every week, once a year?
22    A. Maybe we spoke, maybe, five, six times the
23 whole time.
24    Q. Did he tell you that he filed a lawsuit?
25    A. Yes, he did. And he said that his

Page 32

1 lawsuit -- he was actually -- the reason why he
2 mentioned he wanted to get my permission if he can
3 mention me in his lawsuit that you are a person that
4 happened to have your contract terminated. I'm like,
5 that's public information. There's nothing wrong with
6 that. But I never gave him any ideas of what I think of
7 what happened or whatnot. That is something that I'm
8 not very comfortable talking about.
9    Q. And you have no personal knowledge of what
10 happened to him other than what he told you, correct?
11    A. Other than what he told me, that's correct.
12    Q. Same thing, he doesn't know about your
13 nonrenewal other than what you may have told him, yes,
14 is that right?
15    A. When Anthony reached out to me, that was not
16 the first time I hear his name. The first time I heard
17 his name when I went to Dr. Earle and I explained to her
18 this is what happened to me. And none of my supervisors
19 from the collegewide chair, Dr. Daniels, the dean, Dr.
20 Sibley was even informed that this is something that the
21 administration is going to talk to me about or I have a
22 meeting scheduled with them, which was very alarming
23 that they were not even in the picture. So I went to
24 Dr. Earle to ask, like, I've been really dedicated to
25 the college and I believe I was doing a really good job,

Page 33

1 and I'm not really sure why, but I'm suspecting that my
2 problems with this girl that I married might have
3 something to do with it especially because she's working
4 here, so I don't really know. And I kind of -- I don't
5 like to bring my personal life in my professional life,
6 but I can share a little bit that there is issues that
7 this person is trying to do to me, but I'm trying to
8 keep my personal away from my professional life, so I
9 don't want to bring these problems to the campus.
10    And after I told her, you know, what happened at
11 the meeting and what I've been told by Dr. Flectcher why
12 he's not renewing my contract, she said that this is,
13 kind of, alarming because it's also been happening with
14 other colleagues of yours and she mentioned a few names.
15 Anthony was one of them. Also there was another person
16 from an Arab decent, Anthony El-Khouri. And the same
17 thing happed. So I smell something fishy there. I'm
18 like, I really don't know.
19    Q. Now, you mentioned that the dean and the
20 chair did not know about this in advance. How do you
21 know that? Is that something Earle told you, or did you
22 speak to them?
23    A. As a matter of fact, when I walked out of
24 the meeting with Dr. Handfield and Dr. Fletcher, Dr.
25 Daniels was waiting for me outside because he was just

9 (Pages 30 - 33)

**Exhibit 1**

Page 34

1 curious why did they need me and why doesn't he know
2 anything about it. And he meet me in the parking lot
3 outside and he was devastated to hear what was the
4 meeting about especially he has just conducted my class
5 visit not even a week before and I was waiting for my
6 evaluation, my yearly evaluation. But he, kind of, give
7 me a verbal thumbs up on how he felt that this was one
8 of the most -- he was very cheered. He was very happy
9 with the performance and the engagement with the
10 students. And it wasn't a full class. It was, maybe,
11 15 students in that class when he observed it. But he
12 was very happy and he said that, you know, your
13 evaluation is good, which, by the way, I never got a
14 copy of it until today. But, no, he was not informed.
15 And Dr. Sibley at the time, unfortunately, she was on a
16 medical leave. She had a procedure that she needed to
17 do. So she was not working for a period of time during
18 that. But they were not informed. And when I filed for
19 grievance and I had my grievance with Dr. Sibley, she
20 also mentioned that she was not part of that process.
21     Q. All right. Have you ever been a party to
22 any other lawsuit, other than this one and your family
23 divorce situation?
24     A. Lawsuit?
25     Q. Yes.

Page 35

1     A. Like this?
2     Q. Yes.
3     A. I'm suing someone or someone is suing me?
4     Q. Yes.
5     A. Not that I recall.
6     Q. By the way, before I forget, you mentioned
7 something I meant to ask you. You talked about a
8 girlfriend, paramour, you mentioned being with someone.
9 Do you currently have some other significant other?
10     A. Yes, I do.
11     Q. And who is that?
12     A. You want her name?
13     Q. Yes.
14     A. Suzzie, S-u-z-z-i-e, Acosta, A-c-o-s-t-a.
15     Q. Okay. And how long have you, quote, been
16 with her?
17     A. It's going to sound very awkward, but close
18 to 10 years.
19     Q. That does sound a little awkward. So --
20     A. It was right after my divorce from Shelly.
21     Q. So you've known her for 10 years. Were
22 you --
23     A. Close. I would say eight. 2017 until now,
24 about eight.
25     Q. So at the time that you were married to

Page 36

1 ███████ were you still in some type of relationship with
2 Suzzie?
3     A. That is the time we, kind of, broke up.
4     Q. Okay. So during the short marriage to
5 ███████, which looks like a couple years there, were you
6 still having any type of relationship with Suzzie?
7     A. No.
8     Q. And then after the divorce what happened?
9 Did you get back together?
10     A. It was not after the divorce. It was after
11 she filed that injunction that I mentioned earlier.
12     Q. Okay.
13     A. This is going back on to the too personal
14 stuff. But I'm going to mention what is related to
15 my -- what affect my employment.
16     Q. Keep it short, but go ahead.
17     A. So before ███████ filed for injunction, as I
18 mentioned, I filed for divorce. And I had ███████ with me
19 waiting to have some, sort of, a coordination in terms
20 of timesharing. But when she filed the injunction, when
21 I found out later -- because ███████ has been always
22 jealous of Suzzie and our relationship even though she
23 was already out of the picture, but, you know, she's my
24 ex at the time. So what I found out later that she has
25 been reaching out to Suzzie asking for help allegating

Page 37

1 (sic) that I'm abusing person to Suzzie. And the reason
2 why she reached out to her for two things: To see if
3 she has more dirt on me, and/or Suzzie does work for the
4 sheriff's office in a clerical position. And she's been
5 there for 20 years. She thought, maybe, she had some,
6 sort of, you would say legal advice or something that
7 she would give her. And as a matter of fact, she did
8 help her and told her, yes, if he is doing all these
9 things and he has your daughter, yes, you should file an
10 injunction. That's what you should do and you should
11 get your daughter back. So they were the ones
12 communicating.
13     However, after the injunction was done and now
14 I -- the injunction was a blessing for one reason. Even
15 though it did not stop completely, but I was a little
16 bit relieved from stalking. She has not been stalking
17 me like she used to because of the injunction. However,
18 she did stalk me here on campus and outside campus
19 during the injunction period. But what happened was,
20 Suzzie started to get a little bit fearful from her
21 because she started showing up in her house. We never
22 lived together at the time. But she showed up in her
23 house, trying to talk to there kids, make sure your mother
24 call me. She leave notes on her car, things like that
25 to the point that she reached out to me. Now she knows

**Exhibit 1**

Page 38

1 that there's an injunction between me and her. That she
2 reaching out is like would I -- should I be worried from
3 your wife. And that's how I got her number back or I
4 got in communication back with her. I'm like why you
5 asking. I'm like, it depends who is asking because I
6 didn't know whose number it was. It was a text message.
7 And what is it for. And that's how we starting talking
8 again and we, kind of, end up reconciling shortly after
9 that.
10 Q. Does she live with you at --
11 A. My parents' house.
12 Q. Yes. How long has she been back living with
13 you?
14 A. We rented an apartment together when I was
15 employed that we were able to afford the rent. But once
16 I couldn't carry that weight anymore, that's when we
17 moved in my parents' house and I would say going into a
18 year now.
19 Q. All right. Let's go to some simpler things
20 for a moment. Let's talk about your educational
21 background. Where did you go to high school?
22 A. I went to high school in Cairo, Egypt. It's
23 called -- the acronym for it will be easier for
24 everybody. It's KIS.
25 Q. Okay. And after high school --

Page 39

1 A. It was --
2 Q. -- what college did you go for education?
3 A. The university of Ain Shams. That's A-i-n.
4 Shams is S-h-a-m-s, University faculty of commerce
5 accounting.
6 Q. Where is that?
7 A. Cairo as well.
8 Q. Do you have any type of degree from there?
9 A. Bachelor's in accounting.
10 Q. What other education, if any, do you have?
11 A. Formal education would be Johnson & Wales.
12 And that would be my master's in Rhode Island.
13 Q. Isn't that a culinary school?
14 A. As a matter of fact, that's what they're
15 famous for for undergrad.
16 Q. Okay.
17 A. That's correct. We used to have a lot of
18 beautiful cakes because we were the Guinea pigs. They
19 used to try the stuff on us.
20 Q. What years did you go to Johnson & Wales?
21 A. I graduated right before I moved to Florida.
22 That, I would say 2008 when I graduated.
23 Q. What type of degree?
24 A. Master's in marketing and finance.
25 Q. Do you have any other formal education?

Page 40

1 A. Not that I accomplished. I went to Florida
2 Coastal School of Law, but that's when I was in the
3 process of getting divorced with Shelly and I wanted to
4 be with the kids here. I couldn't be in Jacksonville,
5 so that went out the window. And I did UCF on Ph.D.
6 track, but after all this happened, I cannot get into --
7 pursue that anymore.
8 Q. Did you actually start law school?
9 A. Yes.
10 Q. How far did you get?
11 A. I didn't finish. I had to come back
12 within -- I stayed there three months. So -- so --
13 because at that time, my kids were with me between me
14 and Shelly. And we were discussing divorce. It was
15 mainly just me trying to finish up the school and -- but
16 once we discussed divorce, it was too much for me to
17 stay in Jacksonville at the time. And my LSAT,
18 unfortunately, was not high enough for me to transfer to
19 Barry or FMU, which I tried.
20 Q. Let's talk about your employment. Did you
21 hold any type of full-time employment before you came to
22 the United States?
23 A. Before I came to the United States --
24 Q. Right.
25 A. -- I was most of the time a full-time

Page 41

1 student. And everything I did was part time. And I
2 have been always working especially during the summers.
3 Sometimes in Egypt, sometime overseas. And it's
4 either -- if it's not related to my dad's company at the
5 time, which is related to technology in general either
6 importing computer devices, or hardware stuff, or
7 marketing for software engineering, I did a lot of sales
8 as a kid in terms of during college for other employers.
9 Q. Once you came to the United States, just
10 quickly, can you run us through your different jobs, you
11 know, permanent regular jobs that you had, not part time
12 or short-term jobs?
13 A. Sure. Most of what I did most of my life is
14 being self employed. And I started in real estate
15 shortly after I got married in the late '90s. I started
16 working for Coldwell Banker. And then from Coldwell
17 Banker, I connected with a friend of mine from RE/MAX,
18 and we decided to start our own private label brand real
19 estate company. And that we do residential, commercial,
20 and growth investments, and manage a few hedge funds.
21 Q. Where did you work in real estate? Was it
22 in Florida, Rhode Island?
23 A. Rhode Island.
24 Q. Started in Rhode Island.
25 A. Rhode Island, yes.

11 (Pages 38 - 41)

**Exhibit 1**

Page 42

1    Q. How long did you live in Rhode Island?
2    A. Until I moved to Florida. About 12 years in
3 Rhode Island, give or take.
4    Q. Where did you live in Rhode Island?
5    A. Johnston, Rhode Island.
6    Q. So immediately coming to Florida, you're
7 basically in the real estate business; is that what your
8 testimony is?
9    A. I was, yes. When I came here, I was doing
10 real estate in Rhode Island.
11    Q. What brought you to Florida?
12    A. The kids mainly. The kids were that age
13 that we had very bad couple of winters that took too
14 long. And at the time, if you see the year, I'm talking
15 about 2008 and that was when there was a real estate
16 problem that we had during that time. So we grew the
17 company that we had, about three offices, almost 500
18 agents. I was mainly handling the commercial division.
19 And we decided that this is the time to exit if we want
20 to exit well. And we did.
21    So I sold my share to my partner, the one I just
22 mentioned from RE/MAX. And I sold a couple of
23 properties that I had and brought the kids and we moved
24 down to Orlando for a better environment, better school.
25 We used to put them in a private school in Orlando.

Page 43

1 Many of the kids were at that age that I need to get
2 them somewhere where they can enjoy the outdoors a
3 little more.
4    Q. So were you still married to Shelly?
5    A. Yeah. We moved as a family.
6    Q. Okay. So Shelly and the kids were living
7 with you in Rhode Island --
8    A. Sure.
9    Q. -- and you decided to move to Florida? What
10 brought you to Florida? Was it your parents, or what
11 brought you to Orlando?
12    A. The kids. The kids. We just decided to do
13 Florida. I wasn't sure where to Florida. But, you
14 know, the kids, for the kids would better closer to
15 Disney. We came down for a visit first trying to scout
16 schools. We found a good private school in east side of
17 Orlando that we decided where the kids are going to go,
18 and that's where we ended up moving to. And Shelly is
19 still in that area until today.
20    Q. So once you came to Florida, walk us through
21 your employment.
22    A. I started, first and foremost, working on my
23 licensing. So I worked on getting all my licensing
24 going. So I did my broker license, a reciprocal from
25 Rhode Island for real estate. I turn -- there was an

Page 44

1 opportunity that -- at the time the school was here in
2 Orlando, now it's not, auctioneering school, which I was
3 trying to bring in at the time real estate options into
4 my business. So I sat down for that. I got licensed
5 for that. Then I ended up opening a couple of
6 businesses down in Avalon Park in Orlando.
7    Q. What type of businesses?
8    A. One of them was a Greek restaurant. And the
9 other one was an upscale coffee shop. And a dealership
10 in Winter Park.
11    Q. What did you say, a dealership?
12    A. Used car dealership, that's correct.
13    Q. A used car dealership. Did you own it?
14 Start it?
15    A. Both.
16    Q. What was the name of that?
17    A. Wheels of Orlando.
18    Q. Wheels?
19    A. Of Orlando.
20    Q. Is that still an existing business?
21    A. When -- when I decided to go -- when the
22 Jacksonville thing happened and I was trying to pursue
23 my law career at the time, I ended up liquidating the
24 three businesses by selling them. And I sold the
25 dealership to a gentleman from -- I'm not really sure

Page 45

1 where he's from, from South America. But he's still
2 there. But he renamed it to Volocity Auto and he's
3 still there.
4    Because the name, the way the licensing work for
5 the dealership, it's associated with the license for the
6 location, so I didn't want to give him my credentials
7 with the auctions and stuff like that in case I want to
8 go back in the business. I want to keep that credit, so
9 he just renamed it.
10    Q. All right.
11    A. But the coffee shop and the restaurant, the
12 restaurant is still there, sold out. The coffee shop
13 gentleman that I sold it to did not survive for too
14 long. He closed within two years.
15    Q. When did you first start working for Eastern
16 Florida?
17    A. I started in Eastern Florida State College
18 as an adjunct. I believe that was August 2000 -- it was
19 definitely '14, but it could be '13.
20    Q. Okay.
21    A. And then I started working full time as an
22 academic coach. I'm not sure. Probably 2019 or '18,
23 something like that.
24    Q. All right. So let's assume it was about
25 2014 you started as an adjunct. How did you come to be

12 (Pages 42 - 45)

**Exhibit 1**

Page 46

1 employed as an adjunct?
2    A. Honestly, I applied. I didn't know anybody
3 at the college at that time. I was very new to Brevard
4 County. And the reason why I relocated to the Brevard
5 County at the time because I was looking to get an
6 education. At the time I was thinking about Kaplan or
7 Kaiser down in Melbourne. We were in talks. But I
8 don't like the private section -- sector so much in
9 terms of education. So I decided to move to this area
10 for that and also to be within the 15-mile radius from
11 Shelly. Because at the time, we were not divorced
12 legally yet, but we were talking about divorce it's
13 going to happen, so let's do it the right way. So I
14 ended up buying that condo in 2013/'14 so I can have --
15 be close enough to the kids because, again, they go to a
16 private school. There's no public busses or anything
17 like that. So if they're with me, I want to make sure I
18 am in reasonable distance that I can take them back and
19 forth to school and pick them up and drop them off and
20 all that.
21    Q. So you applied. Was there a particular
22 course --
23    A. Yes.
24    Q. -- you applied for?
25    A. They were applied -- they were looking for a

Page 47

1 marketing professor or a marketing adjunct instructor at
2 the time. And I was called by Dr. Kinner (ph.) She
3 was -- before she came to be a hundred percent online,
4 she was -- her and Dr. Crystal handling that department
5 in the Melbourne campus. And she needed someone right
6 away. It just happened to be -- I'm, kind of, grateful
7 for the opportunity because it was a lot of luck and
8 God's willing to it because it just -- I was there at
9 the right time at the right place. They really needed
10 to cover some classes. Marketing and business program
11 was very new because this is when it was turning to a
12 state college. So all those programs they were looking
13 for someone to help, not just run and manage the
14 classes, but also to build the program itself. So I
15 came in the very beginning and once I interviewed with
16 her and she observed me a couple of my very first
17 classes, she -- she found I was really good fit.
18    Q. Had you had any teaching experience before
19 becoming an adjunct?
20    A. Yes, but not on a formal employment, like,
21 for someone, no.
22    Q. And you say you became full time with the
23 college in 2019. So that's about a five-year period.
24 Did you continue every year to have some adjunct
25 courses?

Page 48

1    A. As long as they have classes for me. Some
2 semesters they will drop me off because the classes
3 didn't make. I would be on the schedule, but the class
4 would not. Again, it was a new program and the online
5 platform was also fairly new especially to the students.
6 It was not a commodity like today. So a lot of times
7 I would be semesters that I would be scheduled for two or
8 three classes, but I end up even with one or none.
9    Q. So you understood as an adjunct, you did not
10 have any type of contract, correct?
11    A. I'm not sure what that means. But I believe
12 so. I don't know.
13    Q. You had no guarantee of employment? If they
14 needed you, they called you --
15    A. Oh, yeah.
16    Q. -- right?
17    A. Yes.
18    Q. And if they didn't have work for you or
19 class for you, then you knew they didn't have to give
20 you any classes, right, at that time?
21    A. Sure.
22    Q. And you're saying over that five-year
23 period, there's some semesters, maybe, they did not need
24 you, you did not teach and there were other semesters
25 you did teach?

Page 49

1    A. It depends on the classes makes or not, yes.
2    Q. Approximately, how many classes a semester
3 would they need you for, assuming it was any. But, I
4 mean, you teach one or two classes, 10 classes?
5    A. They could not give me more than three and I
6 was getting three all the time.
7    Q. So that being a part-time job, did you have
8 other full-time work?
9    A. It was mainly trying to utilize my real
10 estate license at the time. Here in Florida I
11 specialize -- I utilize my real estate license as a
12 broker, real estate broker. I specialize in business
13 brokerage. I sell many (unintelligible) so I do
14 business advising or helping people either to start or
15 exit, or plan an exit, or exit from -- retire from the
16 business or whatnot.
17    Q. Was that a full-time job or just --
18    A. As a self employed, yes, it was.
19    Q. Like, approximately, how much income would
20 you have derived?
21    A. That's very hard to answer because you know
22 how businesses works in terms of expenses and things
23 like that. So you're more than welcome if you can go
24 back to the tax records and look at it. But it was
25 enough to -- for me to support myself and my kids.

13 (Pages 46 - 49)

# Exhibit 1

Page 50

1    Q. And then you're saying 2019, what caused you
2  to seek a full-time position with the college?
3    A. That's a good question. A lot of many
4  different reasons. Number one, my relationship with the
5  college, even though I was an adjunct, I was -- also
6  tried to be as involved as possible with the students
7  with graduation ceremony with all the aspects in terms
8  of community involvement. And now I live in Brevard.
9  Brevard is a very small county. And, pretty much, I
10  wanted to be full-time part of the college itself, even
11  though, when I started, I'll be very frank with you, I
12  started at $28,000 a year, which was not a lot of money.
13  That was not a motivation for me. The motivation for me
14  is to actually be a full-time part of the college as an
15  employee doing what I believe in.
16    Q. All right. So what was the first full-time
17  job you had with the college?
18    A. An academic coach. It was a new position.
19  It was under the umbrella of student success center by
20  Dr. Sibley -- Dr. Sidoran. And it was a very
21  competitive position. And I was lucky enough to get in.
22  It was brand new at that time. And it was just three of
23  us -- or, actually, one each campus, so four of us. But
24  three of us ended up staying. And we were a great team.
25  We mainly -- our focus was working with student

Page 51

1  retention, not recruitment, retention, making sure our
2  students stay in school and graduate. I was in the
3  Cocoa campus here.
4    Q. Who hired you?
5    A. Dr. Sidoran.
6    Q. You said the pay was about 28,000?
7    A. No, it was 28,000. I remember because I was
8  joking in my head about it, like, what am I doing.
9    Q. You had regular employee benefits then,
10  insurance --
11    A. Sure, absolutely. And Friday off. All that
12  was a selling point.
13    THE REPORTER: Sir, you have to wait for the
14  question.
15    THE DEPONENT: I apologize.
16    MS. MIHOK: Just a little word of advice. Maybe
17  count in your head to two --
18    THE DEPONENT: Sure.
19    MS. MIHOK: -- give me a chance to object, and
20  then answer.
21    THE DEPONENT: You haven't objected yet. You
22  need to object a little bit.
23    MS. MIHOK: If this was criminal court, maybe.
24    Q. (BY MR. LEVITT) Did your job change with
25  the college after academic coach?

