```
                                                              Page 1

 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                    ORLANDO DIVISION
 3          CASE NO.:  6:23-cv-01869-RBD-DCI
 4    ISLAM "SAL" SHIMY,
 5         Plaintiff,
 6    vs.
 7    EASTERN FLORIDA STATE
      COLLEGE BOARD OF TRUSTEES,
 8
           Defendant.
 9
10                DEPOSITION OF NICOLE DECARO
11              Taken on Behalf of Plaintiff
12
      DATE TAKEN:    FEBRUARY 20, 2025
13
      TIME:          3:03 P.M. - 3:21 P.M.
14
      PLACE:         ALL PARTIES APPEARED REMOTELY
15
16
17
18
19
20
21
22
              Examination of the witness taken before:
23
                     Amanda L. Daniel-Ennis
24                 Stenographic Court Reporter
25
```

Page 2

```
 1              APPEARANCES
 2
    Counsel for Plaintiff:
 3
      MELISSA MIHOK, ESQUIRE
 4    Mihok Law
      1401 East 22nd Avenue
 5    Tampa, Florida 33605-1837
      melissa@mihoklaw.us
 6    (813)549-4550
 7
    Counsel for Defendant:
 8
      MARK LEVITT, ESQUIRE
 9    Ford Harrison, LLP
      300 South Orange Avenue, Suite 1300
10    Orlando, Florida 32801-3379
      mlevitt@fordharrison.com
11    (407)418-2306
12    HOWARD WALDMAN, ESQUIRE
      Ford Harrison, LLP
13    300 South Orange Avenue, Suite 1300
      Orlando, Florida 32801-3379
14    hwaldman@fordharrison.com
      (407)418-2311
15
      MICHAEL RICHEY, ESQUIRE
16    Eastern Florida State College
      3865 North Wickham Road, Building 10, Room 205
17    Melbourne, Florida 32935-2310
      richeym@easternflorida.edu
18    (321)433-5559
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  WITNESS                              PAGE
 3  Called by the Plaintiff:
 4  NICOLE DECARO
 5  DIRECT EXAMINATION BY MS. MIHOK................... 4
 6  CERTIFICATE OF REPORTER OATH...................... 17
 7  CERTIFICATE OF REPORTER........................... 18
 8  WITNESS READ & SIGN LETTER........................ 19
 9  ERRATA SHEET...................................... 20
10
11
12          E X H I B I T S
13              (None)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

 1    THEREUPON, the following proceedings were had
 2  and taken at 3:03 p.m.:
 3      THE COURT REPORTER: Please raise your right
 4  hand. Do you solemnly swear or affirm that any
 5  testimony you give will be the truth, the whole
 6  truth, and nothing but the truth?
 7      THE WITNESS: Yes.
 8      NICOLE DECARO, called as a witness by the
 9  Plaintiff, having been first duly sworn, testified as
10  follows:
11              DIRECT EXAMINATION
12  BY MS. MIHOK:
13    Q. All right. Doctor DeCaro, is that correct?
14    A. Correct.
15    Q. Okay. My name is Melissa Mihok, I'm an
16  attorney that has been retained to represent Mr. Islam
17  Sal Shimy in a case that he's brought against Eastern
18  Florida State College. There will be times throughout
19  the deposition today, which should not last very long,
20  but I may refer to "the college." When I do that, that
21  means that I'm referring to Eastern Florida State
22  College, do you understand that?
23    A. Understood.
24    Q. Okay. I'm going to be asking you a series of
25  questions that I believe you may have some information

Page 5

 1  that's relevant to those questions. If you do not know
 2  the answer, you don't recall, you forget, just simply
 3  tell me that. I do not want you to guess. I don't want
 4  you to estimate. If I do, I will tell you, you know,
 5  approximately what years or approximately how much time,
 6  or something like that. If not, and you do answer my
 7  question, I will assume that you understood my question
 8  and that you're answering it truthfully based upon your
 9  personal knowledge, okay?