Page 52

1    A. Yes, sir, it did. Our department grew. And
2  we became advisors and we had a little bit more tasks.
3  There was a little bit more structure to it. So my
4  title was changed from an academic success coach to
5  academic success advisor. And they help us for our team
6  to get paid an advisor's salary, which if I recall, we
7  got bumped up from 28,000 to 35,000.
8    Q. Do you recall when you got that or changed
9  jobs, or how much after you had the first job?
10    A. At most one year, if not less.
11    Q. And how long were you in that job?
12    A. Until I got hired by the faculty position.
13    THE REPORTER: By the what position?
14    THE DEPONENT: Faculty. Faculty. Sorry. My
15  accent sometime is...
16    THE REPORTER: Well, you're speaking very fast,
17  you have a heavy accent, and you keep cutting him off.
18  So it's very difficult to take your testimony.
19    Q. (BY MR. LEVITT) Keep it slow and loud.
20    A. Sure.
21    Q. How did you come to be hired as a faculty
22  member?
23    A. As an adjunct instructor, you always have
24  access to the internal applications, if they're
25  advertising a position internally. Even though I have

Page 53

1  started as an academic success coach and academic
2  success advisor, I've never stopped teaching. I always
3  stayed an adjunct. So I would teach in the
4  non-conflicting hours of my work. So I would either
5  teach at night or online. So I've been always with the
6  department. I never left it since I started.
7    And this was not my first time applying for that
8  position. I, actually, applied for that position before
9  and Steve got that job at the time. It was the same
10  position but in Melbourne campus. However, the focus
11  was for HR, which I am marketing/finance. So the
12  need -- it was a great interview. It was great feedback
13  from the interviewing panel, but I did not get the
14  position at the time. So this was my second time to
15  apply. I got the job on my third time to apply.
16    The first time I applied with Dr. Dukes here on
17  the Cocoa campus got the position. And I was her runner
18  up. And I, actually, ended up working with her a lot
19  when she was in that position. And the third time was
20  the charm. That's when I got the position.
21    Q. All right. So what was the process? You
22  had to apply? Was there a committee or interview?
23    A. It's a series of interviews. It's not one
24  interview when it comes to faculty hiring. I don't
25  recall it was two or three interviews. Immediately, the

14 (Pages 50 - 53)

**Exhibit 1**

Page 54

1 final interview at the time when the structure was
2 different was with a provost.
3     So you go through the department chair interview
4 then the committee interview. That's the main interview
5 where you actually demonstrate a 50-minute class of
6 teaching structure. They asking all the questions. And
7 then they recommend three finalists to the provost.
8 This process had happened every single time, so it's
9 been consistent. And then out of -- I have been three
10 times in the final three, the three times I applied. It
11 was just the third time was the finalist.
12     Q. Who was the provost that was the final
13 person who interviewed you the time that you got it?
14     A. The time I got hired?
15     Q. Yes.
16     A. Dr. Sibley. She was the dean -- she was the
17 provost of the Cocoa campus.
18     Q. And was hiring them by campus, so you were
19 hired for the Cocoa campus, correct?
20     A. Correct.
21     Q. And is it your understanding that the
22 provost then, sort of, had the final recommendation?
23     A. That's correct.
24     Q. Was Dr. Sibley, the other two times you
25 applied, was she also the one, the provost?

Page 55

1     A. No. The one before that was the Melbourne
2 campus. That was Dr. Handfield. The first time Dr.
3 Newman, may she rest in peace, she was the provost here
4 in the Cocoa campus.
5     Q. So you get hired for the 2020 school year,
6 like, August 2020 for that year, correct?
7     A. I don't remember the dates, but sure.
8     Q. Okay. Do you recall your first year
9 teaching was the 2020/2021 school year?
10     A. That sounds about right. At the time I was
11 success advisor and then when the time came to switch,
12 we switched.
13     Q. Okay. And when you got hired as a full-time
14 instructor, were you given an annual contract? Is that
15 how it worked?
16     A. I believe so, yes.
17     Q. And did you understand that the contract was
18 for that school year, correct?
19     A. Correct.
20     Q. What department or position did you hold
21 that first year?
22     A. Business instructor.
23     Q. What -- does that have a department, a
24 business department?
25     A. Under business department.

Page 56

1     Q. And that first year, who was your
2 supervisor?
3     A. Before the restructuring of collegewide
4 chairs, when we still had the provost system, my direct
5 supervisor -- I report to Dr. Sibley.
6     Q. To the provost?
7     A. To the provost. I report to her. But the
8 person that handled the schedule is the department
9 chair. And that was Dr. DeCaro.
10     Q. What was the name?
11     A. DeCaro. D-e-c-a-r-o.
12     Q. And he was the department chair --
13     A. She.
14     Q. -- at the time? She was the department
15 chair?
16     A. Yes.
17     Q. Who did your evaluation?
18     A. In the beginning, Dr. Sibley. And then once
19 they hired a collegewide chair and they changed the
20 provost to deans, it was Mike Daniels, who was new to
21 the college at that time.
22     Q. The first year, did it change that first
23 year?
24     A. I'm not sure it was after the first year or
25 during the first year. I don't recall when the change

Page 57

1 exactly happened.
2     Q. So at that point they went to a collegewide
3 chair; is that what you're saying?
4     A. That's correct.
5     Q. And who was your first collegewide chair?
6     A. Michael Daniels.
7     Q. Throughout the course of this deposition, I
8 may be showing you some documents to look at. Just take
9 a second to look at it. Give this copy to your lawyer,
10 please. Marking as Exhibit 1.
11     (Deposition Exhibit 1 was marked.)
12     Q. (BY MR. LEVITT) Does this look familiar?
13     A. It has my signature on it.
14     Q. Okay. And this appears to be an annual
15 contract. It says for the 2020/2021 academic year
16 beginning 8/13 of 2020. Do you see that in paragraph
17 one?
18     A. Yes, sir.
19     Q. Does that refresh your recollection that's
20 the first year you were a full-time instructor?
21     A. Yes. That's accurate.
22     Q. Did you understand under this annual
23 contract, it's set out in paragraph five if you need to
24 take a moment to look at that, there was no obligation
25 of the college to hire you after this year, correct? It

15 (Pages 54 - 57)

**Exhibit 1**

Page 58

1  was up to their discretion, correct?
2      A. Yes.
3      Q. What is the typical load of a full-time
4  instructor in the term of credits or points, load
5  points, things like that?
6      A. If a class is three credits, you have to
7  have a minimum of five.
8      Q. Would that be 150 load points?
9      A. You mean 50.
10     Q. Your entire schedule, wouldn't that be 150
11  total load points?
12     A. Oh, I don't remember the load points. I
13  remember three credits per class.
14     Q. So 15 credits --
15     A. Yes.
16     Q. -- is the normal workload, correct?
17     A. The minimum, yeah.
18     Q. And when you first got hired, is that what
19  you taught that first semester was the regular load?
20     A. I have always had more than that because
21  my -- what I am qualified to teach covers a lot of broad
22  for our department. So I used to do hospitality. So
23  hospitality was a new program. So I was doing most --
24  almost all the classes for that. Either bachelor of
25  classes, nighttime. I was doing the traditional

Page 59

1  business instructor classes, which is the finance
2  business introduction stuff. So I would say, if you
3  want to average it out, I would say seven, eight, nine
4  classes.
5      Q. So you've identified five classes was the --
6  your normal schedule --
7      A. Yes.
8      Q. -- your regular schedule?
9      A. Yes. That's your contract schedule.
10     Q. Okay. And that's -- your salary covered
11  those --
12     A. Sure.
13     Q. -- five classes?
14      If you taught additional classes, did you
15  receive any additional payment?
16     A. Just like an adjunct instructor.
17     Q. Okay. So so many dollars for teaching a
18  class?
19     A. Yes.
20     Q. Do you recall what the pay was back then?
21     A. No clue. I remember the contract because I
22  know the first one was that, whatever is in here, 43750
23  and then it went up, like, I think to 45 the second
24  time, the second.
25     Q. The extra courses you taught above your

Page 60

1  load, that was dependent upon what the need was and what
2  the students needed, correct?
3      A. A hundred percent. And the classes have to
4  make just like what happened when I used to be an
5  adjunct.
6      Q. Okay. So you're like an adjunct for those
7  courses, right?
8      A. That's correct. That's exactly what it is.
9      Q. So there are courses you may have been
10  assigned, but didn't make, and you didn't teach them,
11  right?
12     A. Right. The only difference between 2019 and
13  2014 (sic) is COVID hit and online became a very
14  popular platform. And most of the classes -- I don't
15  think I had any classes that didn't make. I didn't have
16  any classes that didn't make.
17     Q. And was your contract for two semesters,
18  like, fall and spring? Is that your base contract?
19     A. Right. Like, the summer is extra.
20     Q. Right. So the contract did not cover any
21  summer work, correct?
22     A. It did not.
23     Q. Did you teach sometimes in the summer?
24     A. Always.
25     Q. But those would be as an adjunct, if you

Page 61

1  will, the supplemental courses?
2      A. Correct.
3      Q. And you were paid per course for that?
4      A. Correct.
5      Q. And you're not obligated to teach summer --
6      A. That's correct.
7      Q. So that first year, how did that go? What
8  were your evaluations, if you recall?
9      A. That first year, if I recall correctly, I
10  was evaluated by Dr. Sibley. And my evaluation was
11  satisfactory. And we were setting up the goals of --
12  usually when you are in your first year, you start
13  planning for your tenure portfolio and your goals in
14  terms of setting that up. And I believe I accomplished
15  all of it by my second year, but that's irrelevant. But
16  it was satisfactory to answer your question.
17     Q. How long, if you know, by state law or
18  contract do you serve as an annual contract employee
19  until you can get continuing contract?
20     A. I'll tell you what my understanding is
21  because when it comes to contract law, I know nothing
22  about it. But my understanding is, as long as your
23  evaluation is good and your student surveys is good,
24  you're, pretty much, renewed for the next year. That's
25  our -- what we are as faculty accustom to to the point

16 (Pages 58 - 61)

**Exhibit 1**

Page 62

1  that sometimes we would be in the classroom in August
2  and our contracts have not arrived yet.  So it's not
3  something that we worry about.
4      Q.  But you looked at your contract, Exhibit 1,
5  that says they don't have to retain you.  But you're
6  saying if you did good, it was your understanding they
7  typically would?
8      A.  That's correct.  That's correct.
9      Q.  Did you ever hear of faculty members who did
10  not get renewed?
11      A.  No.
12      Q.  And then after a year, did you get a second
13  contract, another annual contract?
14      A.  After this one?
15      Q.  Yes.
16      A.  Yes, sir.
17      Q.  So you had that for a year and then they
18  decided to keep you at the end of the year; is that
19  right, to retain your services?
20      A.  I don't know how to answer that because they
21  don't -- we don't have a meeting or an announcement if
22  we're going to be kept or not.  Usually we know that
23  we're coming back and we come to the welcome back
24  faculty reception in Melbourne.  And a couple of weeks
25  later, you'll have in your internal mail the new

Page 63

1  contract, and you just work with your schedule with your
2  department chair, and that's it.  It's not something
3  that we talk about.
4      Q.  You came to learn, did you not, that if
5  they're not retaining you, they do tell you that?
6      A.  That's correct.
7      Q.  So if you don't hear they're not, you, sort
8  of, assume they're going to and you'll get a contract,
9  right?
10      A.  That's correct.
11      Q.  And so after a year before the second year,
12  for the '21/'22 year, did the college give you another
13  contract for another year?
14      A.  Yes, sir.
15      Q.  And I'll mark as Exhibit 2 what appears to
16  be the contract we just spoke about.  Keep the top one,
17  give your attorney the second one.
18      A.  Sure.  Yeah, I was right, 45.
19          (Deposition Exhibit 2 was marked.)
20      Q.  (BY MR. LEVITT)  Do you see in paragraph one
21  it's saying for the 2021/'22 academic year, correct?
22      A.  Sure.
23      Q.  Sets out your salary, right?
24      A.  Sure.
25      Q.  This is similar to the first one we looked

Page 64

1  at, correct?
2      A.  Pretty much identical, yes.
3      Q.  And paragraph five, again, says there's no
4  obligation of the college to keep you after this
5  contract.  Do you see that there?
6      A.  Yes, both signed by Dr. Richey.
7      Q.  Did you know at the time that the process
8  the college uses -- strike that.
9          Did you know that if you're not going to be
10  renewed, the college has to tell you at some point in
11  time that you're not getting a contract, right?
12      A.  That was not a concern.
13      Q.  Did you understand that there was some
14  timeframe that they had to make a decision, or you
15  didn't know?
16      A.  No, I didn't know.
17      Q.  Did you understand the process the college
18  went through and recommendations by the vice president
19  to the president as far as recommending whether someone
20  was kept or not kept?
21      A.  Not like that.
22      Q.  You didn't have any knowledge how that
23  worked at the time?
24      A.  The only knowledge I know is your direct
25  supervisor and dean, they look at your student surveys

Page 65

1  and your evaluation and based on that, they make their
2  recommendations to their higher ups, which is the ones
3  you mentioned.  I didn't know that those are the ones
4  that make decisions based on all the circumstances.
5      Q.  Those people would make recommendations,
6  but, ultimately, the president -- did you understand the
7  vice president of academic affairs is the one who makes
8  recommendations to the president?
9      A.  I was not aware of that, no.
10      Q.  If you know, and maybe you don't, do you
11  know if the president's recommendations have to be
12  approved or get sent to the board of trustees?
13      A.  I didn't know when it comes to faculty
14  contracts.  I know -- I know for other things in terms
15  of events and stuff we need to do -- the college that
16  the board of trustees has to be involved when it comes
17  to budgeting and SGA, you know, when we do that, Black
18  History Month or we do the Hispanic History Month or any
19  of those events that we're looking for specific
20  approval, we know that the board of trustees are
21  involved.  But when it comes to faculty contracts or
22  employee contracts in general, I didn't know that they
23  were involved.
24      Q.  Were you aware that the faculty had a union
25  representation, the collective bargaining agent, that

17 (Pages 62 - 65)

**Exhibit 1**

Page 66

1 represented faculty?
2     A.  Yes, I knew.  And that's how -- why I joined
3 the union.  I never -- before -- before my employment
4 here, I'm not familiar with the union or the structure
5 or the process.  All that I know is they take a fee out
6 of every paycheck and they say you are a part of a fun
7 thing after graduation every year.
8     Q.  Did you know you had a choice whether or not
9 to join?
10     A.  Yes.  It's not mandatory.
11     Q.  And you chose to join?
12     A.  Sure.
13     Q.  You were a dues-paying member; is that
14 right?
15     A.  Yes.
16     Q.  You chose to join and pay dues to the union,
17 correct?
18     A.  Correct.  For reasons, yes.
19     Q.  Did you hold any office with the union?
20     A.  No.  I was more interested in their events
21 and having being able to be involved in collaborating
22 and networking.
23     Q.  So the second year, what campus did you work
24 at?
25     A.  Same campus.  Same office.  Cocoa campus.

Page 67

1     Q.  And by that time, was the new format in
2 place?
3     A.  I do believe so.
4     Q.  So who was your direct supervisor in year
5 two?
6     A.  Michael Daniels.
7     Q.  And he was what position again?
8     A.  Collegewide chair.
9     Q.  And if you know, who would he have reported
10 to?
11     A.  Dr. Sibley, the dean.
12     Q.  And she was just the dean for Cocoa?
13     A.  I believe the reason for the change, for the
14 vision that the college was looking at at the time is
15 not to have individuality for campuses, to have a
16 collegewide organization.  So it was not campus focused
17 anymore.
18     Q.  Did you know who Sandy Handfield was at the
19 time?
20     A.  Of course.
21     Q.  What was her position in that second year as
22 you understood it?
23     A.  AVP of academic affairs.
24     Q.  And that's associate vice president?
25     A.  Associate vice president of academic

Page 68

1 affairs.
2     Q.  And did you understand her responsibility
3 covered all campuses with the new model?
4     A.  Not in details, but I know she is,
5 ultimately, overlooking faculty.  Yes.
6     Q.  And did you know that she reported to Dr.
7 Randy Flectcher as the vice president of academic
8 affairs?
9     A.  As far as I remember the structure, it was
10 Dr. Flectcher then goes down to Dr. Handfield and Dr.
11 Sidoran, student affairs, academic affairs.
12     Q.  In the second year, what classes did you
13 teach?
14     A.  Specific classes?  I wouldn't remember
15 specific classes.
16     Q.  Did anything change from the first year?
17     A.  No.  It was, pretty much, on the same track
18 except that no classes -- again, hospitality was a new
19 program, so there was things we were doing to try it
20 out.  And at the time I was a member of the committee of
21 putting the, you know, classes together.  So we were
22 putting -- to put a real estate program together at the
23 time.  But I didn't get to teach those classes,
24 unfortunately.
25     Q.  So you had your regular load of five

Page 69

1 classes?
2     A.  Five classes.
3     Q.  Did you continue to teach adjunct or
4 supplemental classes?
5     A.  That's correct.
6     Q.  Same basis?  If a class made -- there would
7 be a class for you if it didn't make, maybe, you didn't
8 teach it, things like that?
9     A.  That's correct.  And I was, actually --
10 after the end of this contract for the summer even
11 though that particular summer, because of personal
12 situations I was going in, I was planning to take the
13 summer off.  And I was asked by my superiors if I would
14 still do my adjunct for the summer and I said yes.  And
15 I was scheduled for the summer.
16     Q.  Who did you speak to about that?
17     A.  Dr. Daniels and Dr. DeCaro.
18     Q.  And you're saying that's the second summer,
19 so summer of 2022, correct?
20     A.  The summer that I was not allowed to work
21 and teach my classes, yes.
22     Q.  That was after you were told you were not
23 being --
24     A.  Correct.
25     Q.  -- brought back?

18 (Pages 66 - 69)

# Exhibit 1

Page 70

1  You said something, you said you were not
2  planning to teach the summer, you were going away?
3      A.  No.  I just -- that was when things was
4  escalating with my divorce situation a lot.  And I
5  really wanted to take the summer to, kind of, focus on
6  getting all the drama resolved.
7      Q.  Were you actually scheduled for courses in
8  the summer?
9      A.  I was.
10     Q.  Do you know how many?
11     A.  I wouldn't be sure.  But definitely no more
12  than five, no less than three.  But I know I had, at
13  least, three to five.  Mostly -- most likely five, but
14  don't quote me on that because I really don't remember.
15  And they were scheduled and they were already -- I was
16  already corresponding with students, discussing the
17  syllabus with them.  I was their instructor until the
18  notification came.
19     Q.  So as that year, the '21/'22 school year was
20  coming to an end in April of 2022, what happened?
21     A.  What happened is what I mentioned earlier.
22  I got an e-mail with an event notification for a meeting
23  scheduled with Dr. Handfield and Dr. Flectcher, which
24  Dr. Flectcher have no prior arrangements of having a
25  meeting directly with me.  However, we've met in the

Page 71

1  past through venues.  But I was not involved directly
2  with him because not even a couple weeks earlier I was
3  with him at the coalition education of Brevard summit
4  that was in Rockledge and a few of us were there.  Of
5  course, Dr. Flectcher was the main representative for
6  the college and there was about five, six of us.  But
7  it's usually stuff I get corresponded by other people.
8  By the way, we going to be doing this and Dr. Flectcher
9  might be there.  But not like Dr. Flectcher want to talk
10  to you.  Who I am for him to talk to me?  About what?
11     So when I got the e-mail, I was, okay, maybe.
12  As a matter of fact, I thought it was related to
13  something positive because at the time we were looking
14  to add a few curriculars and program in the department,
15  and I thought maybe Dr. Handfield just wanted to pick my
16  brain in regard to these particular things.  So I went
17  with that understanding.  However, I still was curious.
18  I'm being called by boss's boss's boss.  So I reached
19  out and Dr. Sibley was out, so I reached out to Dr.
20  Daniels, like, I got invited to this meeting, are you
21  going to be part of this meeting or do you have any idea
22  what this meeting about so I can, at least, be prepared,
23  especially, it is right after my class and it's in
24  Melbourne.  And there was a conflict there, but not
25  important.  I can leave it to go to that meeting.  It

Page 72

1  was here on campus.  It was just one of the student's
2  activities I used to conduct.  So he's, like, no, I have
3  no clue.  I'm like -- Dr. DeCaro, I reached out to Dr.
4  Daniels straight up.  I reached out to Dr. DeCaro, and
5  he's, like -- if there's anything going in the
6  department, is that meeting you guys are part of it or
7  just me.  And he's, like, what meeting.  We don't know
8  what you're talking about, Sal.  Nobody had any
9  information.
10     Q.  So you got invited to a meeting that you
11  understood was going to be Dr. Handfield and Dr.
12  Flectcher, correct?
13     A.  Correct.
14     Q.  And did you go to the meeting?
15     A.  Yes.
16     Q.  And tell us what happened at the meeting.
17     A.  What happened at the meeting is, I walked in
18  there.  And then the bubbly language I got from Dr.
19  Flectcher coming in, he's, like, he didn't know that
20  that was me.  Because we've been physically -- like, me
21  and Dr. Richey now see each other, he might see me in a
22  group, but he wouldn't remember.  I'm not very
23  significant to remember exactly my name or who I am, but
24  I'm a person in the committee or in the place that we're
25  representing the college.  And he would tell me, all

Page 73

1  right, you did a great job, good job, Sal.  Then when he
2  came in, I could see that he was puzzled.  He's like the
3  person I'm coming to meet is really you.  And then we
4  went in there.  And he was sitting on the side, Dr.
5  Handfield in front of me.  And, you know, we're here,
6  Sal, because -- she handed me the letter -- because of,
7  unfortunately, we're doing this.  And she gave me the
8  letter of that they're not planning to renew my
9  contract, and that I should have my office cleared by
10  April whatever date.  So I thought, I'm like, I'm not
11  really sure I understand, like, is there a reason why.
12  I was just talking to my supervisor literally and he
13  just did my class evaluation and I'm over-performing.
14  I'm doing very good.  Is there situation with the
15  students?  I even logged in Canvas and looked at the
16  student surveys all the way back to today.  You know, I
17  talked to other professors.  I can see these surveys are
18  above average.  They're not even average.  They're above
19  average.
20     Q.  Did you check Canvas and student surveys
21  before the meeting?
22     A.  I always do, but I did -- I did check before
23  the meeting.  I don't remember, honestly.  But I believe
24  no.  I believe after the meeting I just make sure that
25  maybe I look in there there's a problem that I'm not

**Exhibit 1**

Page 74

1 aware of.
2    Q. So go back and tell us the best you can
3 recall what they said to you, and what you said. I
4 don't want what you're thinking; I want to know what
5 happed literally at the meeting.
6    A. No, no, no. It's always -- again, this has
7 been very hard for me to remember.
8    Q. Sure.
9    A. It's been emotionally important, so I
10 blocked a lot of it.
11    Q. Just as best you can recall.
12    A. Okay. All I remember Dr. Handfield and push
13 the thing to me. It's like this. And I look at it. At
14 that time I really didn't need as much glasses as today.
15 But I'm, like, we're not renewing the contract. I'm,
16 like, this is really surprising for me. I'm coming here
17 with a completely different energy, completely different
18 intention. I thought you were giving me a promotion.
19 And I usually joke around a lot. What's going on?
20 She's like, unfortunately, this is how it is. And she
21 pointed out to Dr. Flectcher. It's based on Dr.
22 Flectcher's -- actually, it's not my decision. It's Dr.
23 Flectcher based on his recommendation to the president.
24 And he recommended this to the president. And that was
25 the decision made.