10      If you could please answer your questions by
11  saying yes or no as opposed to nodding your head or
12  saying uh-huh and uh-uh, because both of those look the
13  same on a transcript.
14      Also, even if you anticipate what my question
15  may be, if you could please wait for me to finish my
16  question, I will endeavor to let you finish your answer
17  before going on to the next question. We don't want to
18  talk over one another. If I do cut you off, feel free
19  to tell me to be quiet for a moment so that you can
20  finish your answer.
21      I'm not trying to trick you by any means, so if
22  I ask you a confusing question, it's because I'm not a
23  professor, I've never been a professor, so just let me
24  know that you need something rephrased, okay?
25      And finally, you are testifying today just as

Page 6

1 if you're sitting in a courtroom, and it is subject to
2 penalties of perjury; do you understand that?
3    A.  Yes.
4    Q.  Okay.  All right.  Doctor DeCaro, are you
5 employed?
6    A.  Yes.
7    Q.  Where are you employed?
8    A.  Eastern Florida State College.
9    Q.  How long have you worked there?
10   A.  Since 2013 full-time, and part-time prior as an
11 adjunct.
12   Q.  Okay.  What all positions have you held?
13   A.  Adjunct instructor, an assistant professor,
14 change to an associate professor, change to professor.
15 I've been coordinator of the entrepreneurship program,
16 department chair for business in Cocoa.
17   Q.  Okay.  So you're a department chair only over
18 business and only at the Cocoa campus; is that correct?
19   A.  I was.  I'm no longer department chair, yes.
20   Q.  What years or year were you the department
21 chair in Cocoa of business?
22   A.  I don't remember.
23   Q.  Okay.
24   A.  But I would like to add I was also program
25 manager, as well.  I forgot to put that in there.

Page 7

1    Q.  All right.  Do you know Islam Shimy?
2    A.  Yes.
3    Q.  How do you know him?
4    A.  We were faculty members under the business
5 discipline in Cocoa.
6    Q.  At any time did you evaluate Mr. Shimy?
7    A.  No, I don't recall ever evaluating him.
8    Q.  At the time that you and Mr. Shimy both worked
9 at the same campus, were you peers or were you -- was
10 one of you a subordinate to the other?
11   A.  No, we had the same peer relationship.  We both
12 reported to one person, and that was our provost,
13 Dr. Dee Sibley.
14   Q.  Are you aware of any allegations that relate to
15 Mr. Shimy having engaged in some type of battery, be it
16 domestic violence or spousal abuse upon his wife?
17   A.  Yes.
18   Q.  Okay.  How did you become aware of that?
19   A.  Because when he had not attended his class one
20 morning, we wondered where he was, and a well check led
21 to finding out that he had been taken into custody.
22   Q.  Okay.  And who asked for the well check?
23   A.  I asked for one and another individual, Patty
24 Harmon, had asked for one, because she was on campus
25 too, and she usually stopped in his class to say good

Page 8

1 morning, like she did with everybody, and then let me
2 know.
3    Q.  Okay.  And were you personal friends with
4 Mr. Shimy?
5    A.  No.  May I change something slightly?
6    Q.  Yes.
7    A.  Okay.  I didn't call for a well check.  I
8 called, I believe, a nonemergency -- either it was 911
9 or the PD, because I believe he lived in Cocoa, and I
10 said we're worried about him, the hospitals -- we called
11 the hospitals and tried to check where is he, and have
12 you heard anything, and that's when I found out when the
13 officer told me that he was taken into custody.  That's
14 to clarify.
15   Q.  Okay.  And the person that you spoke to when
16 you called the police, did they let you know what the
17 allegations were against Mr. Shimy?
18   A.  No, they -- I asked, and they said they could
19 not tell me.
20   Q.  Okay.  And when did you finally find out, if
21 ever, what the allegations were?
22   A.  I don't remember how I found that out.
23   Q.  Did you have any conversations with Mr. Shimy
24 about the allegations at any time?