Page 75

1    I'm like, first of all, with all due respect to
2 you, to the board of trustees, to Dr. Flectcher himself,
3 and Dr. Richey -- we all love Dr. Richey. We've been
4 working under him for a very long time. Dr. Richey
5 doesn't even know me to recommend me or not. So it's
6 going to be based on somebody saying something. It's
7 not going to just come out, Dr. Richey say Sal is good
8 or Sal is bad because he doesn't know Sal from Adam. So
9 where does that come from? So I told Dr. Richey -- Dr.
10 Flectcher, what is the -- what is -- what is the main
11 reason. He would not give me a specific reason. I'm
12 like, okay, is it, and I brought it up because I have
13 been communicating with Mike Daniels in particular in
14 the absence of Dr. Sibley about all the problems that
15 was going on with my marriage and whatever that person
16 is doing to me. And I brought it up right then and
17 there in the meeting does she have something to do with
18 this or the pending allegations because, again, I did
19 not get the chance to be asked any questions or
20 defending myself because if she brought this to the
21 college. I know right now she's a college employee. I
22 have the right to say my side of what's going on. As a
23 matter of fact, I've been reporting everything to Dr.
24 Daniels and he's the one just saying, keep it there as
25 long as the safety of the students are good. I'm like

Page 76

1 okay, but there's some stuff need to be said.
2    Q. I want to remind you, I want to hear what
3 was said. Now you're telling us what you're thinking
4 why --
5    A. No, this is what I said.
6    Q. You said all that to them in the meeting?
7    A. That's what I said. It's related to her and
8 the allegations that she possibly have on me and I'm
9 going to get a chance -- yes, I did. I brought it up
10 because I thought that maybe that have something to do
11 with it because the reason why I said that because he
12 said it's your professionalism that would have a problem
13 with that particular position, especially, a faculty
14 position, and a very long-term position with the college
15 and based on our private resources of information, your
16 professionalism is not fit for the position. I'm like
17 my professional -- you were just with me commending me
18 on my work last week face-to-face not knowing me from
19 Adam and talking to me as Sal telling me how I'm amazing
20 job representing the college in the Brevard County
21 committee, not just with -- inside the college and today
22 you're coming to tell me, less than a week later or a
23 week later in my face now your professionalism is a
24 problem. How does that make sense? And that's exactly
25 what I tell to him, just like that. And he's like, I

Page 77

1 don't have to tell you anything. It's up to Dr. Richey.
2 Dr. Richey already took the decision. I'm like, Dr.
3 Richey doesn't -- with all respect, he doesn't know.
4 It's based on -- you saying it's based on your
5 recommendation and my supervisor doesn't even know.
6 He's the one that did my evaluation and he said I'm
7 doing amazing job. Where is that coming from?
8    He's like, you can apply for any other position.
9 We can have you as a staff position based on your
10 professionalism, but not a faculty position. And that's
11 where we stand. And that's where we're at.
12    Q. Is it Dr. Flectcher saying this or Sandy
13 Handfield?
14    A. Dr. Flectcher.
15    Q. So he tells you it's professionalism?
16    A. That's correct. And that's why I brought up
17 the possible allegation with Asman if she had something
18 that said or whatever.
19    Q. All right. Anything else said at the
20 meeting, or how did it end?
21    A. Yes.
22    Q. Yes, tell me.
23    A. Then I switched back to Dr. Handfield. I
24 took it as a champ because, again, I am not here for the
25 money or the fame. It was something I'm very passionate

20 (Pages 74 - 77)

Veritext Legal Solutions
800-726-7007                                          305-376-8800

**Exhibit 1**

Page 78

1 about. This is my home. I planned all my life.
2 Actually, there was a promise when I did the interview
3 panel with Dr. Handfield before and with Dr. Sibley, I
4 promised that if I get into a faculty position, I am
5 retiring from here. That's -- that's (sic) was my
6 intention. I'm here to stay to retire, to take care of
7 my students and that's how I used to -- I was building
8 relationships. I was not just teaching.
9       So -- so it was very emotional and very
10 passionate to me. You're taking away not a job, not
11 money, not a -- you know, it was never looked at it that
12 way. This is, pretty much, my life. So if you're
13 taking away, you know what, what -- what -- you know,
14 you've seen my work, Dr. Handfield, what would you
15 recommend. She's like, Sal, you belong in education,
16 unfortunately, it's not my decision. You have the
17 opportunity to talk to Dr. Flectcher, but I would
18 recommend to you and I advise you to look into BPS.
19       Q. Look into what?
20       A. BPS, Brevard Public Schools.
21       Q. Okay.
22       A. And, pretty much, thank you, thank you.
23 There's nothing I can do and I met Dr. Daniels out in
24 the parking lot.
25       Q. Let me show you what we've marked as Exhibit

Page 79

1 3?
2       (Deposition Exhibit 3 was marked.)
3       Q. (BY MR. LEVITT) Is this the letter you're
4 referencing that I'm handing you?
5       MS. MIHOK: Is that one mine?
6       MR. LEVITT: Yeah.
7       Q. (BY MR. LEVITT) Give one to her, please.
8       A. I'm actually not sure because the one I had
9 had the date in it that I need to be -- but, you know,
10 I'm not going to dispute it. Maybe. April 27th, I
11 thought it was before that. I don't remember, but I'm
12 not going to question it either.
13       Q. Okay. But they handed you a one-page letter
14 telling --
15       A. Yeah. Yeah. Looks pretty similar.
16       Q. Let me finish -- telling you that they're
17 not recommending you for reappointment?
18       A. Correct.
19       Q. So when you left the meeting, you may have
20 already mentioned it, you saw Dr. Daniels after the
21 meeting?
22       A. That's correct.
23       Q. And just briefly, tell me again what your
24 conversation with him was.
25       A. Oh, he was just curious. He actually --

Page 80

1 he's the one that wanted to meet me because he works at
2 the Melbourne -- he was at the Melbourne campus. I
3 believe he was out of Palm Bay at the time. And he was
4 curious why would administration want to meet with one
5 of his staff. I believe I was the only one under his
6 umbrella that was called to such a meeting.
7       Q. Did you tell him what happen?
8       A. I did. And he was in denial. And he was,
9 like, all right, let me talk to my superiors and when
10 Dr. Sibley comes back and see what this is all about,
11 Sal. And he was just trying to comfort me.
12       Q. Did you ever speak to him about this
13 nonrenewal after that time?
14       A. I don't think we conversated (sic) after
15 that time.
16       Q. Did he ever get back to you with any more
17 information or anything or he never --
18       A. Oh --
19       Q. Let me finish. Let me finish. He never
20 communicated back with you after that?
21       A. He did.
22       Q. He did. Tell us about that. When?
23       A. When I was requesting my -- a copy of my
24 recent evaluation.
25       Q. Is that back then in '22?

Page 81

1       A. It was after that meeting.
2       Q. Okay.
3       A. It was before I leave the college and after
4 that meeting because I never received an actual copy of
5 my evaluation.
6       Q. What did he say? What happened?
7       A. What I was told was that the evaluation was
8 requested by Dr. Handfield and he was instructed not to
9 give me a copy.
10       Q. Did you have any other communications with
11 him?
12       A. Not after that, no. Not that I remember.
13       Q. Up to this date, have you spoken to him
14 recently?
15       A. No.
16       Q. Have you told him he may be a witness in
17 your case?
18       A. No.
19       Q. Have you ever discussed the lawsuit with
20 him?
21       A. No.
22       Q. Prior to the meeting with Dr. Fletcher, you
23 testified you had met him maybe a week or two before at
24 this other meeting?
25       A. That was the most recent time. I met him

21 (Pages 78 - 81)

Page 82

1  many, many times, of course, at many different events.
2  I was very -- I was very involved in the college events
3  and functions. But, yes, I used to see Dr. Flectcher on
4  regular basis. But that was first time we had a
5  one-on-one conversation.
6       Q. And the other meetings with him, he's always
7  cordial to you? He's never said anything mean or nasty
8  or anything like that to you?
9       A. No. Actually, the last time when we were at
10 the coalition education of Brevard, that was the time
11 that he -- you know, it was a small event. It was not
12 very big. And Eastern Florida was a big part of it.
13 So, no. He was very happy with us in general. And with
14 my work in particular and how we handled running that
15 event.
16      The second time I seen him after that was, I was
17 supposed to -- assuming this is -- the date is accurate
18 here on that letter is April 27th, I supposed to leave
19 my office on May 9th and submit my final grades by then.
20 On May 10th, I was already invited because on the
21 meeting when I asked about my adjunct classes I teach in
22 the summer, they said, no, you're not going to be
23 teaching those. And when I talked about there was an
24 event for student recruitment that I used to do with
25 Christina -- Christina -- I forget her name. She's

Page 83

1  right under the first floor now.
2       Anyway, there was a presentation that I was
3  supposed to do that I already prepared and I did the
4  power point for one of the bachelor program student
5  recruitment events and I was going to represent the
6  business department for the new potential students. I
7  told him about that. So they gave my flash drive to
8  Christina and she did that presentation on my behalf.
9  They didn't want me involved in any -- pretty much, get
10 your stuff and go. You're not involved in anything has
11 to do with this college. That's the energy I got. So
12 the last time I saw him was May 10th, if the date is
13 accurate. But I would --
14      Actually, when I had to clear my office, I was
15 already invited by the volunteer department that is run
16 by Dr. -- forget her name. I'm sorry. Just names are
17 not good with me. But I was one of the faculty members
18 that was being rewarded for one of the volunteers of the
19 year. And, luckily, it was not him that was giving the
20 award. But he was sitting in the front and I could tell
21 he was not very happy that I showed up and I received my
22 award.
23      Q. Had you ever spoken to or met Dr. Handfield
24 before seeing her that day?
25      A. Same thing, casually. Like, you know,

Page 84

1  events, saying hi, how's classes going, Sal. Sometimes
2  I talk about her daughter in Titusville and now she's
3  being online handling classes. She's also a colleague
4  in my department. Just normal casual conversations.
5  Nothing related to that.
6       Q. So after this happened, you mentioned
7  earlier you spoke to Dr. Earle; is that right?
8       A. Dr. Earle, yes.
9       Q. And what was her capacity that made you go
10 to her?
11      A. She was the union representative at the
12 time.
13      Q. And you -- you started to or probably told
14 us most of that conversation already, but at some point
15 did you file a grievance?
16      A. Yes, I did. That's what -- that's what Dr.
17 Earle -- I didn't know what the word grievance meant
18 before this all happened, just like I didn't know what
19 the word DCF mean before my third child was born. So
20 she said you should file a grievance. I didn't
21 understand what that meant. She said, okay, when you
22 don't agree with something that your administration does
23 as faculty and you want to have an appeal or make this
24 decision reconsidered, that's how the process works.
25 It's called grievance. And that's when I did my

Page 85

1  research and that's when I filed my grievance with the
2  union. She has the union represent me. She told me she
3  can help me with that process.
4       Q. You mentioned you were a member of the
5  union. Have you ever reviewed the collective bargaining
6  agreement?
7       A. I used to attend some of the meetings when
8  they are negotiating or bargaining every year, stuff
9  like that. But was I ever involved? No.
10      Q. Did you know under the collective bargaining
11 agreement that it has language in it that the decision
12 whether or not to renew an annual contract for a faculty
13 member was not subject to the grievance procedure?
14      A. That was something that never came up.
15      Q. Did Dr. Earle tell you that normally we
16 can't grieve these things, but let's try or anything
17 come up like that?
18      A. It's actually the opposite.
19      Q. Okay.
20      A. Of what you said.
21      Q. So I'm going to show you what we'll mark as
22 Exhibit 4.
23      (Deposition Exhibit 4 was marked.)
24      Q. (BY MR. LEVITT) It appears to be the
25 grievance that was filed. Take a look at the top copy

22 (Pages 82 - 85)

# Exhibit 1

Page 86

1 that's marked, give the other one to you lawyer.
2        THE DEPONENT: Any objections yet? No.
3        Q. (BY MR. LEVITT)  I'm asking perfect
4 questions, so there's nothing to object to.
5        A. I'm just lightening the mood.  That's all.
6        MS. MIHOK: He's just so good at his job that I
7 don't have to object.
8        THE DEPONENT: Okay.  Do I need to read it or...
9        Q. (BY MR. LEVITT)  Well, do you recognize
10 this?
11        A. Yes.  Mr. Shimy should be reinstated.  I
12 stand by that to now, yes.
13        Q. All right.  So this is the grievance that
14 you understood was filed on your behalf?
15        A. I think I filed it.  Yeah.  But, yeah, she
16 helped me with that.  Absolutely, yes.
17        Q. This one happens not to be signed.  There is
18 probably a signed one somewhere.  But this is the
19 grievance contesting their decision, right?
20        A. Yes.
21        Q. Okay.
22        A. I believe so.
23        Q. What happened with the grievance after that
24 was filed?
25        A. Going back to the courses you were asking

Page 87

1 about for the summer, it says here it was five.  They
2 were the five.
3        Q. All right.  By the way, let me change the
4 question.  I'm sorry.  Let me get this out.
5        When we were talking about what happened at the
6 meeting, you did mention bringing up your summer
7 classes.  But after that, in this testimony you mention
8 that came up, so let me clarify.  After your meeting
9 with Dr. Handfield and Flectcher, did the subject of
10 your summer courses come up at that meeting?
11        A. Yes.  I brought it up.  I brought up,
12 actually, not only that.  I brought up every pending
13 duty that I am scheduled with the college.  I brought up
14 my classes.  I brought up -- there was, actually, a
15 couple of more things, just not the classes.  The
16 classes was number one because I was always in there.
17 They were all online classes.  A couple of them were
18 hybrid, but they were already -- pretty much, I'm in the
19 middle of communicating with the students, like,
20 registration, the door's open, it's already filling up,
21 putting up the material together.  So the classes was
22 one thing is like, am I moving forward, at least, with
23 my classes until we figure this out.  I brought up my
24 presentation that I had to do in the student recruitment
25 for the bachelor program event in the Melbourne campus.

Page 88

1 And I brought up also I was working with Dr. Cadore and
2 the committee on the minority male initiative program
3 that we were working on.  And there was something that
4 was coming up for that in the Palm Bay campus, am I
5 going to be part of that or not, which as a matter of
6 fact, there was a meeting.  We used to have a monthly
7 meeting for the minority male initiative and I -- that's
8 when I attended.  And it was, actually, a few weeks
9 after this letter.  And I attended that meeting to, at
10 least, make sure that I have my weight of whatever my
11 duties were for the committee to do for that.  At the
12 end of the meeting, that's when I informed them that due
13 to my not being employed by the college anymore, I will
14 have to make sure that you guys take me off future --
15 future things.  But I brought all these things in the
16 meeting, all my obligations that I have to do with the
17 college, yes.
18        Q. And at that meeting they told you would not
19 be participating in those things, correct?
20        A. Dr. Flectcher was not being very nice about
21 it, even the way he said it.  I don't recall his exact
22 words.  But I just don't want to curse because it's in
23 the way you "F" off, pretty much.
24        Q. He didn't say that?
25        A. He didn't say that, but that's how I heard

Page 89

1 it.
2        Q. Yeah.  When you filed a grievance, do you
3 know what happened next in the process?
4        A. It was a three-step grievance.  I had three
5 meetings.  And then after the first meeting, you go to
6 the second meeting and the third meeting.  The first
7 meeting was with my, I believe, dean, which was Dr.
8 Sibley.
9        The second one -- do you remember who the second
10 one was?  I'm asking you actually.
11        Q. Unfortunately, I get to ask the questions,
12 but we'll get there.
13        A. But I don't remember if it was Dr. Handfield
14 or someone else.  I don't remember.  But I remember the
15 last one was Mr. Parker.
16        Q. Okay.  Let's take step one.  The first step.
17        A. Sure.
18        Q. Did you actually meet with Dr. Sibley?
19        A. I completed all meetings.  So, yes, I did.
20        Q. Do you recall what was discussed at the step
21 one meeting?
22        A. Yes.  Unfortunately, I do remember to the
23 best of my knowledge.  Yes.
24        Q. What happened?
25        A. I'm sorry, Sal.  I was out when this

23 (Pages 86 - 89)

**Exhibit 1**

Page 90

1 decision happened. I wasn't informed. I don't agree
2 with that decision. However, there is nothing in my
3 power that I can do.
4    Q. Did she also explain that as an annual
5 contract, the college had the right not to renew you for
6 any reason?
7    A. I don't recall we ever talked about the
8 contract.
9    Q. So how long was that meeting with Dr.
10 Sibley?
11    A. I remember it was scheduled for an hour. I
12 would say, at least, 30 minutes, if not more.
13    Q. So how did that meeting end, just what you
14 said there's nothing she can do?
15    A. That's correct. And my -- my -- my feelings
16 and emotions with everybody in the college, they're more
17 family than anything else. So I understood where she's
18 at. And I, kind of, feel bad for her, actually, that
19 you can be in such a position and be that powerless.
20    Q. Did she give you a written response to the
21 step one?
22    A. What do you mean?
23    Q. Did you get a written response to your
24 grievance?
25    A. I believe there was, yes. I believe I got a

Page 91

1 response for every single one of them.
2    Q. Let's take a look at what we marked as
3 Exhibit 5.
4    A. Object.
5      (Deposition Exhibit 5 was marked.)
6    Q. (BY MR. LEVITT) It says, step one
7 grievance. Is that the response you got from her?
8    A. Not very good with paperwork. And maybe.
9 But, yeah, sure.
10    Q. All right. If you look --
11    A. (Unintelligible.)
12    Q. -- at the response on page two --
13    A. Um-hmm.
14    Q. -- she quotes from what appears to be from
15 the collective bargaining agreement. And paragraph two
16 says, Article 11.3F provides the nonrenewal of an annual
17 contract shall not entitle the person to reasons for
18 such actions or to file the grievance procedure or to a
19 hearing. Do you see that's what she wrote? Do you see
20 that?
21    A. I don't, but I believe you.
22    Q. Look at page two, the same paragraph.
23    A. Second paragraph?
24    Q. Yes. In further response. Article 11.3F
25 provides and quotes. Do you see that sentence?

Page 92

1    A. Sure.
2    Q. All right. So I had asked you before if you
3 knew that the contract did not permit you to grieve it,
4 you said you didn't know. But she's telling you here
5 that under the collective bargaining agreement, and she
6 quotes, that there's no right to follow the grievance
7 procedure. That's her response to you that you don't
8 have the right.
9    A. So why would she tell me verbally at the
10 meeting that the next process is you go to a second
11 grievance? Why she would drive there and tell me
12 opposite?
13    Q. That you'd go to the second step after her?
14    A. Um-hmm.
15    Q. So then you went to step two?
16    A. Yes.
17    Q. Who was that with, if you remember?
18    A. I honestly -- I told you I blocked most of
19 the stuff out. But I'm pretty sure it's Dr. Handfield.
20    Q. All right.
21    A. And I believe it was Dr. Handfield. And I
22 believe I had the same exact response, what happened
23 with Dr. Sibley is a copycat of what happened with Dr.
24 Handfield to the point that I believe it was a script.
25    Q. Did you get a written response from Dr.

Page 93

1 Handfield; do you recall?
2    A. I got a written response every time. And I
3 believe it was very similar to the first one.
4    Q. Showing you what we marked as six. Is this
5 the response you got from Dr. Handfield?
6    A. Um-hmm.
7    Q. Yes?
8    A. Sure.
9    Q. And it's the step-two response, right?
10    A. Sure.
11      (Deposition Exhibit 6 was marked.)
12    Q. (BY MR. LEVITT) And it is shorter, but on
13 page two she says that you raised no new issues and the
14 college previous denial remains unchanged, right?
15    A. That's correct.
16    Q. So she adopted, if you will, sort of the
17 first denial, right?
18    A. She told me the third step is Dr. Parker.
19    Q. Do you recall much about the meeting with
20 Dr. Handfield?
21    A. Copycat. Copy, paste Dr. Sibley.
22    Q. Did you talk about the same things, or was
23 it much shorter at that point?
24    A. It was -- it was -- it was same things.
25 However, by that time I did not -- I was not aware of my

24 (Pages 90 - 93)

Page 94

1 ex-wife have something to do with it. So nothing new
2 have came in life in this meeting because, again, I
3 would never bring my personal issues to my professional
4 issues until I have to. At that time, based on the
5 public record request and all the information that I
6 have today -- some of it still don't have -- but
7 there's more information that I have today then I had
8 back then. I never brought up this issue in the first
9 two grievances because I wasn't aware that she actually
10 filed something with the school and that this was,
11 actually, the issue. So there was nothing new in Dr.
12 Handfield except she also feels bad for me. She spoke
13 highly of me being an educator and my ethics, and she
14 reiterated in terms of there's nothing I can do, Sal,
15 but I would highly recommend looking into BPS.
16     Q. Brevard Public Schools?
17     A. Correct.
18     Q. I don't want to jump too far ahead, but you
19 can't understand or believe that your wife's complaints
20 to the college is what might have caused them to take
21 this action? Is that what you were --
22     A. Aware of that before my meeting.
23     THE REPORTER: I'm sorry. Is that what you
24 were?
25     Q. (BY MR. LEVITT) Is that what you were

Page 95

1 alluding to?
2     A. Yes. I became aware of it before my third
3 grievance with Mr. Parker.
4     Q. And that's, sort of, what you suspected in
5 the first meeting based on what you testified to that
6 you asked them if it had anything to do with it?
7     A. Correct. Because -- and the reason why I
8 asked because I was not very confident. But, again, I'm
9 not going to question his judgment when Dr. Daniels
10 would not let all the information I gave him go beyond
11 his desk to the point I did have a conversation with
12 Officer Ginger, security. And she recommended what I
13 needed to do. That I should write a statement. I
14 should write my side of the story and submit it to you.
15 But I did not want to do that without Dr. Daniels'
16 permission, and he said no. Everything will stay here
17 in my office. If it needs to go beyond that, we need to
18 bring it. We don't need to bring anything as long as --
19 what I care about, Sal, that you are able to maintain
20 your safety and your schedule and the students' safety
21 in the classroom. As long as it does not affect those
22 two things. Keep me informed, but if I see that this
23 needs to go beyond my desk, I will.
24     Q. When did you speak to -- this is somebody in
25 the college security office?