25   A.  Yes.

Page 9

1    Q.  Okay.  Tell me about the first time that you
2 can recall speaking to Mr. Shimy about the allegations
3 that he had engaged in some type of battery.
4    A.  I don't remember when the circumstances were
5 that he brought it up.  He would bring it up many times,
6 and it actually was very annoying.  It was very annoying
7 in the workplace, as I found it.  He seemed to become
8 almost obsessed with constantly having negative comments
9 about the person in question, the wife or the person in
10 question, and it was constantly brought up about all the
11 negative things about this particular wife.  And my
12 response simply was this doesn't belong here, you need
13 to get help, see Dr. Sibley or go to HR, but you need to
14 get some good guidance and counseling, I'm not a
15 counselor.
16   Q.  Do you know Mr. Shimy's wife?
17   A.  No, I do not.
18   Q.  Are you aware that Mr. Shimy's wife worked for
19 the college at the same time as Mr. Shimy?
20   A.  Yes.
21   Q.  But you never met her?
22   A.  One time, briefly.
23   Q.  Okay.  What happened when you met her?
24   A.  She was in a car in the passenger seat with a
25 little baby.  They had just had a baby, and I had said

3 (Pages 6 - 9)

**Exhibit 22**

Page 10

1  to Sal I'd love to see your little girl.  And then one
2  day he said, "Do you want see the baby?"
3       I said, "Sure."
4       And then he said to come downstairs, and that
5  was it, for a very brief moment that she was holding the
6  child, and I left.  That was the only time, to my
7  knowledge.
8    Q.  Okay.  Any other conversations that you can
9  recall having with Mr. Shimy about the allegations that
10 he had engaged in assault?
11   A.  That particular one, that's the particular
12 initial custody that he was taken into when he had
13 missed class, is that what you are referring to?
14   Q.  Yes, ma'am.
15   A.  No.
16   Q.  Okay.
17   A.  No.
18   Q.  Okay.  What about after that, did you have any
19 conversations with him about any additional allegations
20 of abuse or assault?
21   A.  Basically, the conversations always turned to
22 his -- he was being victimized, he would tell me how
23 evil and mean his wife was to him, that she got a job --
24 he told me that he was hired at the college -- she was
25 hired at the college, she purposely wanted to be hired

Page 11

1  so that she can defame him and she can get him fired.
2       It was a lot of drama and I had had enough of
3  it, because it went on and on.  And I said, please, you
4  have got to get some help, this is going to affect your
5  job, it's going to affect your little girl, please do
6  something with it.
7    Q.  Okay.  And what was his response to you?
8    A.  He continued to lament about his troubles and
9  his -- you know, the cruel way that he was being
10 treated, the plot that she had, that she didn't want the
11 child, all this drama.  It was very -- I found it very
12 disheartening, and it didn't belong there.  That doesn't
13 mean we don't have compassion.  We help one another when
14 people have trouble, but it didn't seem that he wanted
15 to do anything, that was my frustration with that.
16   Q.  Did Mr. Shimy ever tell you that he did, in
17 fact, batter or abuse his wife?
18   A.  No.
19   Q.  Were you a part of any investigation into any
20 allegations related to battery or assault by Mr. Shimy?
21   A.  No.
22   Q.  Are you aware that there was any investigation
23 conducted?
24   A.  I don't understand.  Investigation conducted by
25 the college?

Page 12

1    Q.  By the college about any allegations of
2  Mr. Shimy engaging in some type of battery against his
3  wife.
4    A.  No, I would have no knowledge of that, because
5  I was not in a position of authority to have that
6  knowledge, so I would imagine it would've been given to
7  somebody above my level on the chart there.
8    Q.  Are you aware of any other full-time faculty
9  members who were accused of having engaged in some type
10 of an assault on another person?