Page 96

1     A. That's correct.
2     Q. Before you were notified of your nonrenewal?
3     A. That I don't recall. But I believe it's
4 directly related to my nonrenewal. So is it before,
5 after the meeting, before I leave the college, after I
6 left the college, I don't know. But I remember that
7 conversation.
8     Q. All right. Well, let's try to reconstruct.
9 So you're just saying you spoke to Dr. Daniels and asked
10 him if you could do it. If you had already been
11 non-renewed, you wouldn't have spoken with Dr. Daniels
12 after that, would you?
13     A. No. I did not have this -- with this
14 conversation with Dr. Daniels after the renewal. I'm
15 saying, during my sharing the information with Dr.
16 Daniels on a consistent basis, I would ask him, I think
17 this needs to go further or needs to go to the security
18 office. And I asked in -- for Ginger. I didn't ask her
19 if there was any issues with my ex-wife, or my wife is
20 an employee here and there might be issues that could be
21 related to the college, what would you advise me to do.
22     Q. She was in the security office?
23     A. That's correct.
24     Q. Was she investigating something?
25     A. No. No. But I was -- I told you, this is a

Page 97

1 very complicated relationship that the heart of it is
2 vindictiveness. So, pretty much, I was told by the
3 alleged victim directly that here is what I might have
4 done without knowing for sure if she done it or not. So
5 I wanted to see if there was something that I needed to
6 do on my side here to protect myself and my job as well.
7     Q. And that's what caused you, in the meeting
8 with Dr. Flectcher and Handfield, they asked you if she
9 had anything to do with this?
10     A. Correct.
11     Q. So that was your suspicion at the time that
12 it might have had something to do with her making
13 complaints against you?
14     A. When you are meeting such an invert person
15 with a very high position in your college -- I have a
16 lot of respect for him. He is my boss's boss's boss. I
17 have nothing against him as the person. But he's a -- I
18 wouldn't say he's a people's person. He's not going to
19 come and high fives everybody while he's walking kind of
20 person. So when you have a person like that opens up to
21 you and have this cheerful conversation saying how much
22 we are honored that you are part of Eastern Florida
23 being represented by people like you guys and, you know,
24 having a conversation with me about that, then a week
25 later he told me your problem is your professionalism

25 (Pages 94 - 97)

**Exhibit 1**

Page 98

1 while my reputation as a teacher -- I still, by the
2 way, by all that's happening and all these legal issues
3 outside, some of it -- all of it is public information.
4 I still meet my students everywhere I go to today and
5 they still recognize me and acknowledge me and say hi.
6 But it's just very alarming that somebody would be like
7 that and the next week says he doesn't know who you are
8 on paper.  And that's why I told you I was very puzzled
9 by his body language when he's feeling that -- he didn't
10 know it was me when he was meeting me as a person.
11      Q.  So at the time of that meeting --
12      A.  At which meeting?  I'm sorry.
13      Q.  With Dr. Flectcher --
14      A.  Sure.
15      Q.  -- and Dr. Handfield, you asked about if
16 your wife had anything to do with it, in essence.  Did
17 you raise any other suspicions as to what else was
18 behind it?
19      A.  Anything related to my performance, which
20 I'm already -- I'm standing on a very solid ground when
21 it comes to that.  I don't think anybody in this
22 college, with all due respect, from the board of
23 trustees all the way down can tell me that I am not
24 professional in what I do.  And if they do, I would like
25 to hear it.

Page 99

1      Q.  Looking back even today, is it your
2 understanding or belief that it was the issues with your
3 wife or complaints by your wife at the time that may
4 have caused the college to make that decision?
5      A.  By the time I saw your response on EEOC,
6 that's how the first time I had actual knowledge of
7 these such complaints, other than her, you know,
8 nonsense stuff that she's sees on and off in her
9 behaviors, that was the first time I have seen a
10 document that says, oh, this, pretty much, was your
11 words that I should not be in education field because
12 I'm an abuser, I have abuser history or whatever that
13 is.  And that's when I know I was right.  So I should --
14 that's why today, I'm like, my boss should have brought
15 my suspicions -- like, the college should have seen and
16 understand that ██████ at the time was a part-time
17 employee for two months and you have somebody who has
18 been serving the college, regardless full time or part
19 time for almost 10 years, the least he can do,
20 especially with someone who does not have a flaw in his
21 personnel file, never missed a class, never been late,
22 his relationship is good with everybody, the least he
23 can do is hear my side of the story, for God's sake.
24 The least he can do.  Even if it's true, the least he
25 can do.

Page 100

1      But I'm not going to name names.  But I believe
2 that, you know, because I know who I'm dealing with, I'm
3 telling, this conflict is still going until today.
4 Until today I still have legal issues with this woman
5 regardless that now there is nothing criminal pending,
6 but there is a lot of legal issues.  And it will be like
7 that for the next 15 years as long as my daughter is
8 under 18.  This is not going to change.  And I'm coping
9 to deal with it.  I'm making sure my personal life,
10 regardless of whatever problems I brought to myself or
11 came to me, I don't bring it to my professional life.
12      But in the meantime, I never got heard on my --
13 on my side of the story.  And she's the only employee,
14 but within -- not even two months when she filed these
15 allegations or she started filing these allegations
16 working as a part-time employee on a temporary work
17 permit.
18      Q.  We're definitely not here to discuss or
19 resolve your --
20      A.  No.  But we are here to discuss my
21 professionalism and my work ethics, and why I am not
22 employed by the college anymore.  And if that is the
23 reason for it, yeah, I think -- I think the college, if
24 that is the reason, it is not anything else, I think I
25 should have been asked a question or being heard.

Page 101

1      Q.  Okay.  So what I'm hearing you say is you
2 don't agree that they should have relied on her
3 complaints in making their decision?  You don't agree
4 that that's what they should have done?
5      A.  Is that how they made the decisions?
6      Q.  I get to ask the questions.
7      A.  Well, if that's how they made decisions, of
8 course, that's wrong.
9      Q.  Other than the information, the complaints
10 by your wife, police reports and the other
11 investigations that you've now seen, is there -- and I
12 understand you don't agree with that and you don't agree
13 what she said was true, but is there anything else that
14 you think may have caused them to do this?  Anything
15 else you're aware of?
16      A.  Object.
17      MR. LEVITT:  No.  She can't --
18      THE DEPONENT:  Just kidding.  I'm just kidding.
19 I need to think.
20      Q.  (BY MR. LEVITT)  Take your time --
21      A.  Because answer -- the answer --
22      THE REPORTER:  I can't understand both of you at
23 the same time.
24      THE DEPONENT:  The answer in one word is no.
25 And here is how I look at it:  I was never informed of

26 (Pages 98 - 101)

**Exhibit 1**

Page 102

1 why I was terminated. Based on my performance, there is
2 not one reason that would lead to that. If my personal
3 issues -- that, yes, she started working at the college
4 at the time is an issue. Then you have two employees in
5 a dispute and one of them is saying I'm in fear of my
6 life from the other person, well, you've get to feel the
7 other person out because if you see my correspondence --
8 and, by the way, this is public record. It's all
9 e-mails to Dr. Daniels so you have access to all that.
10 Stalking into my office, into my classroom, in the
11 parking lot. And I report all that. I share the same
12 problems. With a newcomer to the college from someone
13 who did not have any issues at any of the four campuses
14 for 10 years and not even asked a question. So that's
15 number two if it's the problem.
16      Number three, when you're dealing with a VP that
17 tells you, Sal, you did great, slam, you fired, what do
18 you think of that? Because he loves me as Sal, but he
19 gives me a paper that have my legal name on it, five,
20 six days later that your professionalism is not fit for
21 this college.
22      Q. All right.
23      A. So I don't know what the reason is.
24      Q. So we haven't gotten to step three yet. You
25 mentioned that was with Jack Parker, correct?

Page 103

1      A. Grievance?
2      Q. Yes.
3      A. Back to grievance?
4      Q. Back to grievance.
5      A. Mr. Parker, yes, that's correct.
6      Q. Did you meet with him?
7      A. Online.
8      Q. Zoom, virtual?
9      A. No. As a matter of fact, it's recorded.
10 And you have a record of it and you do not want to give
11 me a copy. So, yes, you're already aware of it.
12      Q. What do you recall -- I'm sorry. Let me ask
13 you another question.
14      I think you said by that time --
15      A. Sure.
16      Q. -- you had some information that your wife
17 had complained, correct?
18      A. Correct.
19      Q. And tell me about your conversation then
20 with Mr. Parker?
21      A. It was all about -- it was all about
22 potential criminal charges. And the background of Mr.
23 Parker is heavy on that being an ex-sheriff. Of course,
24 that was the main focus of the conversation. And he was
25 trying to explain to me and the union that even though

Page 104

1 these are pending investigations and they filed no
2 information on it, that could potentially become a
3 problem. And his words was -- this was over an hour
4 recording. But what sticks out when I asked a very
5 specific question that as a teacher or as instructor, if
6 you get allegated (sic) by somebody by something and you
7 did not do and you're not proven guilty, the decision is
8 based on that.
9      And in the meantime at that time I got tired
10 because, again, you did not take a job from me, you take
11 a career, you take a life, you take education from me.
12 You took my relationship. Everything. I planned my
13 life, buy a house here, everything to be here. It's not
14 like a job and I'm sad, if I get it back, great, if I
15 don't -- it's way more than that. It's way more than
16 that.
17      (Deposition Exhibit 7 was marked.)
18      Q. (BY MR. LEVITT) Tell me about your
19 conversation with Jack Parker. That's what I want to
20 here?
21      A. It was all about he was asking too much
22 details on the pending allegations. So there was only
23 so much I could share at the time in terms of, well, she
24 said you broke her arm. I don't even know her arm was
25 broken. When did she broke it? Who broke it? How did

Page 105

1 it break? Did it break? So -- so -- so he started
2 going on and on that, talking to me more like a
3 detective in terms of -- he was actually -- and I've
4 been dealing with the criminal case itself before I came
5 to this meeting today for the last two years. It's gone
6 on since September, as you know. And I don't think I've
7 been asked details and incriminating questions as much
8 as Mr. Parker did.
9      So I came to the point, I'm like, if the college
10 really look at me like that -- I told him straight up,
11 my relationship with the college will never end. I'm
12 part of this community. My students are always going to
13 be my students. My relationships will always be my
14 relationships. I will never speak badly of the college
15 regardless of the outcome of this meeting, but here's
16 the deal, I'm not going to beg you for my job back. I
17 know that this is the grievance. This is my last
18 chance. But I'm not begging up for it. I think,
19 honestly, it's a lose/lose situation. Yes, I did lose
20 by not being part of Eastern Florida State College. But
21 I also, I know I was doing very good for my students.
22 And now my replacement is doing a good job. Don't get
23 me wrong. I actually congratulated him. We've been
24 working together for a really long time. He's always
25 been part of our adjunct team. I've, actually, been

27 (Pages 102 - 105)

**Exhibit 1**

Page 106

1 helping everybody, regardless being part of the college
2 or not. You're not going to take that away from me, Mr.
3 Parker. But I'm not going to sit down here on my knee,
4 you being a detective about somebody trying -- who is
5 vindictive and trying to ruin my life, and she is, in
6 fact, ruining my life, that you are telling me,
7 allegation like that, Sal, is a career ender. Pretty
8 much, yes, to answer your question. If somebody gets
9 allegated by such crimes, it ends your career. That's
10 my answer to you, Sal. Make your decision however you
11 want. Again, I'll maintain my professionalism. I have
12 nothing against you personally or Salvo or anybody else
13 that I never met. But whoever relays this information,
14 obviously, they're putting their touch in it. Because I
15 know in the college people that have been accused of
16 such crimes close, similar to this and they are either
17 retired or still employed by the college.
18     Q. Okay. We'll get to some of that. Let me
19 show you -- did he give you a written response
20 afterwards?
21     A. That I don't remember. By that time, I was
22 over it.
23     Q. Okay. Let me also clarify, so you're
24 meeting with Mr. Parker. He asked you about the
25 criminal allegations, correct?

Page 107

1     A. Yes. He asked me if I was comfortable
2 enough to bring it up. I got to be fair. I brought it
3 up, he didn't. But once I brought it up, it was on.
4     Q. Did he make clear to you that the reason the
5 college made the decision was because of those
6 allegations?
7     A. He did not make it clear, but that is what I
8 got out of that meeting versus the first two.
9     Q. Handing you what we've marked as seven. It
10 appears to be a step three response from Mr. Parker.
11     THE REPORTER: I didn't hear you, sir.
12     THE DEPONENT: I was talking to her. Oh, that
13 is on record, too? I am collecting a lot of papers
14 today.
15     THE REPORTER: Anything that you say or anybody
16 in this room says goes on the record.
17     THE DEPONENT: Can you put that on record, are
18 we going to get a bathroom break, question mark?
19     Q. (BY MR. LEVITT) That was one of the rules.
20 I should have given this, if at any time you need a
21 break, just let us know. So we will take one in a
22 moment. Just can you confirm this is the written
23 response you got from Jack Parker?
24     A. It looks like it. I am not going to
25 question it.

Page 108

1     Q. Did you know Jack Parker before this --
2     A. I know of him. He's a legend in Brevard
3 County. But -- and also I do know him because he was
4 very involved on getting -- helping us with getting the
5 minority bill initiative with the leadership of Dr.
6 Cadore off the ground. So, yes, behind the scenes. But
7 face-to-face, that was my first just like Dr. Fisher,
8 just like Dr. Richey today or Ms. Ferguson, this is the
9 first time I have a one-on-one conversation with him.
10     Q. So you had a case, you've seen him in
11 person, you've interacted casually --
12     A. Oh, many times. I never missed a
13 graduation. Yeah. Actually, that was the first
14 graduation I missed and I was told even though I had a
15 student graduating in that graduation, I was told not to
16 show up. They made me feel like I am trespassed from
17 the college.
18     Q. And did you, in that meeting -- strike that.
19     Had you had any issues with Mr. Parker before
20 this meeting?
21     A. Not whatever.
22     MR. LEVITT: All right. This is probably a good
23 time for a break. Let's take about 10 minutes.
24     THE DEPONENT: Sounds good.
25     (Recess taken from 1:48 p.m. to 2:09 p.m.)

Page 109

1     (BY MR. LEVITT) So we just finished talking
2 about the grievance procedure. Other than those
3 meetings we talked about, step one, two, and three, have
4 you spoken to anyone at the college about your
5 employment, your nonrenewal, or anything like that?
6     A. Just in the capacity when people say if
7 you're still working at the college or no in terms of
8 informing people that I'm not working there anymore.
9 These are, pretty much, direct friends or acquaintances,
10 but nobody in terms of the grievance process or the
11 case.
12     Q. And I asked you before as far as Dr.
13 Daniels, you've testified when you had spoken to him
14 afterwards. Have you spoken to Dr. Sibley since that
15 step meeting with her?
16     A. I'm not sure if Dr. Sibley is aware of the
17 suit or not.
18     Q. In the last year or so, you haven't spoken
19 to her, reached out to her, or anything like that?
20     A. I know she practiced elderly law. I reached
21 out a few times. I usually reach out to a few people
22 with seasonal greetings, but with her just to refer
23 clients.
24     Q. And then with Jack Parker, have you spoken
25 to him since the step three meeting?

28 (Pages 106 - 109)

**Exhibit 1**

Page 110

1    A. No. I only got the correspondence through
2 the union with his response. I don't think I even got
3 his response from him directly.
4    Q. Would it be true that you have not spoken to
5 Dr. Handfield, Dr. Flectcher since your contract was not
6 renewed, other than --
7    A. Except in the grievance process, no.
8    Q. All right. Now, you filed a charge of
9 discrimination. Do you recall that?
10    A. The EEOC?
11    Q. Yes.
12    A. Um-hmm.
13    Q. How did you know about that?
14    A. The union.
15    Q. Okay. Did the union recommend or suggest
16 that you file a charge?
17    A. That's a great question. They informed me
18 of the procedure. And based on what I told them what
19 happened, they told me to look into it, but I filed it
20 myself.
21    Q. Let me show you what I'm marking as
22 Exhibit 8. Two copies, one to share.
23    (Deposition Exhibit 8 was marked.)
24    Q. (BY MR. LEVITT) Is this the charge that you
25 prepared and filed with the EEOC?

Page 111

1    A. I don't recall seeing this document before.
2 However, the process was that I had to call a designated
3 number and based on that number, I speak with a
4 designated agent. I believe because of the geographical
5 area, we are associated with the office, if I recall, in
6 Miami. And, basically, he would make the decision if
7 this qualifies for me to file or not. And based on what
8 I told him what happened in terms of how, you know, my
9 contract -- how's my contract work and how does it end,
10 he said that I qualify. And he told me, just tell me
11 what happened. And they are the one that usually do
12 this on your behalf. That's what I understand or
13 recall.
14    Q. It does say it's digitally signed by you.
15 Did they send you a copy of this, ask you to approve it
16 or some type of signature?
17    A. I honestly don't recall. I remember that
18 once you speak to them, you -- and you are qualified for
19 their process, they do have some sort of a portal or
20 something like that you communicate through that
21 portal. And maybe I signed it through that. I don't
22 remember.
23    Q. So was the content of this, sort of,
24 prepared by someone from the EEOC after conversation
25 with you?

Page 112

1    A. Correct.
2    Q. Looking at it now, does it reflect what you
3 told them?
4    A. I can read it. Yeah, because I don't
5 usually use these words like Caucasian and stuff like
6 that. That is definitely written by him, yes.
7    Q. Now, in the middle there it says -- they
8 wrote: No reason was given to me for my termination.
9 Do you see that? Sort of, right in the middle there.
10 It's one, two, three, four, fifth line down.
11    A. Okay. I don't see it, but okay.
12    Q. I want you to see it. So it's right here in
13 the middle one, two, three, four, fifth line down in the
14 middle of that line.
15    A. No reason was given for me for my -- yep.
16    Q. All right. Now, that's not true based on
17 your testimony, correct? You did get a reason. Whether
18 you liked it not, they did give you a reason?
19    A. Actually, no, they did not give me a reason.
20 They said -- Dr. Flectcher, the only thing he said at
21 the end of the meeting when we were discussing that he
22 have information it was my professionalism. But he did
23 not use that as a reason. And when I asked for a
24 specific reason, I was denied.
25    Q. Your testimony was he did talk to you about

Page 113

1 professionalism? That's what you previously testified,
2 did you not, that in the course of the conversation with
3 him, he told you professionalism wasn't proper or
4 appropriate for the college?
5    A. His words, again, I'm trying to recall for
6 the best of my knowledge. He did mention, yes, we have
7 some outside sources or outside information about -- in
8 regards to your professionalism. And the way we make
9 our decisions is based upon the recommendations from
10 collegewide chairs and deans in regards of your
11 performance and how I usually make my decision of
12 renewing a contract or not.
13    Q. This is dated May 9th of 2022. The letter
14 you received was 4/17. So in the matter of about two
15 and a half or three weeks, you filed this charge within
16 weeks of being told of your nonrenewal, correct?
17    A. I can't -- I can't confirm that because I
18 think the process took longer. So I don't really know
19 the date. But 5/9, I believe, it was my last day of
20 employment. So I really don't know.
21    Q. Okay. At the bottom it does say you see,
22 digitally signed. We just talked about this. Digitally
23 signed on the date of 5/9 --
24    A. I see that, but I just don't see how. But
25 okay.

Page 114

1    Q.  Okay.  So do you think you filed this much
2  later?
3       A.  I don't remember the exact date I filed it.
4  But I know it took -- I really don't remember.  But it
5  looks like I signed it that day.  But I remember that
6  the 9th is a significant date.  I think it was my last
7  date of employment.  So maybe I signed it that day.  I
8  don't know.
9       Q.  All right.  Then how many times did you
10  speak to the EEOC about your case, have a conversation
11  with an investigator?
12       A.  I don't remember anything when it comes to
13  EEOC except that when I had the initial call, they say,
14  you know, if I qualify or not.  And if I qualify, they
15  assign me to an investigator or an officer or something
16  along those lines.  And they will call me to get my
17  statement one more time.  And if, you know, my statement
18  qualifies for what they think their procedure is, they
19  will file a charge and they'll go from there.  Then, I
20  believe, the union said that after a certain amount
21  period of time, if they do file a charge, then you
22  can -- because we have, I believe, a backup or whatever
23  the system.  I don't know how it works.  But then you
24  can qualify to ask for a letter.  You can file some sort
25  of a suit.

Page 115

1       Q.  Did you at some point ask that they issue
2  you a letter so you can file a suit?
3       A.  I got an e-mail from EEOC saying that
4  they're closing my portal.  And if I need that letter, I
5  have to get it within a certain period of time.  And
6  that's when I reached out to the union.  And, actually,
7  I had a hard time.  It took a little bit of a time
8  because at the time Dr. Earle was not the representative
9  anymore.  It was somebody else (unintelligible) or
10  somebody else.  I forgot who.  But I had to go the
11  e-mails back and forth especially by that time, I do not
12  have my college e-mail anymore.  So it was my personal.
13  So sometimes it doesn't get where it needs to go.  But I
14  forward the letter to them.  I requested the letter.
15  They told me to request the letter and forward the
16  letter to them.
17       Q.  And did you then get a notice back from the
18  Department of Justice?  Showing you Exhibit 9.
19         (Deposition Exhibit 9 was marked.)
20       A.  I believe that is the letter.  Yeah,
21  obligated blah, blah, blah.  Yeah.
22       Q.  (BY MR. LEVITT)  And then you proceeded to
23  file a lawsuit, correct?
24       A.  Yeah.  Forward that to the union.  And
25  that's what, you know, they union recommended.

Page 116

1       Q.  Now at the time of the filing a lawsuit,
2  that's filed by Ms. Mihok, your attorney here today,
3  correct?
4       A.  Is that correct, Ms. Mihok?
5       MS. MIHOK:  I can't answer you.
6       THE DEPONENT:  Okay.  Well, I think so.  She is
7  the attorney for the case.
8       Q.  (BY MR. LEVITT)  Do you know what the
9  allegations in your Complaint are, what you're suing
10  for, what you're claiming?
11       A.  Yes.
12       Q.  What's that?
13       A.  I believe that particularly with the VP did
14  not treat me fairly and terminated me, not based on my
15  performance, based on some other personal reason, that
16  he thinks I'm not fit for the position regardless if
17  it's ethnic background, religion, or professionalism,
18  like I said.  I don't know.
19       Q.  Now, what religion are you?
20       A.  I practice what my name says, Islam.
21       Q.  Has your religion ever come up at the
22  college with your supervisors or in any of these
23  meetings you had?
24       A.  My direct supervisors?
25       Q.  Let's start there.