11   A.  No.
12   Q.  Do you know, is Mr. Shimy Arab?
13   A.  Is Mr. Shimy what?  I didn't hear you.
14   Q.  Arab, A-r-a-b.
15   A.  Arabic, yes, yes.
16   Q.  Okay.  How do you know that?
17   A.  He was very proud of his culture, and when I
18 would walk by his office, sometimes he would have this
19 beautiful Islamic music playing.  And I would comment,
20 I'd say that's very beautiful, it's very melodious.  And
21 he would sometimes -- he would talk about his upbringing
22 and his background, and that was the only context in
23 which he spoke.
24   Q.  Was that something that you ever witnessed him
25 trying to keep a secret from anybody else, that he was

Page 13

1  Arabic?
2    A.  No.  No.
3    Q.  Did you ever have the occasion to observe, and
4  not in the formal sense of the word, but observe with
5  your own two eyes, see Mr. Shimy conducting a class?
6    A.  No.
7    Q.  Did you have any role in the decision to hire
8  Mr. Shimy?
9    A.  Did I have any what?  I'm sorry, decision?
10   Q.  Any role in the decision to hire him?
11   A.  I believe I sat on the hiring committee for Sal
12 Shimy, yes.
13   Q.  Okay.  And what does that entail, being on the
14 hiring committee?
15   A.  When you're on the hiring committee, you listen
16 to the candidates present whatever assignment they were
17 given to do.  So it was to pretend that we are your
18 class, and you are to do a presentation, a PowerPoint
19 presentation about either leadership or a topic of
20 marketing, whatever the discipline would warrant, and
21 that's what we would do, and then we would all listen to
22 the candidate, and we would put our votes and determine
23 which of the candidates would best fit what the position
24 was calling for.
25   Q.  Okay.  And outside of actually being present

4 (Pages 10 - 13)

Page 14

1  during the interviews, did you have any input on who was
2  hired for different positions?
3      A.  For this position?
4      Q.  Yes.
5      A.  In the end I did.  We put our votes together,
6  and then the votes would go as the process and policy
7  requires.  Then our choices are submitted to our
8  provost, which was Dr. Sibley, and Dr. Sibley would take
9  it from there.  And what happens after that, I don't
10 know.
11     Q.  Okay.  What about when a professor is not given
12 an additional annual contract, when they're non-renewed,
13 do you have any input in those decisions?
14     A.  I don't know anything about that.  If they're
15 not renewed, then they don't come back as far as --
16     Q.  I probably gave you the wrong question.  So
17 there are decisions made by the college not to renew
18 certain professors that are working on annual contract,
19 were you --
20     A.  Say that again, I don't understand.
21     Q.  Sure.  There are decisions that are made by
22 people at the college to either renew or non-renew an
23 annual contract at the conclusion of each year.  Were
24 you one of those people that was involved in that
25 decision?

Page 15

1      A.  No, absolutely not.
2      Q.  Do you know Sandra Handfield?
3      A.  Yes.
4      Q.  How do you know her?
5      A.  Oh, I've known her for years.  She's now our
6  academic vice president.  I've known her just by being
7  an employee here and the leadership positions that she's
8  held.
9          MS. MIHOK:  Okay.  That's all the questions I
10 have for you, Dr. DeCaro.  Mr. Levitt may have some
11 for you.
12         THE WITNESS:  Sure.
13         MR. LEVITT:  Give me one second to look at my
14 notes here.
15         All right.  I have no questions, Dr. DeCaro.
16 Thank you very much.
17         THE WITNESS:  Thank you.
18         MS. MIHOK:  Doctor DeCaro, in the event this
19 deposition is transcribed onto paper, because right
20 now it's in this funny little machine that you can't
21 see, but if it is transcribed onto paper, you'll be
22 given the opportunity to review that transcript to
23 make sure that the court reporter took down your
24 testimony accurately, or you can waive that right,
25 that is up to you.  Would you like to read or waive?

Page 16

1          THE WITNESS:  Yeah, I'd like to read it.  Thank
2  you.
3          MS. MIHOK:  And how should the court reporter
4  reach out to you for review?