Page 117

1       A.  Just like as a casual conversation, in terms
2  of what are you guys doing Ramadan, how do you manage to
3  not eat while you're in the classroom.  Things like
4  friendly and acceptable.
5       Q.  No one in supervision or management has ever
6  made a derogatory comment to you that you're aware of
7  about you being Islam or practicing Islam?
8       A.  I can't say now.  But I can't remember a
9  specific incident.
10       Q.  Okay.  In the coarse of the meetings you've
11  described with Dr. Handfield, Dr. Flectcher or even Jack
12  Parker, no one has every brought up your religion in any
13  of those, correct?
14       A.  In the meetings I had directly with them?
15       Q.  Yeah.
16       A.  No.
17       Q.  Excuse me if this isn't the right question
18  or a good question.  It may just show my ignorance.  But
19  do you practice Islam on a daily basis?
20       A.  I'm not sure how to answer that.  Because,
21  again, that's a question that's very hard to ask and
22  very hard to answer.  A belief is a belief.  How you
23  practice it, if you believe in it, then I believe you
24  practice it on a daily basis.
25       Q.  And I don't mean to stereotype anything.

30 (Pages 114 - 117)

**Exhibit 1**

Page 118

1 But, you know, just common knowledge people -- there's
2 prayers involved, daily prayers, there's type of eating,
3 things like that. I mean, have you ever engaged in
4 religious practices at the college? In other words,
5 have they seen you praying? Have you asked for time off
6 to pray? Have you, you know, anything that would be an
7 outward sign of you practicing that? That's all. I'm
8 not questioning your religious belief or anything else.
9 I'm just trying to understand.
10     A. See, I didn't interrupt.
11     Again, I try to keep my professional life far
12 away from my personal. Either problems, religion,
13 beliefs, no matter what it is, as long as it's personal,
14 I don't bring it to professional. So, for example, yes.
15 Just like when people go to church for Saturday or
16 Sunday, I go to the mosque on Friday. On Friday, I'm
17 obligated to let the college know I need time off
18 because usually I don't have too much obligations on
19 Friday. And when I had my committee meetings on Friday
20 or whatever other side obligations, I used to excuse
21 myself for one hour. I don't really have to explain to
22 anybody why to go my prayers.
23     Do I fast at Ramadan? Yeah. Most of the
24 people, the only thing that they really know because it
25 is something on a daily basis when we do events, which I

Page 119

1 don't eat pork, for example. Then they know that when
2 Sal is coming we want to make sure that one of the
3 cheese -- one of the pizzas are cheese pizza, not
4 pepperoni, or those type of things.
5     Q. Okay. Very good. I'm going to hand you --
6 we're going to mark the Complaint as Exhibit 10. Take a
7 quick look.
8     (Deposition Exhibit 10 was marked.)
9     Q. (BY MR. LEVITT) Is this the lawsuit that
10 you filed to the best of your knowledge?
11     A. Yes.
12     Q. Now, on page two, paragraph eight and
13 paragraph 8A, the Complaint says that you were given the
14 nickname Sal by your superiors. That's not really true,
15 is it?
16     A. They call me Sal, yes.
17     Q. But they didn't give you that nickname, did
18 they?
19     A. They made it up for me? No.
20     Q. You went by Sal long before you started --
21 became employed by the college, right?
22     A. Right.
23     Q. And even in the paperwork you filed with the
24 college, you listed your preferred name as Sal, correct?
25     A. Yes, sir.

Page 120

1     Q. So mistakes do happen, but that statement
2 would not be true that they gave you that nickname?
3     A. That they created it or made it up?
4     Q. Yeah.
5     A. No.
6     Q. In fact, just to be sure we're clear, I'm
7 going to hand you emergency contact information that you
8 filed with the college. Marking it as 11.
9     (Deposition Exhibit 11 was marked.)
10     Q. (BY MR. LEVITT) You see there that you list
11 the preferred first name --
12     A. Sal.
13     Q. -- back in 2019 before you were even hired
14 as the preferred first name being Sal, correct?
15     A. That's correct.
16     Q. Let me mark as 12 appears to be a resume.
17 Could you just identify that at least as whether this is
18 the first page of your resume at the time.
19     A. Um-hmm.
20     (Deposition Exhibit 12 was marked.)
21     Q. (BY MR. LEVITT) And, again, just to make
22 sure we're clear --
23     A. Sal is there.
24     Q. -- you list Sal at the top as your name
25 Islam Sal Shimy, correct?

Page 121

1     A. Correct.
2     Q. So again, that's the name you used long
3 before the college?
4     A. Yes.
5     Q. Are you familiar with the requirement if you
6 have outside employment that you're supposed to get
7 permission or notify the college about that employment?
8     A. Yes. We had to fill out an HR, yes.
9     Q. An employee just in the full-time capacity,
10 so 2019 forward, were you also doing other work besides
11 teaching here at the college?
12     A. Yes. I listed my outside adventures,
13 um-hmm.
14     Q. What would that be in 2019/2020 during this
15 timeframe?
16     A. The list would be the real estate part.
17     Q. Were you actively engaging in an effort to
18 earn income from real estate during that timeframe?
19     A. I'm not sure if that was the period when I
20 started working full time. I was working more on a
21 consulting basis. I referred business out and more
22 consulting work, but yes.
23     Q. Did you have some income in 2019/2020 from
24 the outside business?
25     A. I don't remember that.

31 (Pages 118 - 121)

# Exhibit 1

Page 122

1    Q. Okay. Do you recall filing the form, the
2  statement of outside employment with the college?
3    A. Yes.
4    Q. Why did you do that? Who either told you
5  that you had to or what made you aware that you should
6  do that?
7    A. It's part of orientation. They tell you,
8  you know, if you do that. And it has to be signed by
9  your supervisor, something like that.
10    Q. And just for the record, some of these is
11  just putting the documents into the record here. Marked
12  as 13 is that form. And it does show licensed business
13  broker and licensed insurance agent. Is that the form
14  you filed with the college?
15    A. Yeah. The license business broker is what
16  refers to the real estate. And that's when I have my --
17  I do carry my insurance license, but not actively. And
18  it also does list the auctioneer license. It list all
19  three of them, all the licenses I have.
20       (Deposition Exhibit 13 was marked.)
21    Q. (BY MR. LEVITT) Other than your nonrenewal
22  of your contract in April of 2022, is there any other
23  way that the college, you're alleging the college
24  discriminated against you or mistreated you?
25    A. Before Dr. Flectcher, no.

Page 123

1    Q. So, again, we're just trying to clarify the
2  issues in this case. What you're complaining about is
3  the college did not renew you in April of 2022. That's
4  what this case is about; do you agree?
5    A. I'm sorry. What was the question?
6    Q. The case is about the college's decision not
7  to renew you in April of 2022? That's what you're
8  complaining about, that they did not renew you that
9  year, correct?
10    A. It is more about how and why I did not get
11  renewed. Yeah.
12    Q. Okay. Well, you mentioned in your lawsuit
13  that you were treated less favorably than co-workers.
14  Is there someone -- can you identify for us who you
15  believe was treated more favorably than you by the
16  college?
17    A. I would not name names, but everybody I
18  worked with got renewed regardless if they are in the
19  same level in terms of evaluation or not. And even the
20  case that refers to my case, Anthony El-Khouri's case,
21  he got reinstated and I didn't. So I don't know.
22    Q. So you're aware that after Mr. El-Khouri
23  filed a grievance, that the college decided to bring him
24  back and renewed him for another year?
25    A. Mr. Parker did.

Page 124

1    Q. Mr. Parker?
2    A. (Witness nods.)
3    Q. As part of the grievance procedure, the
4  college brought Mr. El-Khouri back, correct?
5    A. Mr. Parker brought El-Khouri back, yes.
6    Q. Well, he was acting on behalf of the
7  college. The college is who employs you and employs Mr.
8  El-Khouri. So the college gave him another contract
9  after he grieved, correct?
10    A. That's what I was told, yes.
11    Q. When did you learn that, I guess, is what
12  I'm trying to figure out. When did you first talk to
13  him? Did he tell you? How did you learn about Mr.
14  El-Khouri?
15    A. Once I had my meeting with Mr. Parker, Mr.
16  El-Khouri was reaching out consistently to see if I got
17  an answer or not because he was waiting for his and he
18  was pretty anxious. And he got his answer before mine.
19  So he was happy and say now it's your turn. I think the
20  college made a mistake and they're rectifying.
21    Q. So he --
22    A. So I was informed by him.
23    Q. So he reached out to you contacted and told
24  you the college decided to bring him back, right?
25    A. He told me that Mr. Parker reinstated him,

Page 125

1  yes.
2    Q. Now, do you know Mr. El-Khouri's national
3  origin?
4    A. Um-hmm, I do.
5    Q. What is it?
6    A. Lebanese.
7       And he informed me on a third co-worker that I
8  never had any communication with, but I've been told
9  about her situation. Because it was only the three of
10  us as far as my knowledge that did not get renewed that
11  year and that was -- her first name is Phaedra. But I
12  don't know her. And I believe she also got reinstated.
13  So my belief when I heard that is, if people go through
14  two steps of grievance and get reinstated on the third,
15  regardless of what happens with me, then the college did
16  make a mistake, and they fixed it. It just happened
17  that with me they have a little bit more -- they have a
18  little bit more reasons that they don't have to fix that
19  mistake because they have an excuse.
20    Q. Is Phaedra, is her last name Williams, if
21  you know?
22    A. I can't agree no. I don't remember, but
23  could be.
24    Q. Okay. Did you know Phaedra Williams?
25    A. Never spoke to her a day in my life.

32 (Pages 122 - 125)

**Exhibit 1**

Page 126

1    Q. Do you know anything about her
2  circumstances?
3    A. All I know is she's black and she felt
4  discriminated against.
5    Q. She's not Egyptian, though, right?
6    A. No.
7    Q. Or Lebanese?
8    A. Maybe she is. I don't know.
9    Q. You don't know what national origin she is?
10   A. I never met her, never talked to her.
11   Q. So you know she's black, you said, because
12 someone told you she's black, right?
13   A. I believe that's what Anthony said. But I
14 don't know really what her background is. He mentioned
15 a lot of different names and different nationalities
16 including Iranian, this and that. But that's not really
17 something I recall names, or it's my concern because
18 it's not something I know firsthand. I only know
19 Anthony firsthand and I know how people get promoted or
20 not get promoted or stay in their position or not stay
21 in their position. Some of them are still active with
22 the college. So I don't know.
23   But the reason why I know about Phaedra because
24 that's what I was told that these are the three that did
25 not get renewed for that year.

Page 127

1    Q. So other than Mr. El-Khouri and Phaedra, is
2  there anyone else you're aware of treated -- let me
3  finish -- treated more favorably than you, or those are
4  the two people you think were treated more favorably?
5    A. No, these are not the two people that I
6  believe you treated more favorably than me. They were
7  getting terminated just like me. So they got the same
8  treatment. The people that got renewed, maybe their
9  performance is less but they don't share the same
10 backgrounds, they got renewed with no questions asked.
11   Q. Okay. Is there anyone you're aware of that
12 had complaints of domestic violence who may have been
13 renewed?
14   A. Not complaints. I know people retired from
15 the college. Some of them were working actively and
16 they had criminal allegations in regards to domestic
17 violence, felony charges, whatever it is, they ended up
18 leaving the college or not leaving the college without
19 being terminated. Some of them with retirement. And
20 some of them they just made an agreement with the
21 college give me time to look for another job. But, yes,
22 I do. But I'm not going to name names.
23   Q. Well, you're saying some, sort of, in lieu
24 of maybe be terminated, they decided to retire? Is that
25 what you're saying?

Page 128

1    A. No. They successfully retired. They've
2  been at the college long enough that they retire. Some
3  of them already retired. Some of them look for another
4  job, went to another -- I'm not going to name names.
5  But, yes, do I know some of them are faculty members,
6  some of them are staff members. They had criminal
7  allegations against them and they did not get terminated
8  regardless how they ended up.
9    Q. Okay. Well, I'm going to ask you who you
10 believe that to be the case.
11   A. I'm not going to name names because of the
12 information is definitely public record. So it's easy
13 for you to find out. And some of this information,
14 these are people that expunged their record or whatever
15 it is. I'm not going to bring it up. It's not my
16 authority to do that.
17   Q. Okay.
18   A. But HR should have all the documents.
19   Q. Would it be fair to say that this is
20 information you've heard from other people versus, like,
21 your personal knowledge? You don't personally know what
22 happened to these people? It's information you've heard
23 from others; would that be a fair statement?
24   A. No. These are people I know personally and
25 I worked with. And some of them had similar positions.

Page 129

1  And these are things I know firsthand, yeah.
2    Q. Do you know firsthand from those people?
3    A. From the source, that's correct.
4    Q. But you don't have firsthand knowledge of
5  why the college did or did not terminate?
6    A. The college did not.
7    Q. But you don't have any information why they
8  did not?
9    A. No.
10 (Whereupon, Darla Ferguson left the deposition.)
11   MR. LEVITT: I'm going to mark as Exhibit 14.
12   (Deposition Exhibit 14 was marked.)
13   Q. (BY MR. LEVITT) Do you recall prior to this
14 litigation you were given questions to answer and you
15 provided information through your attorney to answer
16 those questions? I'm handing you Exhibit 14. They are
17 the answers to interrogatories, which are the questions
18 we asked for you to answer. In fact, if you look at the
19 last page verifying that's your response. Is that your
20 signature?
21   A. Okay.
22   Q. Have you seen this before?
23   A. No.
24   Q. You coordinated with your counsel to provide
25 this information; is that a fair statement?

33 (Pages 126 - 129)

**Exhibit 1**

Page 130

1    A. Sure.
2    Q. And on number five it asks you to identify
3  the people you're referencing in your lawsuit of others
4  who were terminated or non-renewed on the same day and
5  the two you listed was El-Khouri and Phaedra Williams.
6  Do you see that?
7    A. Um-hmm.
8    Q. That's what you told us a few moments ago,
9  right?
10    A. Um-hmm.
11    Q. Yes?
12    A. Yes. Yes. Sorry.
13    Q. All right.
14    A. Are these mine to keep?
15    Q. No. But your counsel has a copy. She can
16  share them with you.
17    A. This is yours?
18    Q. Those will be the court reporter's.
19    MS. MIHOK: These are yours. I'll e-mail them
20  to you.
21    Q. (BY MR. LEVITT) I'm going to mark as the
22  next Exhibit 15, supplemental answers. So you answered
23  them in 14 and now we have, sort of, a follow-up
24  supplement filed by you.
25      (Deposition Exhibit 15 was marked.)

Page 131

1    Q. (BY MR. LEVITT) Again, that's your
2  signature on the last page, correct?
3    A. Yep.
4    Q. All right. If we look at page three,
5  question four it asks you to identify names of
6  individuals referred to in your lawsuit of co-workers
7  who are not members of your class who were treated less
8  favorably -- you were treated less favorably then them.
9  And your answer at this time, your signature is dated
10  December 12th of 2024. So just a month or so ago. It
11  says plaintiff does not currently know the identity of
12  comparatives at this time, but anticipates obtaining
13  such information. So at that time, you did not know the
14  identity of others that you were treated less favorably
15  than. Between then and now up to the date of this
16  deposition, do you know the names of those who you
17  believe were treated better than you?
18    A. Nothing has changed from now since December.
19    Q. Okay. Other than what Mr. El-Khouri told
20  you about his situation, you have no personal knowledge?
21  In other words, that you personally know why the college
22  chose to not renew Mr. El-Khouri or why they decided to
23  bring him back. You were not involved in that decision,
24  correct?
25    A. No. The college never informed me, no.

Page 132

1    Q. You may have somewhat answered this, but are
2  you aware of any non-Islamic instructors who had
3  allegations of domestic violence, but continued to be
4  renewed in their contracts?
5    A. I will not share names. But I do know, yes,
6  instructors that are non-Islamic that had either
7  domestic violence or some sort of violent felony charges
8  that did not get terminated from their teaching
9  positions.
10    Q. I am going to say on the record, I am going
11  to suggest we take a five-minute break and give you and
12  your attorney the opportunity to discuss whether you
13  should answer that question. Because I'll put on the
14  record, if you don't give me names, we're going to argue
15  that you can't later give us names. If you've got
16  information, we have the right to have it so we can do
17  our due diligence and check our records. You can't
18  surprise us at trial and say, yeah, here's six people I
19  know when you don't tell us now. So on this record, if
20  we don't have names, we a will assert that you don't
21  know names.
22      So let's take five minutes and go off the
23  record. You all can step out. And if that's your
24  answer, that pleases me to no end that you can't answer
25  the question. But I don't know that that's what your

Page 133

1  lawyer thinks. So I'm going to give you all five
2  minutes to talk to each other.
3      Let's go off the record.
4      (Recess taken from 2:50 p.m. to 2:57 p.m.)
5    Q. (BY MR. LEVITT) So we're back from the
6  break. Let me ask you, again, Mr. Shimy, can you
7  identify for us any persons you believe were subject to
8  criminal charges, domestic violence charges and were
9  treated differently than you?
10    A. Sure.
11    MS. MIHOK: With the premise that you're not
12  supposed to tell them anything that we talked about.
13    Q. (BY MR. LEVITT) Right. I don't want to
14  know what you and she talked about on the break. I'm
15  asking you questions. So the next question is, can you
16  please identify for us those who you believe were
17  treated differently or better than you were?
18    A. In terms of somebody who got charged with a
19  criminal charge?
20    Q. Uh-huh. We'll start there. I mean, you
21  said others were treated differently. And you
22  identified your others with similar criminal allegations
23  or sufficiently similar, but you think was treated
24  differently.
25    A. Sure. There was both on the staff level and

34 (Pages 130 - 133)

**Exhibit 1**

Page 134

1 the faculty level. The crimes varies. One of them is,
2 actually, the person I replaced in my very similar, same
3 exact position in the same exact campus here in Cocoa,
4 Business Instructor Cynthia Doaks.
5    Q. What's the name?
6    A. Cynthia Doaks.
7    Q. Cynthia?
8    A. Doaks.
9    Q. Can you -- do you how that's spelled?
10    A. Doaks, D-o-a-k-s.
11    Q. And she was a teacher here?
12    A. She was the business instructor here on the
13 Cocoa campus. She was -- actually, in my first
14 interview, she was -- I was her runner up. And she used
15 to be a staff member with accounting before she got into
16 the faculty position. But during her faculty position,
17 in terms of criminal charges, she was charged with a
18 felony and she did not get terminated.
19    Q. Do you know what the charge was or what it
20 related to?
21    A. To the best of my knowledge, it was battery
22 with a deadly weapon.
23    Q. And how did you learn of that?
24    A. I know Cynthia on a personal level because
25 we've been working together for -- since I started with

Page 135

1 the college in the business department.
2    Q. So she told you that she was charged with
3 that?
4    A. It used to be public record. I don't think
5 it is public record anymore. But, yes.
6    Q. Do you know if the college knew about it?
7    A. The college was notified as the process
8 requires. Because, I believe, the process in the
9 college, if there is any arrest or legal action taken
10 against you, you need to notify the college immediately.
11 Yes.
12    Q. Do you know -- what timeframe was that? Was
13 that before you came to the college?
14    A. It was before I took that position. You
15 know, I was still employed by the college.
16    Q. But before you became a full-time employee?
17    A. Before I became a full-time teacher.
18    Q. Okay. And, again, you have no personal
19 knowledge of the allegation; it's something she told you
20 about?
21    A. The answer is yes. And also people that
22 work close with her in my department. That became my
23 department after she left -- but also aware of the
24 incident because the college was notified.
25    Q. Anyone else come to mind that you can

Page 136

1 identify?
2    A. I don't recall the exact name because this
3 is not somebody that I know on a personal level, but I
4 know he is a Caucasian instructor. I don't recall the
5 name. He was accused of child pornography.
6    Q. How did you learn about that?
7    A. I've learned through my 10 years in eastern
8 Florida college. It's a very small community. Almost
9 like a village. Every whisper becomes -- there's no
10 secrets here. I also do know a staff member that got
11 convicted of domestic violence and continued his
12 employment with the college until he retired. But was a
13 staff member, not faculty.
14    Q. What's that person's name?
15    A. I don't recall the person's name,
16 unfortunately.
17    Q. How long ago was it?
18    A. That was over -- definitely over five years
19 ago.
20    Q. So on this last one, how did you learn about
21 it? Just rumor mill? Just people talking?
22    A. Just people talking, yeah.
23    Q. Okay. Again, it's not something you have
24 personal knowledge of?
25    A. No.