5          THE COURT REPORTER:  If you have an e-mail
6  address, it can be your work e-mail, they will
7  e-mail you further instructions once it's ready to
8  be read.
9          THE WITNESS:  Yes, e-mail address, yes.
10         THE COURT REPORTER:  Okay.  What is your e-mail
11 then?
12         THE WITNESS:  It sounds like Decaron, it's
13 Decaron@easternflorida.edu.
14         THEREUPON, the Deposition of Nicole DeCaro,
15 taken at the instance of the Plaintiff, was concluded at
16 3:21 p.m.

Page 17

1          CERTIFICATE OF REPORTER OATH
2
3  STATE OF FLORIDA
4  COUNTY OF BREVARD
5          I, Amanda L. Daniel-Ennis, Stenographic Court
6  Reporter, and Notary Public in and for the State of
7  Florida at large, hereby certify that the witness named
8  herein appeared before me remotely on February 20, 2025,
9  and was duly sworn.
10         WITNESS my hand and official seal this
11 03/04/2025.
12
13
14 _____
15 AMANDA L. DANIEL-ENNIS, COURT REPORTER
16 NOTARY PUBLIC - STATE OF FLORIDA
17 MY COMMISSION NO. HH562828
18 EXPIRES: 7-1-2028

5 (Pages 14 - 17)

```
                                                    Page 18
 1            CERTIFICATE OF REPORTER
 2   STATE OF FLORIDA
 3   COUNTY OF BREVARD
 4        I, Amanda L. Daniel-Ennis, Stenographic Court
 5   Reporter, do hereby certify that I was authorized to and
 6   did stenographically report the examination of the
 7   witness named herein; that a review of the transcript
 8   was requested; and that the foregoing transcript is a
 9   true record of my stenographic notes.
10        I FURTHER CERTIFY that I am not a relative,
11   employee, or attorney, or counsel for any of the
12   parties, nor am I a relative or employee of any of the
13   parties' attorney or counsel connected with the action,
14   nor am I financially interested in the outcome of this
15   action.
16        DATED THIS 03/04/2025 at Brevard County,
17   Florida.
18
19   _____
     AMANDA L. DANIEL-ENNIS,
20   COURT REPORTER and NOTARY PUBLIC
21
22
23
24
25
```

```
                                                    Page 19
 1   TO: Nicole DeCaro
        decaron@easternflorida.edu.
 2
 3              March 4, 2025
 4
     IN RE: Islam Shimy v. Eastern Florida State College
 5      Deposition of Nicole DeCaro
        Taken February 20, 2025
 6      Job No. 7178143
 7
         The above-referenced transcript is ready for
 8   review.
 9        Please read the testimony to verify its
     accuracy.  If there are any changes, please note those
10   with the reason on the attached Errata Sheet.
11        Please date and sign the Errata Sheet and
     e-mail to Veritext at transcripts-fl@veritext.com, and
12   copies will be e-mailed to all ordering parties.
13        It is suggested that the completed Errata Sheet
     be returned 30 days from receipt of testimony, as
14   considered under Federal rules*, however, there is no
     Florida statute to this regard.
15
         If you fail to do so, the transcript may be
16   used as if signed.
17
         Thank you,
18
         Veritext Legal Solutions
19
20   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e).
21
22
23
24
25
```

```
                                                    Page 20
 1              ERRATA SHEET
     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE
 2
     IN RE: ISLAM SHIMY v. EASTERN FLORIDA STATE COLLEGE
 3   CASE NO.: 6:32-cv-01869-RBD-DCI
 4   DEPOSITION OF NICOLE DECARO
     TAKEN FEBRUARY 20, 2025
 5
     PAGE #/LINE #   CHANGE               REASON
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
     Under penalties of perjury, I declare that I have read
20   the foregoing document and that the facts stated in it
     are true.
21
22   _____  _____
       NICOLE DECARO                     DATE
23
     cc: Melissa Mihok, Esquire
24      Mark Levitt, Esquire
25
```