Page 137

1    Q. Do you know which administrators were
2 involved in these decisions?
3    A. I can't confirm. But in terms of answering
4 your question in terms of formal criminal allegations or
5 charges, but I know also a lot of -- or, actually, a
6 couple of teachers that are still employed or never got
7 terminated and they have complaints from students, some
8 are sexual harassment.
9    Q. So student complaints?
10    A. Student complaints or some of them dating
11 students or things that are not ethically and I don't
12 think, per the employee handbook, it allows for teachers
13 to do here in the college.
14    Q. Is there anyone else that comes to mind that
15 you haven't told us about?
16    A. No.
17    Q. Other than what we've already talked about,
18 so you've told us about your meeting and what people
19 said to you, do you have any other evidence that the
20 college did not renew you in April of 2022 because of
21 your national origin?
22    A. When you say evidence, like, physical
23 evidence?
24    Q. Any information or facts. We're interested
25 in facts. Again, you told us about the meetings, you

35 (Pages 134 - 137)

**Exhibit 1**

Page 138

1 told us about the conversation. I'm not asking you to
2 retell the story --
3     A. Sure.
4     Q. -- because you already told us. Is there
5 anything else you haven't told me that you believe would
6 show that they did not renew you because of your
7 national origin?
8     A. Nothing comes to mind.
9     Q. Same thing on religion. Is there any other
10 evidence, other than the fact that you practice Islam,
11 that we haven't talked about that would show that they
12 did not renew you because of your religion?
13     A. Nothing comes to mind.
14     Q. I think I've asked and you told me this, if
15 I recall your testimony, no one at the college,
16 Handfield, supervisors, managers, vice presidents, no
17 one has made a derogatory comment to you about your
18 religion or national origin, correct?
19     A. I can't say now because there's not a
20 particular incident that I remember. But I usually told
21 these kind of comments in terms of either curiosity or
22 somebody was trying to be friendly. But a lot of times
23 there will be microaggression. And what we did was we
24 started doing -- one of the movements that we did is, we
25 started doing once a year a microaggression event that

Page 139

1 we invite students. For one, one is for the staff, to
2 differentiate between racism and microaggression where
3 that stereotyping. People might think it's okay or
4 being friendly, but it come across the way. And we
5 actually developed a course here in the college just to
6 address particularly microaggression so it wouldn't turn
7 into racism and try to keep the campus more friendly.
8     Q. So the college was aware of that and
9 developed the courses, you said, and programs to help
10 alleviate that situation. Is that what you're saying?
11     A. This is more of a staff and faculty
12 movement. Administration was not involved in that.
13     Q. Having said that, you're, obviously, very
14 attune to that. Can you identify even a microaggression
15 that someone did to you? If that's the right way to ask
16 that. Can you identify anything specific, other than
17 saying there may have been something? Can you think of
18 a time when a supervisor or a vice president, deans,
19 Sibley, Daniels, Handfield, Flectcher ever said
20 anything, I'm using the word derogatory? In other
21 words, made fun of or harassed in some way because
22 of your religion or national origin?
23     A. When it comes to administration, no.
24     Q. Now, you've listed in some of the
25 documents -- we've asked for people who you believe

Page 140

1 might support your claim, and you've provided a list of
2 a bunch of names. Some names we've talked about, but I
3 want to be sure we know what the people might know about
4 your case.
5         So you listed Dr. Sibley. Is there anything
6 else about Dr. Sibley, other than what you already told
7 us? We understand she was the dean. She did your step
8 response. What else would Dr. Sibley know about your --
9     A. Do I have a list here? Is this the list
10 we're talking about?
11     Q. I don't know if we're looking at the same
12 one, but, yes, that would be a similar list.
13     A. On this list, that doesn't mean everybody on
14 this list is aware of the case.
15     Q. Well, I want to know if they testified, what
16 would they know about your case. So first thing, here,
17 I'll mark what I'm looking at as 16 so we call all --
18 this is the second supplemental disclosures. We'll mark
19 as 16 plaintiff's second supplemental disclosures.
20     (Deposition Exhibit 16 was marked.)
21     Q. (BY MR. LEVITT) So the first one is Sibley.
22 We know what Sibley's involvement was. Is there
23 anything about Sibley that we haven't talked about? Has
24 she made any comments to you? Any conversations?
25 Anything that you haven't already told us about with

Page 141

1 regard to Dr. Sibley?
2     A. No.
3     Q. What about Dr. Daniels? We know who he was.
4 You told us about your conversations with him, your
5 evaluations. Is there anything else about Dr. Daniels
6 that he would know about the college's nonrenewal of
7 your contract that you haven't told us?
8     A. No.
9     Q. Nicole DeCaro. Name's come up some. She's
10 department chair. Did you talk to her about your
11 nonrenewal?
12     A. She's aware of it. But we didn't talk about
13 it, no.
14     Q. Frank Christopian, what would he know about
15 your case?
16     A. Frank is the professor that overlooks the
17 bachelor program that I teach in. So he's aware of my
18 nonrenewal, but...
19     Q. To your knowledge, he was not involved in
20 the decision, was he?
21     A. No.
22     Q. Dr. Michael Cadore, what would he know about
23 your case?
24     A. I don't think Dr. Cadore knows about the
25 case. But Dr. Cadore, we worked very closely together.

36 (Pages 138 - 141)

**Exhibit 1**

Page 142

1  And he was aware of the problems that I had with my
2  ex-wife on campus.
3      Q.  Is that someone you told about the problems
4  with your ex-wife?
5      A.  Yes.
6      Q.  Who is Maggie at the library; do you know?
7      A.  In that building.
8      Q.  Who's Maggie?
9      A.  She's a librarian.
10     Q.  What would she know about why you were not
11  renewed?
12     A.  She wouldn't know why.
13     Q.  What would she know about that might help or
14  hurt your case?
15     A.  She knows my character.  She knows -- she
16  hears about my feedback.  All my students go to her.  So
17  she knows how my students talk about me or my feedback
18  of.
19     Q.  Who is Beverly Paine?
20     A.  She's a professor.
21     Q.  What would she know about your case, your
22  employment?
23     A.  Never talked about my case.
24     Q.  What would she know about your work or the
25  nonrenewal?

Page 143

1      A.  Nothing in particular in regards to this
2  case.  But she also knows my work and she has a very
3  good idea of my character and my professionalism and
4  things like that.
5      I did not share my case, as I said.  The point
6  of the case is not to bash the college.  So I did not
7  try to make it public as much as I can.  Even with the
8  people that I am very close with, like, I do have
9  friends that I still talk to until today that work for
10  the college, and they still have no idea that there is
11  such a case.  Some of them are even listed on this list.
12  But I never mention the case to them because I don't
13  want to tell after all my history with the college,
14  there is a dispute between me and the college.  So I
15  never got out of my way to make it public.
16     Q.  Who is Sharon Flectcher?
17     A.  She is a professor in my position in the
18  Melbourne campus.  She will be retiring very soon, if
19  she's not retired already.
20     Q.  What would she know about you or the reasons
21  for your nonrenewal?
22     A.  Somehow, I don't know from where, maybe from
23  Mike Daniels at the time or whatnot, that the expression
24  crazy wife came about.
25     Q.  About what now?

Page 144

1      A.  Crazy wife came about.  That -- you know,
2  that she cause a lot of issues with you at work.  And, I
3  believe that somehow, not from me, I don't know from
4  where or who, the word got out that she created problems
5  for your work because the whole department from Dr.
6  Daniels down -- Dr. Daniels is the newest one on the
7  team.  Everybody under him from Dr. DeCaro, Dr.
8  Christopian all the way down.  We've been working
9  together for a very long time and I'm the only one in
10  the entire department that did not get renewed.  So, of
11  course, they, kind of, surprised.  Why Sal, one of the
12  best team players that we have on the team, why he did
13  not get renewed.  So, I believe, that came about
14  sometime when I'm not here.  People gossip, if you will.
15     Q.  Who is Dr. Li, L-i?
16     A.  I believe that is a professor that did not
17  get renewed last year -- the year prior to mine.
18     Q.  Do you know why he was not renewed?
19     A.  He believes for the same reason.
20     Q.  Have you ever spoken to him about that?
21     A.  Not firsthand.
22     Q.  Why do you say he believes it?  How do you
23  know he believes it?
24     A.  I was told not from him.  I've never spoken
25  to him.

Page 145

1      Q.  He's Asian, you said?
2      A.  Yes.
3      Q.  He's not Lebanese or Egyptian, correct?
4  He's not middle eastern?
5      A.  Maybe he's Asian Lebanese Egyptian.  I have
6  no idea.
7      Q.  Who is the Dr. Moss -- or not doctor, Eric
8  Moss?
9      A.  Eric Moss is the director of the TRiO
10  program.
11     Q.  What would he know about you or the case?
12     A.  Again, Mr. Moss, his office used to be next
13  to mine when I was an advisor.  And we knew each other
14  very well.  And he's familiar also with my work and how
15  I got to where I was.  And he also was involved in part
16  of those gossips.
17     Q.  Part of what?
18     A.  Of those gossips.
19     Q.  Oh, gossip.  About your wife's complaints?
20     A.  (Witness nods.)
21     Q.  And Dr. Frank Campos?
22     A.  That used to be the former TRiO director.
23  He would not know anything about the case itself.  But
24  also I've work with him, collaborated with him, if you
25  will, for a very long time helping out with the TRiO

37 (Pages 142 - 145)

# Exhibit 1

Page 146

1 program. So is Joseph Porter. He was my first director
2 when I got my first full-time job. So Dr. Sidoran hired
3 me and he was right under Dr. Sidoran. But now he's in
4 UF.
5     Q. He's where?
6     A. In UF.
7     Q. University of Florida?
8     A. Um-hmm.
9     Q. Tara Gibson, what does she know about your
10 nonrenewal or your performance?
11     A. Tara Gibson was with me when we first
12 started from day one as an academic success coach. She
13 is the Titusville coach and advisor. And I believe now
14 she's here on the Cocoa campus. So we've been working
15 together from day one.
16     Q. Does she have any knowledge about why the
17 college did not renew your contract?
18     A. I'm not really sure about the why, but she
19 knows that the college did not renew my contract, which
20 was a surprise to her.
21     I'm not coercing these people to give
22 information or steer their opinion to any direction.
23 I'm just listing them because they know me well enough
24 that they can give their testimony the way it needs to
25 be given without my involvement.

Page 147

1     Q. So after you were non-renewed, did you seek
2 employment elsewhere?
3     A. Yes.
4     Q. Did you obtain any employment after you were
5 non-renewed in April of 2022?
6     A. Yes.
7     Q. Where did you work?
8     A. I was approached by the Brevard Public
9 Schools. Got recruited by them.
10     Q. What do you mean you were approached? Who
11 approached you?
12     A. Someone from the district in Viera. And
13 they encouraged me to apply for a particular position as
14 a business instructor for Brevard Public Schools because
15 a lot of my students when they used to graduate from the
16 bachelor program, some of them used to go and work as
17 teachers in elementary education. So I was encouraged
18 to apply for that position because I did not have
19 elementary or under secondary teaching certificate. But
20 they say that this particular position is under the CTE
21 program so I can qualify for it.
22     THE REPORTER: I'm sorry. Did you say the city
23 program?
24     MR. LEVITT: CTE.
25     THE DEPONENT: CTE. Sorry. I'll slow down

Page 148

1 more.
2     Q. (BY MR. LEVITT) And did you apply for work
3 with the school then?
4     A. I did.
5     Q. Did you get hired?
6     A. Yes.
7     Q. When did you get hired; do you remember?
8     A. Starting the academic year in August.
9     Q. That would be August of 2022?
10     A. Right.
11     Q. I'm going to mark as 17. I'm not sure what
12 this is. Coordinating teacher/school academies. Is
13 that the job you were applying for, or is this the job
14 description of the job you were applying for, perhaps?
15     A. No.
16     (Deposition Exhibit 17 was marked.)
17     Q. (BY MR. LEVITT) Have you ever seen this?
18     A. I would say it's related. It's close
19 enough. But this is not very specific, you know.
20     Q. Let me show you what we're marking as 18.
21     (Deposition Exhibit 18 was marked.)
22     Q. (BY MR. LEVITT) It appears to be a county
23 school board form showing that you did get employed,
24 dates of employment, things like that. Marking as 18
25 there. Is that consistent with what happened? It says

Page 149

1 start date 8/2/22, CTE. Is that the job --
2     A. CTE, yeah.
3     Q. -- with the county?
4     How much did that pay; do you remember?
5     A. It was around 50, 50 and change, something
6 like that.
7     Q. And did you have a title? Do you recall
8 what the title was?
9     A. Academy director.
10     Q. Academy director. It was a school program,
11 public school program?
12     A. Yes. I overlook the CTE teachers.
13     Q. Okay. And that was full-time employment?
14     A. Yes, sir.
15     Q. With benefits, insurance, pension, things
16 like that, holidays?
17     A. Just like a teacher, yeah.
18     Q. Okay. How long did you work for the school
19 board?
20     A. Until February of '23.
21     Q. What happened February of '23?
22     A. That's when I got arrested for my criminal
23 charge.
24     Q. And what did the school board do then?
25     A. They give me an administrative leave and

38 (Pages 146 - 149)

**Exhibit 1**

Page 150

1 they terminated my contract.
2     Q.  Did you understand it was because of the
3 arrest?
4     A.  Because I was under a probation period for
5 one year and it was because of my arrest.  Yes.
6     Q.  So you understood as probationary, they
7 could just let you go without any reason if they wanted
8 to, right?
9     A.  Yes.
10     Q.  Once you got arrested, that's what they did,
11 correct?
12     A.  Yes.
13     Q.  Notice you received, marking Exhibit 19 from
14 them terminating your employment?  Actually, that
15 appears to be a notice placing you on administrative
16 leave.  Do you see that?
17     A.  Yeah.  Yeah.  But they terminated me shortly
18 after that.
19      (Deposition Exhibit 19 was marked.)
20     Q.  (BY MR. LEVITT)  Let me show you what we've
21 marked as 20.  This termination letter; is that correct?
22     A.  Yeah.
23      (Deposition Exhibit 20 was marked.)
24     Q.  (BY MR. LEVITT)  And you understood the
25 reason for termination was the arrest that had occurred,

Page 151

1 correct?
2     A.  Yes.
3     Q.  And the arrest related to allegations
4 regarding domestic violence against your wife, correct?
5     A.  Yes.
6     Q.  Okay.
7     A.  But usually in Brevard Public Schools, when
8 you get charged with any crime regardless if it's
9 domestic violence or DUI or any criminal charge, they
10 put you on administrative leave until the case gets
11 resolved, then you get reinstated.  But if you within
12 your probationary period within the first year, they
13 cannot give you administrative leave and keep paying you
14 until the case gets resolved.
15     Q.  You didn't bring any types of claims against
16 the school district, did you?
17     A.  No.  Because it was not due to
18 discrimination.
19     Q.  It was due to the --
20     A.  The arrest.
21     Q.  -- arrest?  Okay.
22      Did you hold a Florida Teaching Certificate.
23     A.  I was applying for one.  I don't even know
24 if I got issued one or not.  But I received a letter
25 from Tallahassee that the school need to fire them over

Page 152

1 arrest.  So we cancelled the application on the
2 certificate, whatever that is.
3     Q.  So they were looking at giving you a
4 certificate --
5     A.  Right.
6     Q.  -- and then they stopped --
7     A.  Right.
8     Q.  -- processing that?
9     A.  Um-hmm.
10     Q.  Did you become aware of -- strike that.
11      You've mentioned that you'd had somewhat of a
12 history with your wife or she's made complaints against
13 you.  You're aware of that, correct?
14     A.  Hasn't stopped either.
15     Q.  Okay.  And do you recall an incident in
16 South Carolina that she called the police based on an
17 incident up there in November of 2021?
18     A.  Do you want the details of the incident, or
19 do you want -- because, yes, I do remember.  However,
20 there was a lot of incidents.  Some of them may be
21 brought to your attention.  Some of them didn't.  Do you
22 have a specific question in regards there?
23     Q.  Well, we're trying to walk a fine line.
24 We're not here to prove or disprove domestic violence or
25 whether something is true or not.  I don't think that's

Page 153

1 the place of the college or even this lawsuit.  But I
2 do -- and most of the rest of these documents relate to
3 police reports and things like that.  But I'm not
4 looking for you to admit or deny something that's
5 alleged.  I'm looking at or asking about the fact that
6 you're aware complaints were made and police did
7 investigate things like that?
8     A.  Yes, of course.  There is hundreds, if not
9 more than that between police calls and reports.
10 Probably if you call today, you'll have a hundred more.
11 But if there's a specific question I can answer.  If you
12 want me to tell you an idea of what happened in South
13 Carolina, I can.  Because I, actually, had to travel
14 back just for me to obtain more information because I
15 can tell you I'm not sure what happened.
16     Q.  Well, at this point I'm just saying you're
17 aware that a complaint was made and that police came out and
18 investigated, correct?
19     A.  Yes.  But we both called the police.  We
20 needed the police to come out so we make sure we can get
21 out of there.  So yes.
22     Q.  Okay.  And then when did your wife start
23 working for the college; do you recall?
24     A.  Probably a month prior to that report you
25 have.

39 (Pages 150 - 153)

**Exhibit 1**

Page 154

1    Q.  What was her position here?
2    A.  I don't remember the name of the exact
3  position.  But it's part time student coordinator, some
4  sort of something like that.
5    Q.  Were you aware that she was applying for
6  work here?
7    A.  Yeah.  I submitted her application myself.
8  Yeah.
9    Q.  And were you aware -- did you become aware
10  that she went to her supervisor to let her know that she
11  had claims against you, if you will, relating to
12  possible battery or domestic violence?
13    A.  A lot later.
14    Q.  When was that; do you recall?
15    A.  When she mentioned it casually without
16  giving me specifics when we had a lot of disputes back
17  and forth and a lot of police back and forth.  And
18  that's when I went to Ginger and ask her if I need to
19  file something if it's not related to the campus, but I
20  want to bring it to the college attention.  And also
21  when you filed your reply to EEOC and her complaint was
22  attached, and that's when I found out that she
23  complained her allegations to Patty.  And Patty is
24  Salvo's wife.  That's how I think things escalated from
25  that.

Page 155

1    Q.  Let me show you what we'll mark as 21.  It
2  appears to be a police report from the Myrtle Beach,
3  South Carolina situation.  Is that the report that
4  related to the incident we were talking about in South
5  Carolina?
6    A.  Sure.
7     (Deposition Exhibit 21 was marked.)
8    Q.  (BY MR. LEVITT)  And did the college -- when
9  did the college learn about this; do you know?
10    A.  I don't know.  I have no idea.
11    Q.  Did you report the incident to the college
12  when you came back?
13    A.  Did I report the incident?
14    Q.  Yeah.
15    A.  To Mike Daniels, probably.
16    Q.  Do you recall --
17    A.  I don't -- I don't -- I can't confirm or
18  deny.  I report to the -- to the -- to the college if
19  there is an injunction or an arrest or a legal pending
20  issue.  But this is -- what you're looking at here is
21  something that she does or we have on a daily basis.
22  Pretty much she was just trying to get me arrested in
23  South Carolina.  And I was able to get the cops out of
24  the hotel so we can separate because there was no way we
25  can do a 14-hour drive back in the same car.  And I gave

Page 156

1  her the option in front of the officers between taking
2  the car and my daughter leaving.  She said, no, I'm
3  staying in South Carolina.  I'm not going back.  I'm
4  like, we have work tomorrow.  So we got to decide on
5  this.  Let's get the police involved.  We'll get them
6  called out and they decide what we need to do.  And I
7  want to ask for separation.  Of course, you have to go
8  allegations.
9    So the cop, he asked me what do you want to do.
10  I'm like, whatever she wants.  She wants the car.  She
11  wants my daughter.  I can take my daughter and leave.  I
12  can leave by myself.  She can have the car.  My daughter
13  and I can fly.  I have work tomorrow and I need to be
14  back in Florida by tonight.  So she said, no, he can
15  take the car and leave.  I'm just going to stay here
16  with my daughter.  I might just stay here in South
17  Carolina.  I have -- I'm not sure what she said,
18  relatives or whatnot.  But she might not go back to
19  Florida and she doesn't care.
20    Drove back all the way down for eight or 10
21  hours.  Most of during this period of time while I was
22  teaching, I was not in my house.  I was mainly staying
23  away from her at my parents' house in Orlando.  So I
24  drove back to Orlando, guess who is there?  My parents
25  don't know anything or they're waiting for me.  Her and

Page 157

1  my daughter.  She go down and she's waiting for me there
2  to give me my daughter and leave.
3    Q.  Do you know, again, that the complaint by
4  your wife to Patty Salvo, wasn't that shortly after the
5  incident in South Carolina?
6    A.  I have no idea when she talked to Patty or
7  what did she tell Patty.  I have no firsthand
8  information on that.
9    Q.  Let me show you what we'll mark as 22.  It's
10  a report from Brevard County Sheriff dated 12/9/21.
11     (Deposition Exhibit 22 was marked.)
12    Q.  (BY MR. LEVITT)  And it's referencing an
13  incident earlier.  The sheriff was investigating an
14  incident that occurred back in October.  So the report
15  says:  Prior to arrival, I was informed the battery is
16  not in progress and had occurred in October.  So had
17  your wife gone to the Brevard sheriff's office in
18  December reporting an October incident to your
19  knowledge?
20    A.  Yes.  Of course, now I'm aware of that.
21    Q.  And for any of these, did the sheriff's
22  office ever take a statement from you or meet with you?
23    A.  Not until today.
24    Q.  When you say -- they didn't do it today?
25  You said not until today.  You didn't talk to anybody

40 (Pages 154 - 157)

Page 158

1 today?
2     A. No, not from then until today. Never --
3 never -- what they did is they filed with the state
4 attorney. The state attorney filed no information
5 twice. And then there would be, probably, another suit
6 so I don't want to give too much details because now
7 we're going to be going off subject. But a warrant was
8 issued for these allegations. And I got arrested in
9 February when I left BPS in February of 2022. And the
10 case was dismissed. And, unfortunately, we could not
11 make it to trial because we could not get depositions.
12 It was dismissed in September 2023.
13     Q. September 2023?
14     A. Yes.
15     Q. So when were you arrested for it?
16     A. 2024, sorry.
17     Q. When were you first arrested?
18     A. For this?
19     Q. Yes.
20     A. It was in February 2023.
21     Q. Okay. So after your contract was not
22 renewed here?
23     A. Yes.
24     Q. So prior to your contract not being renewed,
25 you knew there were investigations, but then there was

Page 159

1 no arrest ever made, correct?
2     A. There was few investigations. That was one
3 of them.
4     Q. Are you aware that the college security
5 office did a big investigation into various complaints?
6     A. Is that part of your reply in the EEOC?
7     Q. I'm just asking if you're aware.
8     A. Not sure. No.
9     Q. So you mentioned Ginger Davis's name. Is
10 that someone who works for the school, the college's
11 security office?
12     A. Yeah. I'm familiar with Ginger.
13     Q. And you're aware that she did an
14 investigation in January of 2022?
15     MS. MIHOK: Is that the only question?
16     MR. LEVITT: What's that?
17     MS. MIHOK: Is that the only question, is he
18 aware of the investigation?
19     MR. LEVITT: That's the current question.
20     Q. (BY MR. LEVITT) Are you aware that Ginger
21 Davis, part of the college security department, was
22 doing an investigation in January of 2022?
23     A. No.
24     Q. Did you learn this after the EEOC charge?
25     A. I'm looking at the documents to see if these

Page 160

1 are the ones I looked at or not. But these don't look
2 familiar. So no. The answer is no.
3     Q. Now, if you look at page six, there's the
4 narrative there. It says: On December 14th, 2021, I
5 was asked to get a statement from Patty Salvo. So the
6 report goes on to say December 13th of 2021 your wife
7 had confided to her that she's experienced several
8 incidences of abuse. I'm not asking you to agree to
9 that, but does that help refresh your recollection that
10 was December of '21 when your wife would have gone to
11 Patty Salvo?
12     A. Yes. That I know. I didn't know that
13 Ginger conducted an investigation. Nobody asked me any
14 questions.
15     Q. Do you know whether or not the college --
16 obviously, this is the college's security department.
17 So would you agree that the college was aware of the
18 allegations being made by your wife? True or not,
19 they're aware of the allegations and were doing an
20 investigation into those allegations prior to the time
21 they decided not to renew your contract?
22     A. I wasn't aware of this prior to the time
23 they did not renew my contract. And I did ask at that
24 meeting on termination if this is because of these
25 allegations, regardless is being investigated by the

Page 161

1 college or not, I want my side to be heard.
2     Q. Okay. And they didn't specifically tell you
3 it was, correct? When you asked Dr. Flectcher, he
4 didn't say you're right, did he?
5     A. No.
6     Q. But you brought it up and suspected she had
7 been making complaints. And you were asking him if that
8 had anything to do with their making their decision?
9     A. Correct.
10     Q. Are you aware of an investigation by the
11 Cocoa Beach Police Department into an allegation your
12 then-wife made regarding an additional incident --
13     A. Yes.
14     THE REPORTER: I'm sorry. Regarding an
15 additional incident?
16     MR. LEVITT: In January of 2022.
17     Q. (BY MR. LEVITT) I'm handing you, that's
18 Exhibit 23.
19     (Deposition Exhibit 23 was marked.)
20     Q. (BY MR. LEVITT) You were aware of your wife
21 making an allegation or complaint against you to the
22 Cocoa Beach Police Department --
23     A. Um-hmm.
24     Q. -- and that they were doing on
25 investigation, correct?

41 (Pages 158 - 161)

**Exhibit 1**

Page 162

1      A. (Witness nods.)
2      Q. Again, do you have any reason to believe --
3  strike that.
4      So this all occurred, this is -- we're talking
5  December, January, et cetera. Do you have any reason to
6  question that the college was aware of these
7  investigations and allegations?
8      A. Not that I know of at the time, no.
9      Q. Okay.
10     A. I was told by my direct supervisor if it
11  does not affect the students or anything safety, just
12  keep me informed of what you're doing or what's going
13  on, but don't bring it to security or don't bring it --
14  pretty much, just report to me. So that's why I'm
15  surprised that the college is aware of it. But I was
16  told not to report or speak.
17     Q. When was that conversation, time-wise, in
18  relationship to these allegations?
19     A. It was during.
20     Q. I'm sorry.
21     A. It was during. It was during. And I've
22  been always in communication in regards to what's going
23  on to make sure that -- pretty much, that's what she was
24  trying to accomplish. She was trying to accomplish me
25  getting fired. That's, pretty much, what she trying to

Page 163

1  accomplish. Even these allegations, you know, we can
2  turn this into a criminal court and talk about it for a
3  hundred days. These allegations, there's a lot more
4  now. Before you go to trial or mediation or dismiss or
5  whatever you're doing, there's a hundred more. Now it's
6  involving even my daughter and DCF.
7      Q. Okay.
8      A. So my point to you is, I was instructed as
9  an employee by the college that if there is any legal
10  incident that you're involved in in terms of arrest or a
11  charge or anything related to the students on campus or
12  student safety, that needed to be reported immediately.
13  Everything else, just send to your supervisor and
14  they'll handle it the way they need to handle it. So
15  he's been aware of what's going on in terms of she's
16  being, you know, vindictive.
17     Even the word vindictive, by the way, I learned
18  from this guy from Cocoa Beach. I didn't even know that
19  word. So my problem was -- that's exactly why I brought
20  it to Fletcher at the time when we had that meeting if
21  you're saying professionalism, I'm suspecting this has
22  something to do with the allegation or what's going on
23  with this woman doing to me that started working here a
24  couple months ago or a little bit ago, if that's what it
25  is, the college need to do a full investigation.

Page 164

1  Because if he were investigating something, don't you
2  have to investigate the other person? Why are you
3  assuming I am guilty? I was married and having two kids
4  before now and never had an issue. Whenever now, we're
5  separated and I can legally now I can keep her away
6  from me. I don't know. Now she's doing allegations to
7  my daughter because she can't get to me.
8      Q. So let's circle back to the very beginning
9  where we talked about your contract. You understood,
10  based on the written contracts that are exhibits here,
11  that the college had no duty to reemploy you after the
12  end of each year's contract? That was in writing. We
13  saw that, right?
14     A. I already answered that that understanding
15  the faculty, and that's, pretty much, what everybody
16  here is the contract gets renewed if you are not tenure
17  every year. If you're tenured, every three years or
18  five years depending where you at automatically unless
19  there is a disciplinary action or you have a complaint
20  from a student that need to be investigated. If these
21  two does not -- things don't apply, your contract will
22  get renewed because we don't get notified if you are
23  renewed or not. You show up in August and then you're
24  teaching and still don't have a contract until you
25  receive it.

Page 165

1      Q. But you get notified if you're not renewed,
2  don't you?
3      A. Now I know. But you're telling me my
4  understanding. I told you what my understanding is.
5      Q. But if you go back and look at the words on
6  the agreement that you signed --
7      A. No. The words -- the words on here,
8  agreement, you're saying, it does say that.
9      Q. Okay. Did you not read the agreement when
10  you signed it?
11     A. Probably not. Why would I? If I don't sign
12  it, I don't work. I have an option not to sign it?
13     Q. Yeah. You don't have to work here, right?
14  I mean, if you want to work here, you sign it. Do you
15  usually read legal documents before you sign them?
16     A. If you're saying that if I don't sign it,
17  I'm not working here, I'm signing it.
18     Q. By signing it, you're accepting the rules
19  set out in the contract, right? The contract controls,
20  doesn't it?
21     A. Yeah.
22     Q. You mentioned domestic violence or TRO, a
23  temporary injunction. Let me show you what we'll mark
24  as Exhibit 24.
25         (Deposition Exhibit 24 was marked.)

42 (Pages 162 - 165)

Page 166

1    Q. (BY MR. LEVITT) Is this the temporary
2 injunction you referenced that your wife got against
3 you?
4    A. Yeah.
5    Q. And this is -- it looks like it was filed
6 with the court February 17th, 2022, correct? If you go
7 to the top date there.
8    A. Yeah. She was served with a divorce a day
9 earlier.
10    Q. And did you report this to your supervisor?
11    A. Of course, immediately.
12    Q. And did the college do an investigation
13 based on that temporary injunction; do you know?
14    A. That's when -- I believe I covered this
15 earlier. But that's when Mr. Daniels said that he'll
16 get my classes covered until I get a modification to be
17 able to come back to the classroom.
18    Q. So when this happened, they took you out of
19 the classroom?
20    A. Well, I couldn't come back because this
21 restricted me from coming to campus, so I had no choice.
22    Q. Then you worked it out where you could come
23 as long as you didn't get near her, correct?
24    A. Right. But, for example, one day I was
25 asking for help. And that's when I was thinking about

Page 167

1 going to Ginger. And that's when I texted -- e-mailed
2 Mr. Daniels when she actually -- building five where my
3 classroom was has balconies. And if you go outside, the
4 door gets locked from the inside. And she was stalking
5 me during the injunction period that she came to the
6 office and I had to call for help from the professor
7 next door so I can make sure she gets out. That could
8 have helped with my injunction case.
9    Q. And I've handed you Exhibit 25. This is
10 part of the ongoing investigation by the college
11 security department.
12    A. Um-hmm.
13    (Deposition Exhibit 25 was marked.)
14    Q. (BY MR. LEVITT) It says report by
15 Christopher Carswell. Do you know him to be a member of
16 the college security department?
17    A. No, I'm not familiar with him.
18    Q. But, obviously, the college, as you said,
19 was aware of this temporary injunction. How long did it
20 take you to work that out?
21    A. To come back to campus? A week.
22    Q. And this is where you filed for divorce
23 against her around this time, correct?
24    A. I filed for divorce February 8th, but she
25 got served -- I believe she got served the day or two

Page 168

1 days before the injunction, yeah. That's when I filed
2 for divorce.
3    Q. Okay. You did mention there was a Capias
4 issued in 2023 where you were arrested, correct?
5    A. (No response.)
6    Q. In 2023 you got arrested?
7    A. February, yes.
8    Q. I'm going to mark as Exhibit 26.
9    (Deposition Exhibits 26 and 26A were marked.)
10    Q. (BY MR. LEVITT) This looks like it's, sort
11 of, the court Capias directing them to arrest you. Are
12 you familiar, generally, with that?
13    A. You are bringing good memories back, man.
14    Q. I'll take that as you're aware. And then
15 you were arrested shortly after that; is that right?
16    A. Yes.
17    Q. And the assistant state attorney, actually,
18 issued Capias for your arrest warrant alleging felony
19 battery great bodily harm. Is that what you were
20 charged with?
21    A. Correct.
22    Q. And just for the record, I'm going to put
23 that in.
24    Mark 27.
25    (Deposition Exhibit 27 was marked.)

Page 169

1    Q. (BY MR. LEVITT) And this goes back to the
2 allegations of October of 2021. It took them quite a
3 while to, ultimately, issue this. But based on this
4 Capias, it related to the allegations going back to
5 October of 2021. Is that what you understood?
6    A. That's based on the public records I ordered
7 from the state attorney. There was a couple of strings
8 that were pulled, yeah. Um-hmm.
9    Q. And you mentioned September of 2024 the
10 state decided not to prosecute, correct?
11    A. Correct.
12    Q. Did you ever find out why they made that
13 decision?
14    A. They don't tell you. We were supposed to be
15 on that date. She got two of my attorneys unformerly
16 (sic) charged with crimes. So my first divorce
17 attorney, she had to leave because they got her set up
18 for tampering for witness, so she had to leave the case.
19    And the criminal attorney because he was asked
20 by the family attorney to draft an affidavit for her to
21 sign based on her attorney's recommendation to resolve
22 the case. Pretty much, I give them more money, more
23 custody time. And that's, pretty much, the carrot they
24 were dangling for negotiations in the criminal case, and
25 they ended up turning around going to the state attorney

43 (Pages 166 - 169)

**Exhibit 1**

Page 170

1 and getting both attorneys off the case. So we've been
2 trying -- the reason why they issued -- other than the
3 strings that was pulled by our now-retired state
4 attorney, she came up with two witnesses that they say,
5 allegedly, that I committed this violence. And from the
6 time of arrest until the time they dropped the case,
7 we've been trying to do depositions for them and they
8 getting lame excuses every time they don't speak up
9 because one time they don't speak English, one time
10 this, one time that. So that was the deposition for the
11 third time scheduled because I wanted to go to trial. I
12 wasn't settling for any offers or making any deals
13 because that's what I wanted to do. But one day my
14 attorney that took over the case went to deposition for
15 the third time. That's what the state attorney decided
16 to do.
17     Q. Are you aware that the college reported to
18 DCF, the Department of Children and Families, the
19 potential issue involving your wife and daughter?
20     A. No.
21     Q. Were you ever contacted by DCF?
22     A. We and DCF became very regular with each
23 other because there was multiple allegations from the
24 mother.
25     Q. Do you recall when DCF first got involved?

Page 171

1     A. Not during that time. That's why I was
2 surprised to hear that.
3     Q. Did you understand somebody like the college
4 or an employer, someone with knowledge of possible abuse
5 of a child, that they're obligated to report it, turn it
6 over to DCF so they can then deal with it?
7     A. What date is that? Oh, no, let me take that
8 back. I am sorry, yes, they did. I had Sofia with me
9 full time. We were at my parents' house in Orlando, and
10 they came in and they checked. They did a full
11 investigation in regards to this incident. Speaking
12 with the witnesses that she came up with when she did
13 that charge and they came that they found allegations
14 unfounded. I do have the public record for that, for
15 their investigation. It came out unfounded.
16     Q. Let's mark this 28.
17        (Deposition Exhibit 28 was marked.)
18     Q. (BY MR. LEVITT) Let me ask you this, I
19 understand that you deny the allegations she's made
20 against you and you believe she's on a vendetta, but
21 would you agree, or can we agree that if these
22 allegations are true, that you -- it would not be
23 appropriate for the college to continue to employ you?
24     A. For the safety of the students if these
25 allegations were true, a hundred percent. I cannot

Page 172

1 disagree on that.
2     Q. Okay. Now, we talked about working at
3 Brevard Public Schools and they terminated you upon your
4 arrest. But after that, have you had any other
5 employment?
6     A. No. I've been struggling since then.
7     Q. Have you had any other sources of income?
8     A. Ride share mainly.
9     Q. Okay. Is that Uber?
10     A. It's like Uber.
11     Q. When did you work as a driver?
12     A. When I left the school, I was with Uber, but
13 then she reported me to Uber, so they closed my account
14 because I was still under investigation with the
15 criminal case. So that went out the window. So I was
16 only on unemployment for a while. And then when the
17 case is dropped, I'm getting back on my feet. I'm doing
18 a few things. Now I'm doing Lyft still, but doing a
19 couple other things.
20     Q. Did you look for employment after the
21 college terminated you, or did you figure --
22     A. With the criminal charge, it was very hard
23 to pass background check because they keep the
24 (unintelligible) for a long time. I've been trying to
25 speed up the process and get depositions done and go to

Page 173

1 trial, but I get to the point that it was at the time
2 Judge Crawford, he got in the attorneys faces, like, why
3 is it taking that long to get deposition done. So
4 almost from February of '23 to September, it was very
5 difficult to get regular employment.
6     Q. So just to clarify, did you look and nobody
7 hired you, or did you figure it's just not --
8     A. Yeah. Yeah. I couldn't pass the background
9 check. I, actually, went through process I should start
10 work. And a few of them were even in the teaching
11 field. I just can't pass a background check.
12     Q. So you would agree that once you were
13 arrested, which was 2023, until the charges were
14 dropped, even the college could not have employed you
15 during that time with that arrest hanging over your
16 head?
17     A. It's, actually, yes and no. Because what I
18 understand is, if you have allegations against you, what
19 they do is either they give you administrative leave in
20 some areas here in the college until the case is
21 resolved. And based on the outcome of the case once
22 it's resolved, they base their decision. So if you get
23 incriminated, that's when they can make their decision
24 to terminate you. But if you don't get incriminated and
25 the case gets dismissed or the charges get dismissed,

44 (Pages 170 - 173)

# Exhibit 1

Page 174

1 then it should not affect your employment.
2      Q. But during that time, you would not be
3 employed, correct?
4      A. That's what I said.
5      Q. Right.
6      A. No, you would be employed, but it would be
7 pending on the -- you would be working pending on the
8 results of the charges.
9      Q. Are you familiar with level two screening
10 under Florida law?
11      A. I wouldn't go to that.
12      Q. I'm sorry?
13      A. No, I wouldn't go down that I'm familiar
14 with it. No.
15      Q. Okay. So do you know, and if you don't,
16 that's fine, if you got arrested for domestic violence,
17 under the statute, could the college even continue to
18 employ you as a teacher instructing students?
19      MS. MIHOK: Are you asking the legal basis?
20      MR. LEVITT: I'm asking if he knows. If he
21 doesn't --
22      A. You know that I got arrested twice, not
23 once. The first time I was with the college as a
24 teacher and I reported the arrest to the college.
25      Q. To who?

Page 175

1      A. To my direct supervisor, Dr. Sibley, which
2 she forwarded immediately to Dr. Fletcher. He was the
3 VP at the time and I was teaching through the charges
4 until dropped. And once it's dropped, they even renewed
5 my contract. That was during my first contract.
6      Q. Okay.
7      A. That's when the problems started with this
8 woman.
9      Q. So even after you got arrested, charges were
10 dropped pretty quickly within a few weeks, weren't they?
11      A. No, not a few weeks.
12      Q. How long?
13      A. I don't know exactly. I don't recall. But,
14 pretty much, what I was corresponded from administration
15 that -- because what happened when I got arrested, I had
16 a class next day. So, obviously, people were looking
17 for me. It was, like, there's students here, he don't
18 show up to work. That was the only time in the entire
19 time I never showed up to work. And that's when they
20 know that I'm not available. And I reported once I got
21 out to Dr. Sibley who reported Dr. Daniels. She said
22 we'll keep this on. Don't talk to this -- about this to
23 anybody. Don't bring that business into the school,
24 just maintain your classes. And Dr. Fletcher and I
25 will make a decision to continue your employment or your

Page 176

1 teaching. Because I was nervous I got arrested, it was
2 like, do I lose my job. What happened.
3      Q. Who is telling you this?
4      A. Dr. Sibley, who was my direct supervisor at
5 the time. She was the provost of Cocoa campus. And she
6 said, no, pending, you know, the results of your
7 allegations, that's when the college will make that
8 decision. But as long as these are just allegations and
9 you're not incriminated or you're not convicted, these
10 are just allegations. You just come to the college,
11 do your job, be regular and try to stand back on your
12 feet. And that's what happened the first time.
13      This time I wasn't even arrested. This is some
14 time somebody who came to the supervisor who happens to
15 have the last name Salvo and security saying
16 allegations. And she just started the college literally
17 just for that and once she accomplished what she wanted,
18 she still working at the college today, absolutely not.
19      Q. All right. So Dr. Flectcher was the vice
20 president then, wasn't he?
21      A. He was literally just started. So at that
22 time, he was not making these sorts of decisions that he
23 made a year later.
24 (Whereupon, Darla Ferguson reentered the deposition.)
25      Q. (BY MR. LEVITT) Who made the recommendation

Page 177

1 to give you another contract after that in '21?
2      A. I don't know who makes the recommendation.
3 It's based by evaluation. My evaluation goes from the
4 provost to the VP. And based on the evaluation, they
5 decide this person will stay in this job or not, or they
6 need a disciplinary action.
7      Q. He may have been new, but wasn't he the VP -
8      A. Yes, he was.
9      Q. -- at the time?
10      So he would have been the one to make the
11 recommendation to the president, right?
12      A. Sure. I would assume so. I don't know, but
13 I would think so.
14      Q. Do you know if he was aware of your arrest
15 or the issues with your wife then?
16      A. I had no communication with him. But, of
17 course, I was notified that he is aware of my arrest
18 because he has to get notified. But who beyond that got
19 notified, I don't know. What I did was I notify my
20 supervisor. My supervisor notify him. That's what I
21 know.
22      Q. Let me ask you this, if the college wanted
23 to not renew you because of your national origin or
24 religion, they could have done that in 2021, right?
25 They had the reason then, the arrest, to not renew you,

45 (Pages 174 - 177)

# Exhibit 1

Page 178

1 correct?
2      A. Sure.
3      Q. But they didn't chose to do that; they gave
4 you another contract, right?
5      A. Sure.
6      Q. So why do you believe in the next year that
7 they didn't renew you because of your religion or
8 national origin?
9      A. Why not?
10      Q. That doesn't answer my question. They
11 didn't do it the year before. They knew your national
12 origin and religion the year before and they renewed
13 you, correct?
14      A. Yes.
15      Q. They hired you as a full-time instructor
16 knowing your national origin and religion and they hired
17 you, right, just the year before?
18      A. That's correct.
19      Q. Why would they hire you knowing your
20 religion and national origin with the intent to fire you
21 a year or two later due to your national origin or
22 religion?
23      A. It doesn't make any sense.
24      Q. It doesn't make any sense, does it?
25      A. No.

Page 179

1      Q. But what does make sense is in '22 your wife
2 had an injunction against you and you were under
3 investigation for ongoing allegations of domestic
4 violence, correct?
5      A. And more.
6      Q. And more. Is there currently any type of
7 injunction between your wife and you?
8      A. Unfortunately, no.
9      Q. Have you ever sought one against her?
10      A. I'm sorry.
11      Q. Have you ever filed against her?
12      A. Yes.
13      Q. Have you ever got one?
14      A. No.
15      Q. You mentioned you were on unemployment for a
16 while after Brevard Schools; is that right?
17      A. Yes.
18      Q. And are you ever on any other type of
19 welfare program?
20      A. Right now food stamps.
21      Q. Do you have any job now that's giving you
22 any income now?
23      A. Ride share.
24      Q. Approximately, and I'll get tax returns,
25 but, approximately, how much do you make doing ride

Page 180

1 share?
2      A. It depends on the week, three to 500 a week.
3      Q. And do you try to do that full time or you
4 just do it as you feel like it?
5      A. No. I just drive as much as I can to make
6 that.
7      Q. Do you have any other outstanding
8 applications? Now that charges have been dropped, have
9 you applied for any other full-time work?
10      A. Yes, I do have few offers.
11      Q. You have offers. Who do you have offers
12 from?
13      A. The one I might take is with the Marriott.
14 It's with real estate sales.
15      Q. What type of job is that?
16      A. Real estate sales.
17      Q. Real estate?
18      A. Sales.
19      Q. Sales. And what's the income associated if
20 you do take that?
21      A. Commission based.
22      Q. Let's see, have they talked to you about
23 anticipated income?
24      A. Usually between a hundred to 150 a year.
25      Q. Any other jobs you've been offered?

Page 181

1      A. This is the one I'm considering most. But I
2 do have jobs in insurance, offers in insurance for 15 to
3 $20 an hour. I do have offers from tutoring online for
4 $19 an hour. I do have offers from -- most of the other
5 stuff is also commission based, but these are the ones
6 I'm considering.
7      Q. Have you sought a job back with Brevard
8 County schools?
9      A. No. I'm not looking to go back with BPS,
10 no.
11      Q. Have you sought -- have you done any adjunct
12 instructing?
13      A. No.
14      Q. Have you sought employment doing adjunct?
15      A. I didn't apply for any adjunct instructors.
16      Q. Have you applied for any full-time
17 instructing positions with any institution?
18      A. No. Within here or anywhere?
19      Q. What's that?
20      A. Within any institution or here?
21      Q. No, any college.
22      A. No.
23      Q. I mean, you've talked about Orlando, you've
24 get colleges there. You've got --
25      A. No.

46 (Pages 178 - 181)

**Exhibit 1**

Page 182

1    Q. -- state colleges, things like that.
2        You've never applied to Valencia, UCF, or
3  anything like that?
4    A. No.
5    Q. Are there any other people you think might
6  have knowledge about your case or the reason the college
7  did not renew you that we have not already talked about?
8  We talked about a lot of people. I asked you about a
9  lot of people.
10   A. Yeah.
11   Q. Is there anybody else that comes to mind as
12 you're sitting here today that say, oh, so and so might
13 know about my case? Anybody else?
14   A. Like, in terms of potential witnesses?
15   Q. Yeah. Just best you can recall.
16   A. I don't think so.
17   Q. Are there any other facts or evidence, facts
18 are evidence, that we have not talked about that you
19 think go to the college's reason to not renew your
20 contract?
21   A. Nothing that I can think of except that the
22 only thing that's not related to this is discussing old
23 allegations and what's going to happen with those
24 allegations next, but this is an ongoing process.
25   Q. You're living with who again now?

Page 183

1    A. Suzzie.
2    Q. Suzzie.
3    A. Suzzie and my daughter ███.
4    Q. Does she work, Suzzie?
5    A. Um-hmm.
6    Q. What does she do again?
7    A. Yes.
8    Q. What does she do?
9    A. She works at the sheriff's office in
10 Titusville.
11   Q. How are you supporting yourself and your
12 family, through her income and whatever income you're
13 bringing in?
14   A. Through her. Me and my parents are helping
15 out. They gave us a place to live, you know.
16   Q. So was it common knowledge back in '22 among
17 your colleagues in your department that they were aware
18 your wife was making allegations against you, correct?
19   A. Never bought my personal life into campus,
20 ever. This all happens that this gossip started. They
21 found out on their own. I don't even know where, but,
22 most likely, somebody in security or whatever. That was
23 after my contract was terminated and they were, kind of,
24 puzzled why my contract was not renewed. I never
25 brought this to campus regardless of what it is.

Page 184

1        There was one time I came here driving from
2  Orlando to do my class at nine o'clock in the morning,
3  and I found my three-month daughter in my parking spot,
4  alone in the car seat unattended. Never proved that.
5  Nobody knows about it. I took care of my daughter. I
6  make sure I take care of her and I still did not miss
7  class.
8    Q. Some of the people you identified, though,
9  who you worked with, I thought you said, testified they
10 knew your wife was making allegations?
11   A. Some of them, kind of, know the details
12 after the fact of when I did not get renewed. And some
13 of them, they know during. So depends who is it, yes.
14 But, in general, I don't bring my issues into campus
15 because it's not -- I thought it was not the right thing
16 to do. But the fact that you showed me that security
17 was doing an investigation and I was not part of it or
18 not -- did they ask me any questions or bring the
19 reports that I have in terms of the police reports or
20 other issues, you can just check how many places this
21 woman is trespassed from. She's even trespassed from
22 the daycare where my daughter used to go. So that shows
23 you behavior and pattern versus an employee that the
24 college had for 10 years to simply try to get his side
25 of the story during investigation. So I'm not sure how

Page 185

1  you would call investigation if they're only
2  investigating one side. I'm not happy with that. That
3  was the reason why. But at the time I wasn't even
4  arrested.
5    Q. All right. Let's take a break. Let me look
6  through my notes.
7    A. Are we not done yet?
8    Q. We may be. We're awful close.
9    (Recess taken from 4:17 p.m. to. 4:31 p.m.)
10   Q. (BY MR. LEVITT) A couple random catchups
11 here. You mentioned just in passing your daughter being
12 in a car seat in the parking lot. What was that?
13   A. When? When? I don't remember the nature.
14   Q. I'm not sure I understand what you said or
15 what happened.
16   A. What I'm saying at the time was that I was
17 trying not to bring any of my personal issues to campus
18 or my professional work. There was many, many incidents
19 that happened while she's employed by the college that I
20 could have brought to campus. And one of those
21 incidents is in December and, I believe, December 6th,
22 if I don't recall, around the same time she was doing
23 all these allegations stuff. She had my daughter that
24 day. And the deal was, I used to teach and work at the
25 opposite times of her part-time hours. So what I used

47 (Pages 182 - 185)

# Exhibit 1

1  to do when I was trying to get separated and being away
2  from her is, I would go to the house, watch my daughter
3  until she finishes work.  Then when she comes back, I
4  leave and I come to work.  So one day she was just
5  having this moment of outburst.  I drove -- I used to
6  park at the same spot most of the time by my building.
7  And I drove in and what I see in my parking spot is my
8  daughter, a three-month old, in her car seat.
9        Q.  A car seat sitting in the spot?
10       A.  In my spot.
11       Q.  Not in the car, but just the person?
12       A.  In the parking spot.  I really didn't know
13  what to do.  My daughter was in it with her bottle.  So
14  I took my daughter because I know what she did and what
15  she was trying to do is just cause problems at work and
16  make sure I don't attend to my students and my class.
17  But luckily, I usually arrive a little bit early to go
18  to my office and get myself ready for the classroom.
19  What I did is, I took my daughter in the car and I was
20  able to make arrangements for her during the couple of
21  hours I had class.  And I went, I finished my class and
22  I got my daughter.  This is just an example of what the
23  things that I was encountering to make sure it does not
24  affect my work or my students.
25       Q.  Did you report that to anybody?

1        A.  Not to security.  But I -- I did -- at the
2  time the only person that was available in the
3  building -- I forgot who, it was one of the professors.
4  And I made sure that she just open the classroom for me
5  to make sure that the students come in whoever comes in
6  early -- because usually I open the class a little bit
7  early -- until I got arrangement for my daughter and I
8  came back.
9        Q.  You did not report it to security --
10       A.  No, I did not.
11       Q.  -- or anyone at the college?
12       A.  No.
13       Q.  Or even law enforcement?
14       A.  The only reason I did not because her job
15  was new.  She was still under the work authorization.
16  Everybody was telling me you should have called DCF, and
17  this and that.  But unfortunately -- and that's why I
18  went far with these allegations the way it went because
19  I should have took the initiative and reported it, but I
20  never did.
21       Q.  Now, when you were first arrested that first
22  time you were talking about, that was in early '22,
23  correct?
24       A.  '22, no.
25       Q.  That was '21.  I'm sorry.  The year before?

1        A.  Yes.
2        Q.  Your wife was not working here at the time,
3  correct?
4        A.  No.
5        Q.  So there's no issue with you being on campus
6  and her being on campus?  That was not going on at that
7  time?
8        A.  That was not part, no.
9        Q.  But in '22 when she's making these
10  allegations, she's now working --
11       A.  Correct.
12       Q.  -- here?
13       Did you ever file any type of -- not any type --
14  did you ever file bankruptcy?
15       A.  No.
16       Q.  And you said you've never been part of any
17  lawsuits?  You've not been sued for collections or
18  anything like that, right?
19       A.  The only time that I was aware of me being
20  part of that, it was -- I was a co-signer for a loan for
21  my ex-wife Shelly.  And then during the divorce, she got
22  behind and I believe they filed something, but it got
23  settled.  But I was a co-signer.
24       Q.  All right.  Now, with regard to your claim
25  in your lawsuit, you are claiming damages.  What do you

1  expect to get out of this lawsuit?  What do you think?
2  What's the remedy in this lawsuit as you understand it
3  or think?
4        A.  I was hoping to get reinstated to my
5  position.
6        Q.  And any other damages?  What type of damage?
7        A.  My goal is, since I filed the grievance
8  until today is for the college to rectify what they can
9  see is a mistake, if they will, if they ever will and
10  just give me my life back, my position.
11       Q.  Have you -- I know we talked about, you
12  know, teaching and things like that, but have you
13  suffered any specific physical ailments or anything like
14  that associated with not being employed here?
15       A.  Other than the depression and the
16  psychological damage, of course, you know.  Financially,
17  it's been difficult, but I was able to go on PBS.  I
18  was, actually, making similar money there.  But after
19  the arrest, that went away.  So it made things a lot
20  difficult.
21       Q.  Of course, you understand the college didn't
22  get you arrested?
23       A.  No, of course not.  No, of course not.  A
24  hundred percent, no.  That is all on me.
25       Q.  Okay.  You mentioned depression.  My ears

48 (Pages 186 - 189)

**Exhibit 1**

Page 190

1 perk up when I hear that. Have you ever sought
2 treatment for depression?
3      A. Yes, I did. And it just -- it's hard when
4 you -- when you think your job and not making a job,
5 taking it to heart, and relationships, and your
6 relationship with the students. It was very hard for me
7 not to be on campus anymore.
8      Q. The question was, did you ever seek
9 treatment for depression. So let me clarify. Have you
10 ever been to a doctor for depression, sought counseling,
11 been to a psychiatrist, anything like that?
12      A. Mainly my just (sic) physician.
13      Q. I'm sorry.
14      A. Mainly my physician. I tried to get into
15 counseling, but it was very hard at that time because my
16 insurance was -- like, I was not an employee here
17 anymore, so I can't go to EAP or something like that.
18 So I did not see a counselor at the time. But I did
19 talk to my physician about it. Yeah.
20      Q. Well, you had insurance through the public
21 school system, right?
22      A. No. I'm talking about during my
23 termination.
24      Q. Well, you got employed right afterwards.
25      A. Yeah. Yeah. I do see a psychiatrist. And

Page 191

1 I'm going to be seeing a counselor, yes.
2      Q. You say you did see a psychiatrist?
3      A. Um-hmm.
4      Q. When did you start seeing a psychiatrist?
5      A. A few weeks ago.
6      Q. Imagine that? Who suggested you see a
7 psychiatrist?
8      A. My physician.
9      Q. So how often -- first of all, I'm going
10 through the interrogatories. Did you disclose any
11 medical doctors to us? Are you seeing any medical
12 doctors? Let me find that.
13      A. Yes, I did, Andrea.
14      Q. Looking at Exhibit 14, you were asked to
15 identify any medical people you're seeing and you
16 identified Health First, comma, Andrea, comma, Merritt
17 Island. So --
18      A. Right.
19      Q. -- who is Andrea?
20      A. That is the physician that I see in Merritt
21 Island. I forgot her last name.
22      Q. So she's -- it's all the same person, right?
23 You see one physician?
24      A. Now I see somebody else.
25      Q. Okay. Health First, is that Andrea?

Page 192

1      A. Yes.
2      MS. MIHOK: If I could, Mark. It's a P. A.
3 It's physician assistant.
4      Q. (BY MR. LEVITT) What type of practice is
5 that, do you know, that she's with?
6      A. I'm not really sure. I don't understand the
7 question.
8      Q. Is she with a doctor's office? Is she by
9 herself?
10      A. Health First. Health First is a big
11 organization.
12      Q. Right.
13      A. It's like a mini hospital kind of thing.
14      Q. Right. So is she at a clinic of some kind?
15      A. Yeah. She works in that clinic, yes. It's
16 a facility that they cover a lot of different things.
17 It's like a small mini --
18      Q. When did you first see her?
19      A. A couple years ago.
20      Q. In relationship to be non-renewed, were you
21 seeing her before while you were employed at the
22 college?
23      A. No. Before I was seeing a doctor that
24 retired. He was in Rockledge, Dr. Person (ph.)
25      Q. Okay. So, approximately, when did you start

Page 193

1 seeing this doctor?
2      A. I got my Health First when I left BPS, a
3 year -- what year is this? '25. I would say in 2020 --
4 end of 2022.
5      Q. Were you employed at Brevard Public Schools
6 at the time of after?
7      A. I don't remember.
8      Q. You don't remember if you were employed when
9 you --
10      A. No. I don't remember when I saw her. I saw
11 her when I was employed or after I was employed.
12      Q. Did you have insurance to see her?
13      A. Health First. It's Health First insurance.
14 Yes.
15      Q. And who did you have that insurance from?
16      A. I just applied for it.
17      Q. So it wasn't the school system's insurance?
18      A. No. I don't think I've ever used the school
19 system's insurance.
20      Q. All right. And what did you go see her for?
21      A. She's my general doctor. So I see her for
22 my yearly checkups. And that's when she talks to me
23 about things I need. But nothing in particular,
24 other than that.
25      Q. Do you suffer from any particular health

49 (Pages 190 - 193)

**Exhibit 1**

Page 194

1 problems or conditions?
2      A.  No.
3      Q.  Not diabetic, high blood pressure,
4 cholesterol?
5      A.  Just cholesterol.
6      Q.  Just cholesterol.  Are you on cholesterol
7 medicine?
8      A.  Unfortunately.
9      Q.  How long have you been on cholesterol
10 medicine, from your prior doctor?
11      A.  Yeah.
12      Q.  So even while you were employed here, you
13 were on cholesterol medication?
14      A.  Yes.
15      Q.  Has anything changed since you've been
16 employed here with your physical health?
17      A.  Not that I know of.
18      Q.  And so tell me about the conversations with
19 her about your mental health.
20      A.  In what way?  In what regard?
21      Q.  You said you were depressed.  So did --
22      A.  Yeah.  She --
23      Q.  -- you talk about being depressed?
24      A.  Yeah.  She --
25      Q.  What did you tell her?

Page 195

1      A.  That, you know -- about what I -- how I'm
2 feeling in terms of being blue or depressed, insomnia
3 sometimes.  Things along this nature.  So I don't like
4 taking medications.  So she recommended different types
5 of medications.  But I told her let me try to see if I
6 can ride it out before I start getting on something
7 specific, so...
8      Q.  And how many times have you seen her?
9      A.  Three times, probably.
10      Q.  And which times did you talk about
11 medications?
12      A.  The first time after I told her I'm
13 managing.  So I never got on medication.
14      Q.  So after that, you told her you were
15 managing and you didn't need medication, correct?
16      A.  Correct.
17      Q.  Do you recall what medications she talked
18 about?
19      A.  I wouldn't know that.
20      Q.  What were the symptoms, if you will, that
21 you were having that caused you to talk to her about
22 this?
23      A.  There was -- with a lot of stuff that's
24 going on in my life, I feel like I'm not able to get
25 proper sleep, anxiety, feeling down, not feeling good

Page 196

1 about yourself, these type of things.
2      Q.  Would you agree that the problems you were
3 having with your wife were a pretty good part of that?
4      A.  Sure, of course.
5      Q.  And your kid?
6      A.  Of course, a hundred percent.
7      Q.  Finding your kid in the parking lot?
8      A.  It's not all on the college, if that's what
9 you're...
10      Q.  And then you said a couple weeks ago you saw
11 some other doctor?
12      A.  That one is funny because I started taking
13 ███ to therapy.  But the inconsistency with
14 timesharing makes it very inconsistent.  So, finally,
15 when the mother left back in November, I know I have
16 ███, at least, until May.  And so that's a good, solid
17 six months.  So DCF helped getting her counseling.  I
18 take her there weekly to these counseling appointments.
19 And DCF recommended that I should look into it as well,
20 you know.  Because they came to the house with no --
21 interaction with the counselor is consistent now.  They
22 understand that this is an ongoing situation.  So they
23 also referred me and recommended that I should also seek
24 the same thing.
25      So I went to my first appointment a few weeks

Page 197

1 ago, like I told you.  Plus I don't think it's related
2 to our meeting today.  But I follow the instructions.
3 But what happened was, I find out it was a psychiatrist,
4 not a counselor.  And when I met her, she scheduled me
5 for an hour and I have no arrangement for ███ except
6 for today.  ███ is with me every day.  She does not go
7 to a daycare.  So Sofia was with me.  So I wasn't very
8 comfortable having a conversation with her.  I told her,
9 I just came to make sure I don't lose my spot, but I
10 really don't have arrangements for ███.  And I think
11 that is not the proper way to have a conversation while
12 I have my three-year old.  That's when I found out it's
13 a psychiatrist, not a counselor.  But after we talk a
14 little bit, she recommended counseling.  And she
15 recommended medication as well for depression, but I
16 told her, you know, I would -- she did write me a
17 prescription.  But I told her I will get the
18 prescription, but I'm not sure if I will take it or not.
19 Let's do another follow up, you know, to see if I can
20 handle well without medication.  I don't want to get on
21 medication.
22      Q.  Do you recall what she prescribed?
23      A.  My phone is off.  I have it off for this
24 meeting.  But CVS should have it on there, but it's
25 something related to antidepression.  An antidepression

50 (Pages 194 - 197)

**Exhibit 1**

Page 198

1 type of thing.
2      Q. Did you ever fill it?
3      A. I did. I picked it up, but I never took it.
4      Q. Do you have another appointment with the
5 psychiatrist?
6      A. I have another appointment with that
7 psychiatrist to follow up to see how am I doing with or
8 without medication. And I do have a counselor set up
9 finally. Because now I do have the state Medicaid or
10 Medicare. I don't know the name of it, whichever one I
11 got for my daughter, and that's what I have for
12 insurance now. So it's very difficult to get in
13 quickly. Usually, it takes months to get those
14 appointments. So I do have it sometime in March.
15      Q. And this was the recommendation of DCF, you
16 said?
17      A. Yeah.
18      Q. What is the name of the psychiatrist; do you
19 recall?
20      A. It's here in Rockledge. I don't remember
21 the name. No, I don't.
22      Q. I'm going to ask you and your counsel to
23 please supplement your answers so we have current
24 information as to doctors you've seen, okay?
25      MR. LEVITT: Melissa, if you'll do that, or we

Page 199

1 can do a formal request, but I think you have a duty to
2 supplement and he's got a new doctor, so you didn't
3 disclose that in these interrogatories.
4      THE DEPONENT: That was after that.
5      Q. (BY MR. LEVITT) That's what I'm saying, her
6 duty to supplement.
7      A. Sure.
8      Q. So we would like to have their name. And
9 more specific, the name of Andrea, as far as her last
10 name, address, so we can get records if we deem that
11 appropriate.
12      So at this time, no medication. You haven't
13 seen the counselor yet. You went to a psychiatrist
14 once, all recommended by DCF, correct?
15      A. Um-hmm.
16      Q. That's a yes?
17      A. Yes.
18      Q. And are there any other doctors you've seen
19 in the last year or two?
20      A. Yes. I'll have to get you that in the
21 supplement because I only went there once. It's in Port
22 St. John here in Cocoa, but I don't remember the name.
23      Q. What was that for?
24      A. I transfer from Andrea to him now.
25      Q. Oh, okay.

Page 200

1      A. So now that is my physician.
2      Q. And you have had a visit with that doctor?
3      A. Yes.
4      Q. Do you have another visit scheduled with
5 that doctor?
6      A. Not soon.
7      Q. Is there any particular ailment or problem,
8 or you just established with a new doctor?
9      A. Got established.
10      Q. Anybody else?
11      A. Not that I know of.
12      Q. Been to the hospital or emergency room for
13 any reason?
14      A. No -- yes. It was -- I'm sorry. It was a
15 couple weeks ago for the flu. New Years. Around the
16 last few days of December.
17      Q. The college didn't give you the flu, right?
18      A. Let me think about that.
19      Q. All right. You did say you're currently on
20 Medicaid. So is that what you have through the state,
21 Medicaid?
22      A. Yes.
23      Q. And that covers you and your daughter?
24      A. Yes, sir.
25      Q. And SNAP, is that the food stamp

Page 201

1 terminology?
2      A. Yes.
3      Q. We've been here a long time. Is there
4 anything over the break or anything since you've been
5 sitting here, anything to add to any of the answers
6 you've given, or is there anything you thought about and
7 think you need to alter or revise your answers to any of
8 the questions?
9      A. Not that I know of.
10      MR. LEVITT: All right. I don't have any other
11 questions then.
12      MS. MIHOK: I just have one.
13           CROSS-EXAMINATION
14 BY MS. MIHOK:
15      Q. You were asked on direct whether or not the
16 college knew about your national origin or religion at
17 the time that you were hired. Do you know whether or
18 not they knew about your national origin or religion at
19 that time?
20      A. I wouldn't know that.
21      MS. MIHOK: That's all the questions I have. He
22 will read.
23      MR. LEVITT: Well, let me just follow up on
24 that.
25

51 (Pages 198 - 201)

# Exhibit 1

Page 202

1        REDIRECT EXAMINATION
2  BY MR. LEVITT:
3        Q. So even at the time of your nonrenewal, you
4  don't know if they knew your national origin or
5  religion, right?
6        A. True.
7        MR. LEVITT:  That's all.  We will order.
8        THE REPORTER:  Do you want a copy?
9        MS. MIHOK:  Not yet.
10       THE REPORTER:  Okay.
11       MR. LEVITT:  Thank you, sir.
12              * * * * * *
13       WHEREUPON, the within proceedings were concluded
14  at the approximate hour of 4:56 p.m. on the 30th day of
15  January, 2025.
16              * * * * * *
17
18
19
20
21
22
23
24
25

Page 203

1        CERTIFICATE OF OATH
2
3  STATE OF FLORIDA:
4  COUNTY OF BREVARD:
5
6        I, Anne Marie Hamill, RPR, and Notary Public, State
7  of Florida, do hereby certify that ISLAM "SAL" SHIMY
8  personally appeared before me on January 30, 2025 and
9  was duly sworn and produced Florida driver's license as
10  identification.
11       Signed this 30th day of January, 2025.
12
13
14
15
16
17       Anne Marie Hamill, RPR
         My Commission No.:  HH 479868
18       Expires:  January 10, 2028
19
20
21
22
23
24
25

Page 204

1        CERTIFICATE OF REPORTER
2  STATE OF FLORIDA:
3  COUNTY OF BREVARD:
4
5        I, Anne Marie Hamill, Registered Professional
6  Reporter, Florida Professional Reporter, Notary Public,
7  State of Florida, certify that I was authorized to and
8  did stenographically report the deposition of ISLAM
9  "SAL" SHIMY; that a review of the transcript was
10  requested; and that the foregoing transcript, pages 1
11  through 206, is a true and accurate record of my
12  stenographic notes.
13       I further certify that I am not a relative,
14  employee, or attorney, or counsel of any of the parties,
15  nor am I a relative or employee of any of the parties'
16  attorneys or counsel connected with the action, nor am I
17  financially interested in the action.
18
19  DATED this 13th day of January, 2025.
20
21
22
23       Anne Marie Hamill, RPR
24
25

Page 205

1  MELISSA CHRISTINE MIHOK, ESQUIRE
   Mmihoklaw@gmail.com
2
   February 13, 2025
3
   RE:  ISLAM "SAL" SHIMY v EASTERN FLORIDA STATE COLLEGE
4  BOARD OF TRUSTEES
5  (1-30-25/ISLAM SHIMY/7114112)
6
7        The above-referenced transcript is available for
8  Review.
9        (The witness/You) should read the testimony to
10  verify its accuracy.  If there are any changes, (the
11  witness/you) should note those with the reason
12  on the attached Errata Sheet.
13       (The witness/You) should, please, date and sign the
14  Errata Sheet and e-mail to the deposing attorney as well
15  as to Veritext at Transcripts-fl@veritext.com and copies
16  will be emailed to all ordering parties.
17       It is suggested that the completed errata be
18  returned 30 days from receipt of testimony, as
19  considered reasonable under Federal rules*, however,
20  there is no Florida statute to this regard.
21       If the witness fails to do so, the transcript may
22  be used as if signed.
23            Yours,
24            Veritext Legal Solutions
25  *Federal Civil Procedure Rule 30(e)/Florida Civil
   Procedure Rule 1.310(e).

52 (Pages 202 - 205)

**Exhibit 1**

Page 206

1  ISLAM "SAL" SHIMY v EASTERN FLORIDA STATE COLLEGE BOARD
   OF TRUSTEES

2

   (1-30-25/ISLAM SHIMY)

3

              E R R A T A  S H E E T

4

5  PAGE_____ LINE_____ CHANGE_____

6  _____

7  REASON_____

8  PAGE_____ LINE_____ CHANGE_____

9  _____

10 REASON_____

11 PAGE_____ LINE_____ CHANGE_____

12 _____

13 REASON_____

14 PAGE_____ LINE_____ CHANGE_____

15 _____

16 REASON_____

17 PAGE_____ LINE_____ CHANGE_____

18 _____

19 REASON_____

20

21 Under penalties of perjury, I declare that I have read

22 the foregoing document and that the facts stated in it

23 are true.

24 _____     _____

25      ISLAM "SAL" SHIMY       DATE

Veritext Legal Solutions
800-726-7007                                          305-376-8800